UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                              Chapter 11

WESTPORT HOLDINGS TAMPA,                            Case No. 8:16-bk-8167-MGW
LIMITED PARTNERSHIP,

WESTPORT HOLDINGS TAMPA                             Case No. 8:16-bk-8168-MGW
II, LIMITED PARTNERSHIP,

                                                    *Jointly Administered under*
        Debtors.                                    Case No. 8:16-bk-8167-MGW
_____/

**DEBTORS' MOTION FOR ENTRY OF
AN ORDER AUTHORIZING (I) THE SALE OF DEBTORS'
ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS, AND
(II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS**

        WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP and WESTPORT

HOLDINGS TAMPA II, LIMITED PARTNERSHIP, the Debtors and Debtors-in-Possession (the

"**Debtors**"), by and through their undersigned counsel, request that this Court enter an order

authorizing: (a) the sale of substantially all of the Debtors' Assets (as defined herein) free and clear

of all liens, claims, and encumbrances to Skyline HealthCare, LLC, subject to higher and better

offers; and  (b) the assumption and assignment of Contracts (as defined herein) (the "**Motion**"),

and in support thereof, state as follows:

**Jurisdiction and Venue**

        1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper in this district pursuant to 28 U.S.C. § 1408.

2.      The statutory predicates for the relief sought in this Motion include 11 U.S.C. §§ 105, 363, 365, 1107, 1108, and 1129(b); Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure; and Local Rule 6004-1.

### Preliminary Statement

3.      By this Motion, the Debtors seek entry of an order authorizing the sale of substantially all of the Debtors' Assets in connection with the sale of a continuing care retirement community to Skyline HealthCare, LLC for $53,500,000.00, or to such other prospective purchaser who may submit a higher and better offer for the Debtors' Assets at the Auction (as defined below). To ensure that the sale process is open, fair, and efficient, the Debtors have filed a separate motion seeking the approval of bid procedures (the "**Bid Procedures**").

### Background

4.      On September 22, 2016 (the "**Petition Date**"), the Debtors filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

5.      Pursuant to an order of this Court dated September 22, 2016, the Debtors' Chapter 11 cases are being jointly administered for procedural purposes only under *In re: Westport Holdings Tampa, Limited Partnership*, Case No. 8:16-bk-8167-MGW.

6.      The Debtors own and operate "University Village," one of Tampa's most established Continuing Care Retirement Communities ("**CCRC**"). Westport Holdings Tampa, Limited Partnership ("**Holdings**") owns and operates University Village (the "**Village**"), an independent living facility containing 446 apartments. Westport Holdings Tampa II, Limited Partnership ("**Holdings II**") owns the Independent Living Villas, which are commonly known as the Retirement Center at University Villages (the "**Retirement Center**"). The Retirement Center

consists of 46 apartments and condominium units clustered within a neighborhood of duplex buildings and includes a dedicated clubhouse.

7.      As a CCRC, the Debtors provide "lifecare" services to its residents, which recognize that the healthcare and residency needs vary along a continuum from independent living to full-time nursing care.   Under the "continuing care" concept, residents enter into a residency and care agreement with Holdings which requires payment of a one-time entrance fee (either prospective or deferred) and a monthly service fee.   Generally, payment of these fees entitles residents to the use and privileges of the Village for life but does not entitle the residents to an interest in the real estate or any property owned by Holdings.

8.      The Debtors' assets are encumbered by the liens of CPIF Lending, LLC, who is owed approximately $9,500,000.  The Debtors owe approximately $1.6 million to trade creditors. The Debtors owe refund claims to certain residents under matured Life Care Residence Agreements ("**LCRAs**").   Certain residents and former residents loaned money to the Debtors under a personal income protection program ("**PIP**"). As of the Petition Date, the Debtors owed approximately $9 million for matured LCRA refunds and PIP claims.

9.      The Debtors also have contingent liabilities to residents.   The contingent, unmatured potential entrance fee contract liability under the LRCAs and PIP liabilities is estimated to be approximately $32,000,000.

10.      The Debtors have determined that it would be in the best interests of their creditors and their estates to sell substantially all of their assets and to assume and assign executory contracts and unexpired leases pursuant to Sections 363 and 365 of the Bankruptcy Code.

11.      The Debtors have been soliciting offers over an extended period of time from potential purchasers.

12.    The Debtors filed these bankruptcy proceedings to effectuate a sale of substantially all of their assets.  After the filing of the petitions, the Debtors intensified their efforts to find an acceptable purchaser and to maximize the value of their assets through a sale as a going-concern. The Debtors have been seeking to obtain offers from parties willing to assume the contingent obligations to residents under PIP contracts and the LCRAs and pay sufficient consideration to pay creditors in full.

13.    The Debtors intend to sell substantially all of their assets utilized in their business operations (the "**Assets**") to Skyline HealthCare, LLC (the "**Purchaser**") pursuant to an asset purchase agreement.  At present, the Debtors have negotiated a detailed Letter of Intent (the "**LOI**") containing the material terms to be incorporated in an asset purchase agreement.  The LOI also provides for the Purchaser's acquisition of property (collectively, the "**Non-Debtor Assets**") owned by Westport Nursing Tampa, LLC ("**Nursing**" or the "**Non-Debtor**").  The Debtors intend to enter into an Asset Purchase Agreement (the "**APA**") with the Purchaser on or before November 30, 2016.   A copy of the LOI is attached hereto as **Exhibit A**.

14.    A summary of the material provisions[1] of the LOI are:

| | |
|---|---|
| Purchase Price | $78,500,000 |
| Liabilities paid from Purchase Price | Cash to Debtors – $21,500,000<br>Assumption of Liabilities – $32,000,000[2]<br>Cash to Non-Debtor - $25,000,000[3] |
| Deposit | $500,000 with an additional $500,000 upon expiration of due diligence |

[1] All capitalized terms in this paragraph, if not defined herein, shall have the meanings ascribed to them in the LOI.
[2] This is an approximate amount, to be fixed in the APA.
[3] This sum is inclusive of the MLR Shortfall Amount.

- 4 -

| | |
|---|---|
| Stalking Horse Bid | The Purchaser will serve as stalking horse bidder, subject to a comprehensive bidding process set forth in the Bid Procedures Motion, filed contemporaneous with this Motion. |
| Assets Acquired | Debtors' rights, title and interest, free and clear of all liens, claims, interests, encumbrances and liabilities, in and to, all real property, tangible personal property (including inventory), intangible personal property (including but not limited to trademarks, copyrights, or other licensing agreements), permits and licenses (to the extent transferrable), the MLR (defined below), books and records relating to the business, Contracts, residency agreements except as otherwise provided herein, and other assets identified in the LOI owned or held by Debtors (the "**Assets**"). |
| Liabilities Assumed | Purchaser will assume all obligations arising under the LRCA and PIP agreements entered into by the Debtors and all current residents, including any entrance fee refund obligations contained therein. |
| | For avoidance of doubt, Purchaser is not assuming any obligations presently owing to the former residents. |
| | Except as specifically identified in the LOI, Purchaser will assume no other liabilities of the Debtors. |
| Minimum Liquid Reserve ("**MLR**") | The Non-Debtor shall transfer to the Purchaser, out of its cash consideration, an amount equal to approximately $3,000,000.00 (the "**MLR Shortfall Amount**") to fund the current shortfall in the MLR.  To the extent the actual balance of the MLR required to be in place on the Closing Date is less than or greater than the amount of $5,000,000.00, there shall be a corresponding dollar-for-dollar reduction or increase, respectively, to the MLR Shortfall Amount. |
| Closing | The Closing shall occur no later than ten (10) days following the satisfaction or waiver (if permissible) of the conditions to Closing set forth in the Definitive Purchase Agreements (the "**Closing Date**"), which Closing Date may be extended upon the mutual written agreement of the Debtors and the Purchaser. |

- 5 -

| Stalking Horse Protection Fee | A stalking horse protection fee in the amount of $500,000.00 (the "**Stalking Horse Protection Fee**") payable to the Purchaser in the event that (a) the Purchaser remains willing, and is able, to proceed with the transactions contemplated by and is not in breach of any of its obligations under the LOI and the APA, and (b) the Assets are sold to a party other than the Purchaser. |

15.     The Purchaser is not an insider of the Debtors and neither the Debtors nor their affiliates have any interest in the Purchaser.

16.     Concurrently herewith, the Debtors have filed a motion to approve certain bid procedures (the "**Bid Procedures**") for the submission of competing bids.

## Relief Sought and Basis for Relief

**A.     Sale of Assets**

17.     The Debtors propose a sale of the Assets pursuant to the terms of the APA, subject to higher and better offers conducted in accordance with the Bid Procedures. The Assets will be sold at an auction (the "**Auction**") free and clear of all liens, claims and encumbrances pursuant to § 363(f) of the Bankruptcy Code (the "**Sale**"), except as provided in the APA, with any liens, claims, or encumbrances shall attach to the proceeds of the Sale to the same extent, validity, and priority as existed on the Petition Date.[4]

18.     This Court has statutory authority to authorize the sale of substantially all of the Debtors' Assets free and clear of liens pursuant to Section 363(f) of the Bankruptcy Code.  A trustee or debtor in possession may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

---

[4] The Debtors intend to file a plan and disclosure statement on or before November 10, 2016 which will set forth the procedures to distribute sale proceeds.

| (a) | applicable non-bankruptcy law permits sale of such property free and clear of such interest; |
| (b) | such entity consents; |
| (c) | such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; |
| (d) | such interest is in bona fide dispute; or |
| (e) | such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. |

11 U.S.C. § 365(f)(5); *In re Bryan*, 2013 WL4716194, *1 (Bankr. M.D. Ala. 2013) ("Pursuant to 11 U.S.C. § 363(f) the trustee may sell property of the estate 'free and clear of any interest in such property of an entity other than the estate,' provided any one of the five disjunctive conditions are satisfied…").  Courts usually defer to the business judgment of a debtor in deciding whether or not to authorize a debtor to sell property outside the ordinary course of business.  *See e.g., In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Mason's Nursing Center, Inc.*, 73 E.R. 360, 362 (Bankr. S.D. Fla. 1987).

19.    Section 363(b)(1) of the Bankruptcy Code authorizes a trustee or debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate" after notice and a hearing.  11 U.S.C. §§ 363(b)(1), 704(a)(1).  The standard applicable to a motion under Section 363(b)(1) of the Bankruptcy Code is whether the proposed sale serves a sound business purpose.  *In re BDK Health Management*, 1998 WL 34188241, *5 (Bankr. M.D.Fla. 1998).  To determine whether this standard is satisfied, Courts have considered:  (1) any improper or bad faith motive, (2) price is fair and the negotiations or bidding occurred at arm's length, (3) adequate procedure, including proper exposure to the market and accurate and reasonable notice to all parties in interest.  *In re Gulf States Steel Inc. of Alabama*, 285 B.R. 497, 514 (Bankr. N.D.Ala. 2002).  In this instance each of the factors are met.

20.     Subject to the terms and conditions of the APA, the Debtors, in the sound exercise of their business judgment, have concluded that consummation of the Sale will best maximize the value of the Debtors' estates for the benefit of the Debtors' creditors.

21.     In order to ensure the highest possible recovery for the Debtors' estates, the Debtors propose a competitive Auction for the sale of the Assets, as contemplated in the Bidding Procedures.  Accordingly, the Debtors respectfully assert that ample business justification exists for the Sale.

22.     Pursuant to Section 363(f) of the Bankruptcy Code, the Debtors will sell the Assets free and clear of all liens, claims and encumbrances, except those assumed in the APA.  The Debtors seek an order deeming that the contemplated Sale to the Purchaser be free and clear of all liens, claims and encumbrances.  The Debtors propose that any liens transfer and attach to the net sale proceeds with the same validity, priority, force and effect that such liens had on the Assets immediately prior to the Closing.  The Sale will result in sufficient proceeds to pay all secured claims in full, which satisfies the requirements of Section 363(f).

23.     The Debtors request that this Court find, at the hearing to consider this Motion (the "**Sale Hearing**"), that the Purchaser is a good-faith purchaser entitled to the protections of Sections 363(m) and (n) of the Bankruptcy Code.  The Debtors further request that, after the Sale Hearing, this Court enter the order approving the sale (the "**Sale Approval Order**") authorizing and approving the APA executed by the party deemed by the Court to have submitted the highest and best bid (the "**Successful Bidder**") and designating the party deemed by the Court to have submitted the second highest bid (the "**Backup Bidder**"), and authorize the Debtors' execution of, entry into, and consummation of the Successful Bidder's APA or Backup Bidder's APA.

24. The Debtors further request that the Court enter a finding that the Successful Bidder, as defined herein, constitutes a good faith purchaser of the Assets pursuant to 11 U.S.C. § 363(m) such that the reversal or modification on appeal of the sale of the Assets to the Successful Bidder shall not affect the validity of the Sale to the Successful Bidder whether or not the Successful Bidder knew of the pendency of the appeal.

## B. Assumption and Assignment of Contracts

25. By this Motion, the Debtors also seek, pursuant to Sections 365(a) and (b)(1) of the Bankruptcy Code, authority to assume and/or assign to the Purchaser all of their right, title and interest in and to the executory contracts, leases, and agreements as set forth in the APA (collectively, the "**Contracts**") free and clear of all liens, claims, and encumbrances.  The Debtors' assumption and/or assignment to the Purchaser of the Contracts is conditioned upon the approval of this Court and the closing of the transactions contemplated by the APA as well as the resolution of any objections to such assumption and/or assignment filed with the Court.

26. The Purchaser has agreed to assume all active LCRAs and PIPs, which will provide significant benefit to the residents. The Purchaser has sufficient assets to provide adequate assurance of future performance under the LCRAs and PIPs.

27. The Debtors believe that the Purchaser will be able to perform its obligations under the Assumed Contracts following the closing under the APA, and that the assumption and/or assignment to the Purchaser of the Assumed Contracts is in the best interest of the Debtors, their creditors and their estates in that it will relieve the Debtors of additional claims and obligations under the Contracts.  The Purchaser is willing to undertake performance of the Contracts upon the Closing of, and subject to the terms and conditions of, the APA, conditioned upon the Court's approval of the assumption and/or assignment of the Contracts and Closing on the APA.

- 9 -

28.     The assumption and assignment of the Contracts is a condition precedent to the sale of the Assets to the Purchaser as described in the APA.  For the reasons set forth in the Motion, the sale of the Assets is required to avoid future operating losses, defaults under the leases, executory contracts and other financial obligations relating to the Debtors' businesses, and the subsequent losses that would be suffered in liquidating the Debtors' assets.

29.     The Debtors have performed or will have performed all conditions precedent to the assumption and/or assignment of the Contracts as of the date of Closing under the APA.

**C.     Section 1146 Exemption**

30.     The confirmation of a plan of reorganization will occur before closing.  As a sale in connection with a confirmed plan, pursuant to § 1146(a) of the Bankruptcy Code, the Debtors hereby request that the making or delivery of an instrument or instruments of transfer, any or all of which include the vesting, transfer and/or the sale of any real or personal property or any direct or indirect interest therein, including, without limitation, all documents relating to or referred to in the APA, not be taxed under any law imposing any recording, registration, transfer or stamp tax or fee, or any similar tax or fee, including any applicable transfer taxes or fees, sales taxes, or mortgage recording taxes or fees.  The Debtors further request that all Federal, state and local governmental agencies or departments be directed to accept and abide by the terms of the transfer tax exemption as set forth herein in connection with any transfer of the Purchased Assets, including accepting any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

WHEREFORE, the Debtors respectfully request that the Court enter an order (a) approving the sale of the Assets free and clear of all liens, claims and encumbrances, except as noted herein; (b) authorizing the assumption and assignment of Contracts, and (c) for such other and further relief as the Court deems just and proper.

DATED: October 31, 2016

> _/s/ Scott A. Stichter_
> Charles A. Postler (FBN 455318)
> Scott A. Stichter (FBN 0710670)
> Stephen R. Leslie (FBN 0000349)
> Matthew B. Hale (FBN 0110600)
> Stichter, Riedel, Blain & Postler, P.A.
> 110 East Madison Street, Suite 200
> Tampa, Florida 33602
> Telephone: (813) 229-0144
> Facsimile: (813) 229-1811
> Email: sstichter@srbp.com
> Attorneys for the Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the foregoing Sale Motion have been furnished on this 31st day of October, 2016, by the Court's CM/ECF system to all creditors and parties in interest receiving noticing through the Court's CM/ECF system. All creditors and parties in interest not receiving CM/ECF noticing will be served by U.S. Mail the immediately following day, and the Debtors shall file a supplemental certificate of service reflecting such service.

> _/s/ Scott A. Stichter_
> Scott A. Stichter (FBN 0710679)

<u>Exhibit A</u>
<u>Letter of Intent</u>

<u>LETTER OF INTENT</u>

October 31, 2016

Eli Freiden, Manager of
IMH Healthcare, LLC, General Partner
Westport Holdings Tampa, Limited Partnership
Westport Holdings Tampa II, Limited Partnership
Westport Nursing Tampa, L.L.C.
12401 North 22nd Street
Tampa, Florida 33612

> Re:    **Purchase of Substantially All of the Assets of Westport Holdings Tampa,**
> **Limited Partnership, Westport Holdings Tampa II, Limited Partnership,**
> **and Westport Nursing Tampa, L.L.C.**

Dear Mr. Freiden:

Skyline HealthCare, LLC, a New Jersey limited liability company, is pleased to submit this letter of intent (the "<u>Letter of Intent</u>") to acquire, either directly or through one or more affiliates (collectively, the "<u>Purchaser</u>"), substantially all of the assets, and to assume certain specified liabilities, of (i) Westport Holdings Tampa, Limited Partnership, a Delaware limited partnership ("<u>WHT</u>"), (ii) Westport Holdings Tampa II, Limited Partnership, a Delaware limited partnership ("<u>WHT II</u>" and, together with WHT, the "<u>Debtors</u>"), and (iii) Westport Nursing Tampa, L.L.C., a Florida limited liability company ("<u>WNT</u>" and, together with the Debtors, the "<u>Sellers</u>"), subject to the terms and conditions set forth below in this Letter of Intent (the "<u>Proposed Transaction</u>"). The Purchaser and the Sellers are sometimes referred to below individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>".

The overall purpose of the Proposed Transaction is to preserve the operations of the CCRC (as defined below), including providing residents of the CCRC with continued access to the Health Center (as defined below), by agreeing to the Proposed Transaction with an entity that owns and operates over one hundred (100) senior housing, assisted living and nursing facilities.

1.    <u>Bankruptcy Case</u>.    On September 22, 2016, the Debtors filed Voluntary Petitions for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "<u>Bankruptcy Court</u>"), which Chapter 11 cases are being jointly administered for procedural purposes only under *In re: Westport Holdings Tampa, Limited Partnership*, Case No. 8:16-bk-08167-MGW (the "<u>Bankruptcy Case</u>"). WNT is not a debtor or a debtor-in-possession in the Bankruptcy Case.

2.    <u>Purchase and Sale of Assets</u>.    The Proposed Transaction is contemplated to be a purchase of substantially all of the assets, real, personal or mixed, tangible or tangible, owned

Eli Freiden, Manager of
IMH Healthcare, LLC, General Partner
Page 2 of 11
October 31, 2016

or held by the Sellers as of the Closing Date (as defined below), relating to that certain continuing care retirement community known as "University Village" (collectively, the "Purchased Assets") consisting of (i) the assets owned or held by the Debtors relating to an independent living facility located at 12401 North 22nd Street, Tampa, Florida 33612, comprised of 446 independent living apartments and 46 independent living villas (collectively, the "ILF"), and (ii) the assets owned or held by WNT relating to a 110-bed assisted living facility (the "ALF") and a 120-bed skilled nursing facility (the "SNF" and, together with the ALF, the "Health Center") located at 12250 North 22nd Street, Tampa, Florida 33612. For purposes of this Letter of Intent, the ILF, the ALF and the SNF shall hereinafter be collectively defined as the "CCRC".

3.    Assumed Contracts. The Purchased Assets will include (i) all life-care and residency care contracts (including any amendments thereto) between the Debtors and the current residents of the CCRC, (ii) all other pre-petition executory contracts and/or unexpired leases and post-petition contracts or leases to which either Debtor is a party and designated to be assumed by the Purchaser, at the Purchaser's discretion, and (iii) all contracts between WNT or its operators and the current residents of the CCRC (collectively, the "Assumed Contracts"). The Purchaser will be responsible for the payment (out of the Debtors' Cash Consideration (as defined below)) or cure of all Cure Claims (as defined below) allowed by order of the Bankruptcy Court and shall also provide adequate assurance of future performance under the Assumed Contracts to which either Debtor is a party as required under Section 365 of the Bankruptcy Code.

4.    Minimum Liquid Reserve. The Purchased Assets will include any funds held in escrow on the Closing Date pursuant to the requirements of the Florida Office of Insurance Regulation (the "FOIR"), including the Minimum Liquid Reserve balance (estimated to be approximately $2,000,000.00) (the "MLR").

5.    Other Assets. WNT shall use its best efforts to cause the current operators of the ALF and the SNF (the "Current Operators") to transfer to the Purchaser any and all rights, licenses, permits, governmental authorizations, and contracts to operate, or necessary to operate, the ALF and the SNF, to the extent permissible under applicable law.

6.    New Health Center Lease. At the Closing, the Purchaser will enter into a lease with respect to the Health Center with one or more new operators who are unaffiliated with the Sellers (or their respective affiliates) or the Current Operators.

7.    Excluded Assets. The Purchased Assets will not include (i) any cash (restricted and unrestricted), deposits, amounts held in escrow (except for the MLR), or accounts receivable of the Sellers, (ii) any claims or causes of action which either of the Debtors may have against a third party including, but not limited to, under any provision of the Bankruptcy Code, (iii) the federal and state income tax attributes of the Sellers as of the Closing Date, and (iv) the limited partnership and limited liability company records of the Debtors and WNT, respectively.

Eli Freiden, Manager of
IMH Healthcare, LLC, General Partner
Page 3 of 11
October 31, 2016

8.     Purchase Price.    The purchase price for the Purchased Assets shall be $78,500,000.00 (the "Purchase Price"), consisting of a combination of cash consideration, in immediately available funds, to be paid by the Purchaser to the Sellers at the Closing (as defined below) and the assumption by the Purchaser of certain liabilities of the Debtors, as follows: (a) $53,500,000.00 in total consideration to the Debtors, consisting of (i) cash in the amount of $21,500,000.00 (the "Debtors' Cash Consideration") to pay the following liabilities or obligations of the Debtors at the Closing (collectively, the "Debtors' Claims"): (A) the allowed secured claim of CPIF Lending, LLC against the Debtors (estimated to be approximately $9,500,000.00), (B) the allowed unsecured claims against the Debtors (inclusive of an estimated $9,000,000.00 to pay entrance fee refunds and personal income protection funds which are currently due and owing to certain residents and former residents of the CCRC and an estimated $1,600,000.00 to pay delinquent accounts payable of the Debtors), (C) any allowed administrative claims and priority claims against the Debtors, (D) any closing costs of the Debtors, and (E) customary closing pro-rations for sellers of assets in Hillsborough County, Florida (excluding those amounts to be paid by the Purchaser pursuant to Section 21 below); and (ii) the assumption by the Purchaser of all existing liabilities of the Debtors to residents of the CCRC for entrance fee refund obligations and personal income protection obligations (estimated to be, in the aggregate, approximately $32,000,000.00) (collectively, the "Resident Obligations"); and (b) $25,000,000.00 in cash consideration to WNT (the "WNT Cash Consideration"), such amount to be used to pay the secured claim of USAmeriBank against WNT (estimated to be approximately $11,500,000.00). The Purchaser and the Debtors acknowledge and agree that, at the Closing, WNT shall transfer to the Purchaser, out of the WNT Cash Consideration, an amount equal to approximately $3,000,000.00 (the "MLR Shortfall Amount") to fund the current shortfall in the MLR. To the extent the actual balance of the MLR required to be in place on the Closing Date is less than or greater than the amount of $5,000,000.00, there shall be a corresponding dollar-for-dollar reduction or increase, respectively, to the MLR Shortfall Amount.

9.     Assumed Liabilities.    Except for the Resident Obligations and any obligations or liabilities under the Assumed Contracts agreed to be assumed by the Purchaser under this Letter of Intent (including, without limitation, the Cure Claims), the Purchaser shall not assume any liabilities or obligations of the Sellers of any nature whatsoever.

10.     Allocation of Purchase Price.    The allocation of the Purchase Price among the Purchased Assets is subject to the mutual agreement of the Sellers and the Purchaser, such allocation to be incorporated in the Definitive Purchase Agreements (as defined below). The Parties agree that the allocation of the Purchase Price between the Debtors and WNT, as currently described in Section 8 above, shall be adjusted as necessary in the Definitive Purchase Agreements to insure that all of the Debtors' Claims are paid in full.

11.     Bid Procedures; Stalking Horse Protection Fee.    By no later than October 31, 2016, the Debtors shall file with the Bankruptcy Court a motion (the "Bid Procedures Motion"), which Bid Procedures Motion shall be reasonably acceptable to the Purchaser and

Eli Freiden, Manager of
IMH Healthcare, LLC, General Partner
Page 4 of 11
October 31, 2016

the Debtors, seeking Bankruptcy Court approval of (i) bidding procedures for the submission of competing bids for the purchase and sale of the Purchased Assets, which bidding procedures shall provide, among other things, that (a) the deadline to execute and deliver the Definitive Purchase Agreements is November 30, 2016, (b) the deadline for other bidders to submit competing bids for the Purchased Assets is December 15, 2016, (c) the deadline for parties in interest to object to the Definitive Purchase Agreements is December 15, 2016 (the "Sale Objection Deadline"), (d) an auction (the "Auction") to seek the highest and best offer for the Purchased Assets shall be held on December 20, 2016 in Tampa, Florida, (e) the initial topping fee for any competing bidder shall be an amount equal to the Purchase Price plus the Break-Up Fee (as defined below) plus the amount of $200,000.00, (f) any incremental bid at the Auction shall be in the amount of at least $200,000.00, and (g) a hearing to approve the winning bidder shall be held by the Bankruptcy Court on December 21, 2016; (ii) the requirements for the submission of a competing bid; (iii) the manner of notice of the bidding procedures; and (iv) a stalking horse protection fee in favor of the Purchaser in the amount of $500,000.00 (the "Break-Up Fee") in the event that (a) the Purchaser remains willing, and is able, to proceed with the transactions contemplated by, and is not in breach of any of its obligations under, this Letter of Intent and the Definitive Purchase Agreements, and (b) the Purchased Assets of the Debtors are sold to a party other than the Purchaser (an "Alternative Transaction"). The Break-Up Fee, if earned, shall be (x) allowed as an administrative expense claim pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, and (y) payable to the Purchaser only upon the closing of the Alternative Transaction. The bidding procedures and the Break-Up Fee, as approved by the Bankruptcy Court in the Bid Procedures Order (as defined below), shall be incorporated in the Definitive Purchase Agreements.

12.    Deposit. Within one (1) Business Day (as defined below) following the entry of an order of the Bankruptcy Court granting the Bid Procedures Motion (the "Bid Procedures Order"), which Bid Procedures Order shall be reasonably acceptable to the Purchaser and the Debtors, the Purchaser shall deliver a deposit in the amount of $500,000.00 (the "Initial Deposit"), in immediately available funds, to the Debtors' bankruptcy counsel, Stichter, Riedel, Blain & Postler, P.A. ("SRBP"). The Initial Deposit shall be non-refundable to the Purchaser except as otherwise provided in Section 13 below and in the Debtors' Purchase Agreement (as defined below). Within one (1) Business Day following the acceptance of Due Diligence (as defined below) by the Purchaser, the Purchaser shall deliver an additional deposit in the amount of $500,000.00 (the "Additional Deposit" and, together with the Initial Deposit, the "Deposit"), in immediately available funds, to SRBP. The Deposit shall be non-refundable to the Purchaser except as otherwise provided in the Definitive Purchase Agreements. The Deposit shall be made under the Debtors' Purchase Agreement and applied to the Debtors' Cash Consideration payable to the Debtors at the Closing.

13.    Investigation Period; Due Diligence. The Purchaser, its agents, employees, advisors, and other representatives shall have until 5:00 p.m. on November 30, 2016 (the "Investigation Period") in which to conduct due diligence (the "Due Diligence") as to the Sellers and their businesses relating to the CCRC (collectively, the "Business"). It is

Eli Freiden, Manager of
IMH Healthcare, LLC, General Partner
Page 5 of 11
October 31, 2016

anticipated that Due Diligence will include, among other things, review of documents contained in the virtual data room established by the Debtors (to which the Purchaser has been provided access prior to the execution of this Letter of Intent), review of (to the extent available) contracts and leases, limited partnership and limited liability company records, financial statements, title reports, environmental reports, property condition reports, surveys, cost reports, budgets, and business plans, validation of financial performance, and discussions with creditors, key customers, suppliers and employees of the Sellers. The Sellers agree to reasonably cooperate, and shall cause the officers, members, managers, and employees of the Sellers to reasonably cooperate, and to direct its representatives, advisors and operators (including the Current Operators) to reasonably cooperate, in each case during the Investigation Period, with the Purchaser's Due Diligence of the Sellers and the Business and, in connection therewith, shall afford to the Purchaser, its agents, employees, advisors and other representatives complete and prompt access, during normal business hours, to the Business and to the properties, operations and personnel of, and to the financial, legal, tax and other data and information pertaining to, the Sellers and the Business that are reasonably requested by the Purchaser or its employees, agents, advisors and other representatives. In the event the Purchaser, in its sole discretion, decides not to proceed with the Proposed Transaction as a result of its Due Diligence, the Purchaser shall provide written notice thereof to the Sellers on or prior to the expiration of the Investigation Period and, thereupon, the Initial Deposit shall be returned to the Purchaser by SRBP. If no such written notice is received by the Sellers on or prior to the expiration of the Investigation Period, then the Purchaser shall be deemed to have waived any further rights to Due Diligence, and the Deposit shall become non-refundable to the Purchaser subject to the satisfaction of the conditions to Closing set forth in the Definitive Purchase Agreements.

14. <u>Definitive Purchase Agreements</u>. The respective Parties' obligations to proceed with the Proposed Transaction are subject to (i) the execution and delivery of a definitive asset purchase agreement by and between the Debtors and the Purchaser (the "<u>Debtors' Purchase Agreement</u>"), and (ii) the execution and delivery of a definitive asset purchase agreement by and between WNT and the Purchaser (the "<u>WNT Purchase Agreement</u>" and, together with the Debtors' Purchase Agreement, the "<u>Definitive Purchase Agreements</u>"), in each case in form and substance satisfactory to the Purchaser and the Sellers, and which shall contain terms consistent with the terms of this Letter of Intent and such other terms as are usual and customary for transactions of this type including, without limitation, representations and warranties and covenants relating to the operation of the Business prior to the Closing; provided, however, that the Purchased Assets of the Debtors shall be sold on an "AS IS, WHERE IS" basis and the representations, warranties and covenants of the Debtors set forth in the Debtors' Purchase Agreement shall expire as of the Closing. The Definitive Purchase Agreements shall also include a final list of the Assumed Contracts. The Definitive Purchase Agreements shall supersede in its entirety this Letter of Intent. Upon the full execution of this Letter of Intent, the Purchaser will direct its legal counsel to prepare the Debtors' Purchase Agreement and the WNT Purchase Agreement.

Eli Freiden, Manager of
IMH Healthcare, LLC, General Partner
Page 6 of 11
October 31, 2016

15.    <u>Sale Motion</u>.  By no later than October 31, 2016, the Debtors shall file with the Bankruptcy Court a motion (the "<u>Sale Motion</u>"), which Sale Motion shall be reasonably acceptable to the Purchaser and the Debtors, seeking Bankruptcy Court approval of (i) the Debtors' execution of this Letter of Intent, (ii) the Debtors' execution of the Debtors' Purchase Agreement, (iii) the sale of the Purchased Assets of the Debtors to the Purchaser free and clear of any and all liens, claims and encumbrances pursuant to Section 363 of the Bankruptcy Code, and (iv) the assumption and/or assignment to the Purchaser of the Assumed Contracts to which either Debtor is a party pursuant to Section 365 of the Bankruptcy Code.  The Sale Motion shall also set forth the requirements for parties to the Assumed Contracts to which either Debtor is a party to assert, on or before the Sale Objection Deadline, any and all defaults of the Debtors under the Assumed Contracts (whether monetary or non-monetary), claims of any nature whatsoever against the Debtors, and cure amounts, if any, due and owing by the Debtors pursuant to Section 365(b) of the Bankruptcy Code under such Assumed Contracts (collectively, the "<u>Cure Claims</u>").

16.    <u>Closing</u>.  The closing of the Proposed Transaction (the "<u>Closing</u>") shall occur by no later than ten (10) days after the satisfaction or waiver (if permissible) of the conditions to Closing set forth in the Definitive Purchase Agreements (the "<u>Closing Date</u>"), which Closing Date may be extended upon the mutual written agreement of the Sellers and the Purchaser.  At the Closing, the Parties shall execute and/or deliver the documents required by the Definitive Purchase Agreements and the Sellers shall sell, assign, transfer, convey and deliver the Purchased Assets to the Purchaser subject to receipt of the Purchase Price.  The Closing will be subject to the conditions set forth in this Letter of Intent, and, upon the execution of the Definitive Purchase Agreements, the Closing will be subject only to the conditions set forth in the Definitive Purchase Agreements.

17.    <u>Conditions to Obligations of the Parties to Close</u>.  The Parties' obligations to close the Proposed Transaction is subject to the following conditions:

a.    as to the Purchaser only, the waiver of Due Diligence on or prior to the expiration of the Investigation Period;

b.    the entry by the Bankruptcy Court of the Bid Procedures Order by no later than November 9, 2016;

c.    the execution and delivery of the Definitive Purchase Agreements on or before November 30, 2016;

d.    the entry by the Bankruptcy Court of an order granting the Sale Motion, which order shall be reasonably acceptable to the Purchaser and the Debtors (the "<u>Sale Order</u>"), which Sale Order shall provide, among other things, (i) that the Purchaser's offer is the highest and best offer for the Purchased Assets of the Debtors, (ii) for the approval of the

Eli Freiden, Manager of
IMH Healthcare, LLC, General Partner
Page 7 of 11
October 31, 2016

Debtors' Purchase Agreement, (iii) for the sale of the Purchased Assets of the Debtors to the Purchaser free and clear of any and all liens, claims and encumbrances, including the Debtors' Claims, (iv) for the assumption and/or assignment to the Purchaser of the Assumed Contracts to which either Debtor is a party, (v) for the assumption of the Assumed Liabilities by the Purchaser, and (vi) that the Purchaser is purchasing the Purchased Assets of the Debtors in good faith as contemplated by Section 363(m) of the Bankruptcy Code;

e.  the satisfaction or waiver (if permissible) of the conditions to Closing expressly set forth in the Definitive Purchase Agreements;

f.  the receipt by the Purchaser of all necessary regulatory approvals, if any, that are required to proceed with the Closing of the Proposed Transaction, including any necessary approvals to operate the CCRC from the State of Florida Agency for Health Care Administration, the FOIR, the Florida Department of Financial Services, the Centers for Medicare and Medicaid Services, and any other applicable governmental authorities having jurisdiction over the CCRC;

g.  the receipt by the Purchaser of one or more owner's title insurance policies with respect to real property owned by the Sellers and to be conveyed to the Purchaser under the Definitive Purchase Agreements;

h.  the Closings shall have concurrently occurred under the Debtors' Purchase Agreement and the WNT Purchase Agreement; and

i.  as to the Debtors only, the Debtors shall have determined that the Debtors' Cash Consideration to be received by the Debtors at the Closing is in an amount sufficient to pay in full the Debtors' Claims.

18.    Consents.  Each of the Parties will cooperate with one another and proceed, as promptly as is reasonably practicable, to seek and obtain all necessary consents and approvals from governmental bodies and other third parties, and to endeavor to comply with all other legal or contractual requirements for, or pre-conditions to, the execution and consummation of the Definitive Purchase Agreements.

19.    Access.  Until the Closing, the Sellers shall provide the Purchaser complete access to the Sellers' facilities, books and records and shall cause the members, managers, employees, accountants and other agents and representatives of the Sellers to cooperate fully with the Purchaser and the Purchaser's representatives in connection with the Purchaser's review of the Sellers and their respective assets, contracts, liabilities, operations, records, and other aspects of the Business.

Eli Freiden, Manager of
IMH Healthcare, LLC, General Partner
Page 8 of 11
October 31, 2016

20.     Confidentiality.   Each Party agrees to treat confidential all information concerning the other Parties furnished, or to be furnished, by or on behalf of the other Parties (collectively, the "Information").   The Information will be used solely for the purposes of evaluating the transactions contemplated hereunder, and will be kept confidential by the recipient, and its respective officers, members, managers, employees, representatives, agents and advisors.   The recipient shall disclose such Information only to the recipient's respective officers, members, managers, employees, representatives, agents and advisors who need to know such information for the purpose of evaluating the transactions contemplated herein, and who have been informed of the confidentiality requirements set forth herein.  If the transactions contemplated herein are not consummated for any reason, the recipient will return to the furnishing Party all material containing or reflecting the Information and will not retain any copies, extracts, or other reproductions thereof.  The provisions of this Section 20 shall survive the termination of this Letter of Intent.   Notwithstanding the foregoing, the terms of the Confidentiality and Non-Disclosure Agreement between the Debtors and the Purchaser dated October 26, 2016 (the "NDA") shall remain in full force and effect in accordance with the terms thereof.

21.     Expenses.   Except for the Break-Up Fee, each of the Parties will be solely responsible for and bear all of its own expenses, including, without limitation, expenses of legal counsel, accountants, and other advisors, incurred at any time in connection with pursuing or consummating the Definitive Purchase Agreements and the transactions contemplated herein.   The Purchaser will be solely responsible for any transfer taxes or recording fees in connection with the Proposed Transaction.  The Purchaser shall also pay all costs incurred for any title insurance policies, surveys, inspections, environmental audits, filing fees, and costs of any financing to be obtained by the Purchaser in connection with the Proposed Transaction.

22.     Governing Law.  This Letter of Intent, and the Proposed Transaction evidenced hereby, are governed by the laws of the State of Florida without regard to the principles of conflicts of law.

23.     Counterparts.  This Letter of Intent may be executed in counterparts, each of which will be deemed to be an original copy and all of which, when taken together, will be deemed to constitute one and the same agreement.

24.     Jurisdiction and Venue.  The Parties hereby consent to the exclusive jurisdiction of the Bankruptcy Court and irrevocably agree that all actions or proceedings arising out of this Letter of Intent or the transactions described herein shall be litigated in the Bankruptcy Court.   THE PARTIES HERETO, AFTER CONSULTING WITH THEIR RESPECTIVE LEGAL COUNSEL, HEREBY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN CONNECTION WITH THIS LETTER OF INTENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

25.     Termination.  This Letter of Intent may be terminated by any Party hereto in the event the Definitive Purchase Agreements have not been executed by the Parties on or

Eli Freiden, Manager of
IMH Healthcare, LLC, General Partner
Page 9 of 11
October 31, 2016

before November 30, 2016. In the event of any such termination, the Purchaser shall not be entitled to payment of the Break-Up Fee.

26.    Entire Agreement. This Letter of Intent supersedes in their entirety any and all prior or concurrent offers, proposals, understandings, or agreements (whether written or oral) between the Sellers and the Purchaser (except the NDA).

27.    No Financing. The Purchaser's offer to acquire the Purchased Assets is not contingent upon obtaining financing.

28.    Notices. All notices to the Debtors hereunder shall be provided to Charles A. Postler, Esquire, and Scott A. Stichter, Esquire, Stichter, Riedel, Blain & Postler, P.A., 110 East Madison Street, Suite 200, Tampa, Florida 33602, Facsimile Number 813-229-1811. All notices to WNT hereunder shall be provided to _____ _____, Facsimile Number _____. All notices to the Purchaser hereunder shall be provided to Allen V. Koss, Esquire, Koss & Schonfeld, LLP, 90 John Street, Suite 408, New York, New York 10038, Facsimile Number 212-401-4757. Notices shall be deemed effective upon hand delivery or receipt by facsimile transmission.

29.    Binding Effect. This Letter of Intent sets forth our intent with respect to the Proposed Transaction but, except as set forth in the next sentence, shall not create any binding obligation on the part of the Parties hereto, including with respect to proceeding with or consummating the Proposed Transaction, and no such obligation shall arise, unless and until mutually satisfactory Definitive Purchase Agreements have been executed and delivered by the Parties (in which event, the obligations of the Parties hereto shall be subject to the terms and conditions set forth in such Definitive Purchase Agreements). Notwithstanding the immediately foregoing sentence, the provisions of this Section 29 and of Section 12 (Deposit), Section 13 (Investigation Period; Due Diligence), Section 20 (Confidentiality), Section 21 (Expenses), Section 22 (Governing Law), Section 24 (Jurisdiction and Venue), Section 25 (Termination), Section 26 (Entire Agreement), Section 27 (No Financing), and Section 28 (Notices) shall be binding on the Parties hereto (in recognition of the significant costs to be borne by the Parties in pursuing the Proposed Transaction, and, further, in consideration for their mutual undertakings as to the matters described herein).

30.    Business Days. For purposes of this Letter of Intent, the term "Business Day" shall mean any day other than Saturday, Sunday or such other day on which banks in Tampa, Florida are authorized to close.

This Letter of Intent will automatically terminate at 5:00 p.m., Tampa, Florida time, on October 31, 2016, unless a countersigned copy hereof is received by the Purchaser prior to such time. If this Letter of Intent is not accepted and returned within said time period, this Letter of Intent will be null and void and of no further force and effect. We are prepared to begin working with you to perform Due Diligence and work expeditiously toward the

Eli Freiden, Manager of
IMH Healthcare, LLC, General Partner
Page 10 of 11
October 31, 2016


execution of the Definitive Purchase Agreements.  We look forward to an affirmative response to this proposal from you.

[Signature Page Follows on the Next Page]

Eli Freiden, Manager of
IMH Healthcare, LLC, General Partner
Page 11 of 11
October 31, 2016

Sincerely,

**Skyline HealthCare, LLC**

By:
Name:  Louis Schwartz
Its:   M&A

**Accepted and agreed to** this _____ day
of October, 2016:

**Westport Holdings Tampa, Limited Partnership**

By:    **IMH Healthcare, LLC, General Partner**

    By:    _____
    Name: Eli Freiden
    Title:  Manager

**Westport Holdings Tampa II, Limited Partnership**

By:    **IMH Healthcare, LLC, General Partner**

    By:    _____
    Name: Eli Freiden
    Title:  Manager

**Westport Nursing Tampa, L.L.C.**

By:    **IMH Healthcare, LLC, General Partner**

    By:    _____
    Name: Eli Freiden
    Title:  Manager