UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                          Chapter 11

WESTPORT HOLDINGS TAMPA,              Case No. 8:16-bk-08167-MGW
LIMITED PARTNERSHIP,

WESTPORT HOLDINGS TAMPA               Case No. 8:16-bk-08168-MGW
II, LIMITED PARTNERSHIP,

                                                 *Jointly Administered under*
            Debtors.                             *Case No. 8:16-bk-08167-MGW*
_____/

**DISCLOSURE STATEMENT FOR
FIRST AMENDED AND RESTATED JOINT PLAN OF LIQUIDATION
UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Tampa, Florida
Dated as of December 31, 2017

Stichter, Riedel, Blain & Postler, P.A.
Charles A. Postler (FBN 455318)
Scott A. Stichter (FBN 0710670)
Matthew B. Hale (FBN 0110600)
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
Email: cpostler@srbp.com;
sstichter@srbp.com; mhale@srbp.com
Attorneys for the Debtors

Jennis Law Firm
David S. Jennis (FBN 775940)
Eric D. Jacobs (FBN 0058512)
606 East Madison Street
Tampa, FL 33602
Telephone: (813) 229-2800
Fax: (813) 229-1707
djennis@jennislaw.com; ejacobs@jennislaw.com
Attorneys for the Official Committee of Resident
Creditors

THIS DISCLOSURE STATEMENT FOR FIRST AMENDED AND RESTATED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "**DISCLOSURE STATEMENT**") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE FIRST AMENDED AND RESTATED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE DATED AS OF DECEMBER 31, 2017 (AS FURTHER AMENDED FROM TIME TO TIME, THE "**PLAN**"), AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR SECURITIES LAWS OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.  ANY CREDITOR OR OTHER PARTY BUYING OR SELLING A CLAIM BASED ON THE INFORMATION CONTAINED HEREIN DOES SO AT ITS OWN RISK.

ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE ENTIRE DISCLOSURE STATEMENT FURNISHED TO THEM AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, PRIOR TO SUBMITTING A BALLOT PURSUANT TO THIS SOLICITATION.  THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF.  EACH CREDITOR AND HOLDER OF AN EQUITY INTEREST SHOULD READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.

**ARTICLES 11 OF THE PLAN PROPOSES CERTAIN EXCULPATIONS, RELEASES, AND INJUNCTIONS FROM LIABILITY AS TO THE DEBTORS AND VARIOUS NON-DEBTOR PARTIES, WHICH PROVISIONS WOULD ENJOIN THE DEBTORS, HOLDERS OF CLAIMS, HOLDERS OF EQUITY INTERESTS, AND OTHER PARTIES FROM PURSUING CERTAIN ACTIONS AGAINST SUCH PARTIES EXCEPT AS OTHERWISE PROVIDED IN THE PLAN.  THE EXCULPATION FROM LIABILITY PROVISIONS CONTAINED IN ARTICLE 11.01 OF THE PLAN ARE NOT INTENDED TO, AND DO NOT, RELEASE ANY PREPETITION CAUSES OF ACTION OR RETAINED CAUSES OF ACTION.  ALL CREDITORS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO READ CAREFULLY ARTICLE 11 OF THE PLAN.**

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. IN ADDITION, THE DISCLOSURE STATEMENT AND THE PLAN HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.

**NO PERSON IS AUTHORIZED BY THE PLAN PROPONENTS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR THE ACCOMPANYING DOCUMENTS INCORPORATED BY REFERENCE OR REFERRED TO HEREIN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PLAN PROPONENTS.    SUCH ADDITIONAL REPRESENTATIONS SHOULD BE REPORTED TO BANKRUPTCY COUNSEL FOR THE PLAN PROPONENTS, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE.**

THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. THIS DISCLOSURE STATEMENT IS DATED AS OF DECEMBER 31, 2017, AND CREDITORS AND HOLDERS OF EQUITY INTERESTS ARE ENCOURAGED TO REVIEW THE DOCKET IN THE BANKRUPTCY CASES IN ORDER TO APPRISE THEMSELVES OF EVENTS WHICH OCCUR BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THIS DISCLOSURE STATEMENT AND IN THE ACCOMPANYING PLAN CONCERNING THE HISTORY OF THE DEBTORS' BUSINESSES, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTORS, TRANSACTIONS TO WHICH THE DEBTORS WERE OR ARE A PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE ATTRIBUTABLE EXCLUSIVELY TO THE PLAN PROPONENTS AND NOT TO ANY OTHER PARTY. THE CASH FLOW AND INCOME STATEMENT PROJECTIONS REGARDING THE FUTURE PERFORMANCE OF THE DEBTORS FOLLOWING THE EFFECTIVE DATE, WHICH ARE ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT, HAVE BEEN PROVIDED TO THE PLAN PROPONENTS BY THE FINANCIAL ADVISOR FOR THE CURRENT RESIDENT COMMITTEE AND THE PLAN PROPONENTS MAKE NO REPRESENTATIONS CONCERNING SUCH PROJECTIONS. NONE OF THE ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS RETAINED BY THE PLAN PROPONENTS MAKES ANY REPRESENTATIONS CONCERNING SUCH INFORMATION OR PROJECTIONS.

IN THE EVENT THAT ANY IMPAIRED CLASS OF CLAIMS OR EQUITY INTERESTS VOTES TO REJECT THE PLAN, (1) THE PLAN PROPONENTS MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO THAT CLASS UNDER THE BANKRUPTCY CODE'S "CRAMDOWN" PROVISIONS AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS, OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN.

THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF IMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH IN THE SECTION OF THIS DISCLOSURE STATEMENT TITLED "VOTING ON AND CONFIRMATION OF THE PLAN".

## INDEX TO EXHIBITS TO
## <u>DISCLOSURE STATEMENT</u>

<u>Exhibit A</u>    −    Cash Flow and Income Statement Projections for the Debtors for the Ten-Year Period Following the Effective Date

<u>Exhibit B</u>    −    Liquidation Analysis

# DISCLOSURE STATEMENT PURSUANT TO
# SECTION 1125 OF THE BANKRUPTCY CODE

## INTRODUCTION

Westport Holdings Tampa, Limited Partnership and Westport Holdings Tampa II, Limited Partnership (the "**Debtors**"), as Debtors and Debtors in Possession in the Bankruptcy Cases, and the Official Committee of Resident Creditors (the "**Current Resident Committee**") have jointly filed with the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "**Bankruptcy Court**"), their First Amended and Restated Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code dated as of December 31, 2017 (as amended from time to time, the "**Plan**"). This Disclosure Statement for First Amended and Restated Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code (the "**Disclosure Statement**") is submitted pursuant to Section 1125 of the Bankruptcy Code, 11 U.S.C. Section 101, *et. seq.* (the "**Bankruptcy Code**"), in connection with the solicitation of votes on the Plan from Holders of Impaired Claims against, and Impaired Equity Interests in, the Debtors and the hearing on Confirmation of the Plan scheduled by the Bankruptcy Court.

This Disclosure Statement has been conditionally approved by the Bankruptcy Court in accordance with Section 1125(b) of the Bankruptcy Code as containing information of a kind and in sufficient detail adequate to enable a hypothetical reasonable investor typical of the holders of Claims of the relevant Voting Classes (as defined below) to make an informed judgment whether to accept or reject the Plan. The conditional approval of this Disclosure Statement by the Bankruptcy Court and the transmittal of this Disclosure Statement do not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan and should not be interpreted as being a recommendation by the Bankruptcy Court either to accept or reject the Plan.

Effort has been made to provide meanings of capitalized and other terms used in this Disclosure Statement. Reference is made to the Plan, however, for the actual meanings of all capitalized and other terms used in this Disclosure Statement and in the Plan and for controlling language with respect to any provision referenced in this Disclosure Statement or in the Plan. Unless otherwise defined herein, the capitalized and other terms used in this Disclosure Statement and in the Plan are defined in Article 1 of the Plan. In the event of a conflict between the definition of any term or any other provision contained in this Disclosure Statement and the corresponding definition or provision contained in the Plan, the definition or provision contained in the Plan shall control.

**In summary, but subject to more specific details provided herein, the Plan provides for (i) the liquidation of the Purchased Assets after the Effective Date and in accordance with the Confirmation Order and a subsequent order of the Bankruptcy Court providing for the sale, under the Plan, of substantially all of the Purchased Assets free and clear of any and all Liens, except the Assumed Liabilities and the Permitted Exceptions, to a Buyer, (ii) the Distribution of the Cash Sale Proceeds to Holders of Allowed Claims in accordance with Articles 3 and 5 of the Plan at or as soon as reasonably practicable following the Closing, and (iii) the Releases and issuance of the Bar Order and injunctions as described in Article 11 of the Plan.**

THE PLAN HAS BEEN APPROVED BY THE PLAN PROPONENTS.  IN THE OPINION OF THE PLAN PROPONENTS, THE TREATMENT OF CLAIMS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS.  ACCORDINGLY, THE PLAN PROPONENTS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS, AND THE PLAN PROPONENTS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.

Accompanying this Disclosure Statement are copies of the following documents:

(a)     the Plan, including all Exhibits thereto;

(b)     Cash Flow and Income Statement Projections for the Debtors for the Ten-Year Period Following the Effective Date, included as Exhibit A to this Disclosure Statement;

(c)     Liquidation Analysis, included as Exhibit B to this Disclosure Statement;

(d)     the Bankruptcy Court's order conditionally approving this Disclosure Statement (the "**Disclosure Statement Approval Order**"); and

(e)     in the case of Impaired Classes of Claims entitled to vote on the Plan, a Ballot for acceptance or rejection of the Plan.

**In addition, additional documents and information can be accessed on the website of the Debtors' bankruptcy counsel at http://www.srbp.com/srbp/case-documents/887-westport-holdings-tampa. All Holders of Claims and Equity Interests are encouraged to review periodically the documents and information contained on the website of the Debtors' bankruptcy counsel.**

## PURPOSE OF THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the Holders of Claims and Equity Interests with adequate information to make an informed judgment about the Plan.  This information includes, among other things, (a) the procedures for voting on the Plan, (b) a summary of the Plan and an explanation of how the Plan will function, including the means of implementing and funding the Plan, (c) general information about the histories and businesses of the Debtors prior to the Petition Date, (d) the events leading to the filing of the Bankruptcy Cases, and (e) a summary of significant events that have occurred to date in the Bankruptcy Cases.

This Disclosure Statement contains important information about the Plan and considerations pertinent to a vote for or against the Confirmation of the Plan.  All Holders of Claims and Equity Interests are encouraged to review carefully this Disclosure Statement.

2

*Unless otherwise defined herein, all capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan.* Any term used in the Plan or herein that is not defined in the Plan or herein and that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be. If there is any conflict between the definitions contained in this Disclosure Statement and the definitions contained in the Plan, the definitions contained in the Plan shall control.

## VOTING INSTRUCTIONS

### *Who May Vote*

Only the Holders of Claims and Equity Interests which are "Impaired" under the terms and provisions of the Plan are permitted to vote to accept or reject the Plan. For purposes of the Plan, only the Holders of Claims in Classes 2, 3, 4, 5, 6, 7, 8, 9, 13, 14, and 15 (collectively, the "**Voting Classes**") are Impaired under the Plan and thus may vote to accept or reject the Plan.

### *How to Vote*

Each Holder of a Claim in a Voting Class should read the Disclosure Statement, together with the Plan and any Exhibits thereto, in their entirety. After carefully reviewing the Plan and this Disclosure Statement and any Exhibits thereto, please complete the enclosed Ballot, including your vote with respect to the Plan, and return it as provided below. If you have an Impaired Claim in more than one Class, you should receive a separate Ballot for each such Claim. If you receive more than one Ballot, you should assume that each Ballot is for a separate Impaired Claim and you should complete and return all of them.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact Susan McKee by telephone at (813) 229-0144 or by email at smckee@srbp.com.

Completed Ballots should be sent by regular mail, hand delivery, or overnight delivery, **SO AS TO BE RECEIVED NO LATER THAN THE BALLOT DEADLINE SET FORTH ON THE SECOND PAGE OF THE BALLOT**, to:

Clerk of the United States Bankruptcy Court
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue, Suite 555
Tampa, Florida 33602

or electronically through the Bankruptcy Court's website, at www.flmb.uscourts.gov, by selecting "Electronic Filings" and "Chapter 11 Ballots".

A copy of the Ballot should also be sent to:

Scott A. Stichter, Esq.                    David S. Jennis, Esq.
Stichter, Riedel, Blain & Postler, P.A.            Jennis Law Firm
110 E. Madison Street, Suite 200           606 East Madison Street
Tampa, Florida 33602                       Tampa, Florida 33602
sstichter@srbp.com                         djennis@jennislaw.com

### *Acceptance of Plan and Vote Required for Class Acceptance*

As the Holder of an Allowed Claim in a Voting Class, your vote on the Plan is extremely important. The Plan Proponents are soliciting acceptances of the Plan only from Holders of Claims in Classes 2, 3, 4, 5, 6, 7, 8, 9, 13, 14, and 15, which are the only Classes entitled to vote on the Plan. You may be contacted by the Plan Proponents or their counsel with regard to your vote on the Plan.

Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan. Pursuant to Section 1126(d) of the Bankruptcy Code, an Impaired Class of Equity Interests shall have accepted the Plan if the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

To meet the requirement for confirmation of the Plan under the "cram-down" provisions of the Bankruptcy Code with respect to any Impaired Class of Claims or Equity Interests which votes to reject, or is deemed to vote to reject, the Plan (a "**Rejecting Class**"), the Plan Proponents would have to show that all Classes junior to the Rejecting Class will not receive or retain any property under the Plan unless all Holders of Claims or Equity Interests in the Rejecting Class receive or retain under the Plan property having a value equal to the full amount of their Allowed Claims or Allowed Equity Interests. For a more complete description of the implementation of the "cram-down" provisions of the Bankruptcy Code pursuant to the Plan, see the section of this Disclosure Statement titled "VOTING ON AND CONFIRMATION OF THE PLAN -- Confirmation Without Acceptance by All Impaired Classes".

### *Confirmation Hearing and Objections to Confirmation*

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for **February 23, 2018 at _____ __.m.** (the "**Confirmation Hearing**"), which may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. The Bankruptcy Court has directed that any objection to confirmation of the Plan must be in writing and specify in detail the name and address of the objector, the basis for the objection and the specific grounds for the objection, and the

amount of the Claim held by the objector.  Consistent with Rule 3020(b) of the Federal Rules of Bankruptcy Procedure and Local Rule 3020-1(a), any such objection must be filed with the Bankruptcy Court and served upon each of the following parties, so as to be actually received on or before the objection deadline set by the Bankruptcy Court in the Disclosure Statement Approval Order:

| | |
|---|---|
| Debtors: | Scott A. Stichter, Esq.<br>Stichter, Riedel, Blain & Postler, P.A.<br>110 East Madison Street, Suite 200<br>Tampa, Florida 33602 |
| Current Resident Committee: | David S. Jennis, Esq.<br>Jennis Law Firm<br>606 East Madison Street<br>Tampa, Florida 33602 |
| U.S. Trustee: | Denise Barnett, Esq.<br>Assistant United States Trustee<br>501 East Polk Street, Suite 1200<br>Tampa, Florida 33602 |

## HISTORY AND BUSINESS OF THE DEBTORS PRIOR TO THE CHAPTER 11 FILINGS; EVENTS LEADING TO THE CHAPTER 11 FILINGS

University Village was established over thirty years ago as a continuing care retirement community ("**CCRC**") and, pursuant to Section 651 of the Florida Statutes, its then-owner and provider, Freedom Properties, Ltd., was granted a Certificate of Authority in 1987 to operate the CCRC.  University Village consists of: 446 independent living apartments, 46 independent living villas, and associated common-area buildings (the "**Retirement Center**"); an assisted living facility (the "**ALF**"); and a skilled nursing facility (the "**SNF**" and together with the ALF, the "**Health Center**").

In 1999, Westport Housing Tampa, LLC was approved by the State of Florida Office of Insurance Regulation ("**OIR**") to acquire the Certificate of Authority held by Freedom Properties, Ltd.  Through a series of transactions in 2000, Westport Housing Tampa, LLC merged with Westport Holdings Tampa, Limited Partnership ("**Westport**"), with Westport becoming the surviving entity and holder of the Certificate of Authority.  Westport then became the provider at University Village.

Since 2000, Westport's ownership structure has been comprised of two partnership interests: a 1% general partnership interest and a 99% limited partnership interest.  From 2000 through 2013, the general partnership interest was owned by Westport Holdings University Village, LLC ("**WHUV**"), and the limited partnership interest was owned by Westport Senior Living Investment Fund, LP ("**Westport Senior Living**").  Mr. Larry Landry was President and Manager of both of these entities and operated the Retirement Center portion of University Village, along with a management company (AgeWell Senior Living, LLC).

5

Westport entered into life care residency agreements with the residents, which, among other things, obligated Westport to provide assisted living or skilled nursing services to residents who needed services from the Health Center. The Health Center generally accepted transfers from the Retirement Center if the providers could meet the needs of the resident.

In 1999, the owners of Westport created a separate entity known as Westport Nursing Tampa, L.L.C. ("**WNT**") to own the Health Center. Prior to 2014, WNT was a wholly-owned subsidiary of Westport. In 2014, new ownership of Westport transferred the membership interests of WNT to an ownership group comprised of the owners of Westport's limited partnership interests.

WNT leases the SNF and the ALF to providers, who are third-party operators. Since 2003, the operators of the Health Center have been two independent Florida non-profit corporations: TR&SNF, Inc. d/b/a the Nursing Home of University Village and TALF, Inc. d/b/a The Inn at University Village (collectively, the "**Current Operators**"). The Current Operators were obligated to pay base rent and additional rent to WNT based on increased occupancy.

In August 2013, BVM Management/Westport Holdings, L.P. ("**BVM**") entered into a purchase agreement with Westport Senior Living to purchase the 99% limited partnership interest in Westport and Westport Holdings Tampa II, Limited Partnership. The transaction contemplated that BVM would purchase the limited partnership interest and WHUV, the then-existing general partner, would continue for a period of time as Westport's general partner and would continue to own the 1% general partnership interest in Westport until further consideration was provided and a new general partner designated.

BVM sought additional parties and financing sources to complete the transaction. Through the new limited partners and funds borrowed from USAmeriBank and CPIF, the purchase was funded.

WHUV, the general partner, resigned from the partnership and IMH Healthcare, LLC ("**IMH**") submitted an acquisition application to OIR. OIR suspended Westport's Certificate of Authority and denied IMH's acquisition application. IMH and Westport appealed the OIR's decisions. Litigation in various state courts and administrative proceedings were commenced involving the Debtors, OIR, the State of Florida Department of Financial Services ("**DFS**") and other parties. The Debtors sought relief by filing their voluntary petitions..

## SIGNIFICANT EVENTS IN THE BANKRUPTCY CASES

On September 22, 2016, the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which were designated as Case No. 8:16-bk-08167-MGW and Case No. 8:16-bk-08168-MGW. The Debtors remain in possession of their properties and continue to manage their assets as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Set forth below is a brief summary of significant matters or events which have occurred to date in the Bankruptcy Cases. The description of such matters or events is qualified in its entirety

by the actual pleadings filed in the Bankruptcy Cases and, to the extent of any inconsistencies between the descriptions in this Disclosure Statement and such pleadings, the filed pleadings shall control. All of such pleadings are on file with, and may be obtained from, the Bankruptcy Court.

## Joint Administration

Pursuant to an order entered by the Bankruptcy Court dated September 22, 2016 [Doc. No. 4], the Bankruptcy Cases are being jointly administered for procedural purposes only under *In re: Westport Holdings Tampa, Limited Partnership*, Case No. 8:16-bk-08167-MGW.

## Use of Cash Collateral

On the Petition Date, the Debtors' Assets, including accounts receivable, were encumbered by the Liens of CPIF. On September 22, 2016, the Debtors filed the Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Granting Replacement Liens Pursuant to Sections 105(a), 361, 363, 541, and 552 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure seeking authority to use cash collateral [Doc. No. 9]. The Bankruptcy Court has entered numerous orders authorizing the use of cash collateral on an interim basis [Doc. Nos. 82, 99, 116, 160, 210, 230, 276, 472, and 477] pursuant to budgets attached to the interim orders and the procedures set forth in the orders for paying expenses.

## Payment of Prepetition Wages

On September 22, 2016, the Debtors filed an Emergency Motion for Authorization to Pay Prepetition Wages, Salaries, and Other Employee Benefits [Doc. No. 7]. The Bankruptcy Court entered an order authorizing the Debtors to pay the prepetition wages specified in the motion [Doc. No. 61].

## Utilities

On October 7, 2016, the Debtors filed a Motion for Order Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (i) Prohibiting Utilities from Altering, Refusing or Discontinuing Service on Account of Prepetition Invoices; (ii) Approving the Debtors' Proposed Adequate Assurance of Payment; and (iii) Establishing Procedures for Determining Additional Requests for Adequate Assurance of Payment [Doc. No. 66]. On December 5, 2016, the Bankruptcy Court entered an order granting the Motion [Doc. No. 191].

## Retention of Professionals by the Debtors

The Debtors obtained Bankruptcy Court approval to retain the law firm of Stichter, Riedel, Blain & Postler, P.A. as their general bankruptcy counsel in the Bankruptcy Cases [Doc. No. 85]. The Bankruptcy Court approved the retention by the Debtors of Broad and Cassel as special counsel to handle certain litigation and healthcare issues [Doc. No. 288]. The Bankruptcy Court approved the Debtors' retention of Josh Levine, CPA, PC, as accountant, to prepare Prepetition audits [Doc. No. 130] and to prepare the Debtors' tax returns [Doc. No. 314].

**Appointment of the Unsecured Creditors Committee**

On October 11, 2016, the United States Trustee filed a Notice of Appointment of Official Committee of Unsecured Creditors (the "**Committee**") [Doc. No. 73]. The following entity and individuals were appointed to the Committee: (i) Muriel T. Upton Trust, (ii) Darrell D. Ballard, and (iii) Thomas M. Allensworth, Jr. (Chairperson).

**Appointment of the Current Residents Committee**

On December 29, 2016, the United States Trustee filed a Notice of Appointment of Committee of Resident Creditors (the "**Current Resident Committee**") [Doc. No. 258]. The following individuals were appointed to the Current Resident Committee: (i) David Whiting, (ii) Irwin Kerpay, (iii) David P. Henry, (iv) Marvin Weathers, (v) Denis Johnson, (vi) Mary Adams Castor, and (vii) Stephen Miller. The Current Resident Committee retained Jennis Law Firm as its counsel [Doc. No. 346] and CR3 Partners, LLC as its financial advisor on a limited basis [Doc. No. 456].

**Schedules and Statements of Financial Affairs**

On October 19, 2016, the Debtors filed their Schedules and Statements of Financial Affairs with the Bankruptcy Court [Doc. Nos. 91 and 14]. The Debtors have filed various amendments to their Schedules and Statements of Financial Affairs.

**Section 341 Meetings of Creditors**

On October 27, 2016, the United States Trustee convened and concluded meetings of creditors in the Bankruptcy Cases pursuant to Section 341 of the Bankruptcy Code.

**Bar Dates**

On September 23, 2016, the Bankruptcy Court issued a Notice of Chapter 11 Bankruptcy, which fixed January 9, 2017 as the bar date to file Claims in the Bankruptcy Cases and March 20, 2017 as the bar date for Governmental Units to file Claims in the Bankruptcy Cases [Doc. No. 14].

**Motion to Dismiss**

On October 4, 2016, the State of Florida, Department of Financial Services filed a Motion to Dismiss, Abstain or, Alternatively, for Entry of Order Declaring Automatic Stay Inapplicable to the State of Florida, Department of Financial Services' Receivership Action [Doc. No. 50]. The Debtors filed a response in opposition to the motion [Doc. No. 111]. The Bankruptcy Court entered an order deferring consideration of the Motion [Doc. No. 208].

**Appointment of Examiner**

The Bankruptcy Court granted an *ore tenus* motion to appoint an examiner (the

"**Examiner**") at a hearing on November 2, 2016. On November 7, 2016, the Bankruptcy Court entered its Order Appointing Examiner [Doc. No. 133] and, on November 15, 2016, its Order Approving Appointment of Chapter 11 Examiner [Doc. No. 144] which appointed Jeffrey W. Warren of Bush Ross, P.A. as the Examiner. The Examiner was authorized to employ Bush Ross, P.A. as his legal counsel [Doc. No. 179]. The Examiner was authorized to retain Terracon Consultants, Inc. to prepare a property condition assessment of the Debtors' facilities [Doc. No. 457]. The Examiner requested and was authorized to have access to CR3 Partners, LLC, the Current Resident Committee's financial advisor, and to share information and receive any reports or opinions of CR3 Partners, LLC.

**Attempts to Sell the Debtors' Assets**

Pursuant to the Bid Procedures Order, the Bankruptcy Court established procedures for the submission of bids in connection with the sale by the Debtors of substantially all of their Assets. The Debtors and WNT extensively negotiated the terms of a sale with numerous interested entities. Definitive asset purchase agreements with A+ Operating LLC ("**A+**") and with SouthPoint Global Investments, LLC ("**SouthPoint**") were executed and filed with the Bankruptcy Court, but no asset purchase agreement was finally approved by the Bankruptcy Court.

**Employment of Management Company**

The Debtors initially filed their application to pay a management fee to IMH Healthcare, LLC [Doc. No. 21], although that application was subsequently withdrawn.

The Debtors filed a motion to reject the management agreement with Novum Management Group, Inc. to the extent that it had not been terminated prior to the Petition Date [Doc. No. 67]. The Bankruptcy Court entered an order granting the motion to reject [Doc. No. 175]. Novum filed a rejection damage claim and an administrative claim.

The Debtors filed a motion to approve a compromise with Novum [Doc. No. 448]. The Debtors filed a motion to approve property management agreement with HMS of Tampa, Inc. [Doc. No. 37].

**Health Care Ombudsman**

The Debtors filed a motion to deny the appointment of a patient care ombudsman under Section 333 of the Bankruptcy Code [Doc. No. 65].

**Motion for Relief from Automatic Stay**

On October 20, 2016, the OIR filed a motion for relief from automatic stay to allow the OIR to pursue relief in a pending administrative action [Doc. No. 94]. The Bankruptcy Court entered an order deferring consideration of the motion [Doc. No. 208].

**Tax Returns and Audits**

On October 24, 2016, the Debtors sought an extension of the time to file Prepetition tax returns [Doc. No.101].  The Bankruptcy Court granted an extension until January 23, 2017 [Doc. No. 107]. On November 3, 2016, the Debtors filed an application to employ Josh Levine CPA PC as certified public accountants for audit services [Doc. No. 130] which application was approved by Order entered on November 8, 2016 {Doc. No. 138]. On February 3, 2017, the Debtors filed an application to expand the services of Josh Levine CPA PC to include an audit of the last quarter of 2016 and to file tax returns for the years ended 2014, 2015 and 2016 [Doc. No. 311] which application was approved by Order entered on February 3, 2017. [Doc. No. 314].

**Plan and Disclosure Statement**

On January 3, 2018, the Plan Proponents filed the Plan and this Disclosure Statement.  All previously filed plans and disclosure statements are deemed withdrawn.

**Motion to Appoint Chapter 11 Trustee**

On October 17, 2017, the Resident Committee filed with the Bankruptcy Court the Official Resident Committee's Motion to (I) Appoint Chapter 11 Trustee or, Alternatively, (II) Expand Power of Examiner to (A) Restart the Sale Process, (B) Employ a Marketing Firm, and (C) Employ an Auction Firm, and Grant Resident Committee Standing to Pursue Fraudulent Transfer Claims (Doc. No. 753 in the Westport Bankruptcy Case), which attached a copy of a draft complaint to be filed by the Resident Committee against the Insiders (as defined below) and certain other parties (the "**Draft Complaint**").

On November 8, 2017, the Bankruptcy Court entered an Interim Order Granting in Part Official Committee of Resident Creditors' Motion to (I) Appoint Chapter 11 Trustee or, Alternatively, (ii) Expand Power of Examiner to (A) Restart the Sale Process, (B) Employ a Marketing Firm, and (C) Employ an Auction Firm, and Grant Committee Standing to Pursue Fraudulent Transfer Claims (the "**Insider Recovery Order**") (Doc. No. 770 in the Westport Bankruptcy Case) which, among other things, authorized the Resident Committee to derivatively pursue causes of action the Debtors could assert against the Insiders and certain other parties (collectively, and including any other possible causes of action against the Insiders not described in the Draft Complaint, the "**Insider Causes of Action**") for the benefit of the Debtors' Estates (as defined below), through the filing of a complaint initiating an adversary proceeding pursuant to Rule 7001 of the Bankruptcy Rules (as defined below).

Before the Resident Committee filed an adversary complaint to pursue the Insider Causes of Action, the Debtors and the Current Resident Committee determined in the Mediation that they desired to settle fully and finally all differences, disputes, claims and causes of action among them including, but not limited to, those with respect to the Debtors, WNT, University Village, the Independent Living Facility, the Assisted Living Facility, the Skilled Nursing Facility, the Health Center, the Bankruptcy Cases, the Joint Plan, the Draft Complaint, the Insider Recovery Claims (as defined below), and the Insider Causes of Action (collectively, the "**Disputes**"), without limitation or reservation whatsoever, and ultimately entering into the Mediated Settlement Agreement.

On December 31, 2017, the Debtors and the Current Resident Committee filed a Joint Motion to Approve Settlement and Release Agreement [Doc. No. 802]. The Bankruptcy Court has scheduled a hearing to consider the joint motion for January 12, 2018 at 10:00 A.M.

## PACA and Section 503(b)(9) Claims

On November 28, 2016, US Foods, Inc. ("**US Foods**") filed a motion seeking allowance and payment of a claim under the Perishable Agricultural Commodities Act ("**PACA**") in the amount of $58,186.91 [Doc. No. 171]. US Foods also sought payment of its claim under Section 503(b)(9) of the Bankruptcy Code in the amount of $84,703.30 [Doc. No.172]. The Bankruptcy Court initially entered an order authorizing the payment of the PACA claims [Doc. Nos. 205 and 262] and an order allowing the Section 503(b)(9) claim in the amount of $68,123.55 [Doc. No. 274]. The PACA claims have been paid in full, but the Section 503(b)(9) claim has not yet been paid.

## Alternative Claim Forms for Former Residents and Current Residents

On December 5, 2016, the Debtors filed their Motion to Approve Alternative Claim Form and Cure Notice in Connection with Sales Process and Procedures to Fix Amounts Owed to Current and Former Residents [Doc. No. 193], which sought approval of procedures to liquidate claims of Former Residents and Current Residents. On January 30, 2017, the Bankruptcy Court entered an order granting this motion [Doc. No. 309], which is referred to as the Resident Claims Order in the Plan.

## Motions to Borrow

On December 16, 2016, the Debtors filed a motion to borrow money from SCM Specialty Finance Opportunities Fund, L.P. [Doc. No. 221]. The Examiner filed an objection to the motion 234]. The Bankruptcy Court entered an order denying the motion.

On December 26, 2017, the Examiner filed a supplemental objection which sought approval of a debtor in possession financing facility from USAmeriBank. On January 13, 2017 the Bankruptcy Court entered an order approving the borrowing from USAmeriBank, which transaction closed on January 27, 2017. The Debtors' filed a motion to modify the loan approval order and to amend the loan documents to allow a borrowing of up to $2,000,000 [Doc. No. 765] which was granted by order entered on November 20, 2017 [Doc. No. 776].

On March 30, 2017, the Debtors filed a motion to approve insurance premium financing [Doc. No. 493], which was granted by the Bankruptcy Court [Doc. No. 494].

## SUMMARY OF THE PLAN

## Introduction

Chapter 11 is the principal business chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize and/or liquidate its business for the benefit of itself and its

creditors and stockholders. The formulation of a plan is the principal objective of a Chapter 11 case. In general, a Chapter 11 plan (i) divides claims and interests into separate classes, (ii) specifies the property that each class is to receive under such plan, and (iii) contains other provisions necessary to the reorganization and/or liquidation of the debtor. Chapter 11 does not require each holder of a claim or interest to vote in favor of the plan in order for the Bankruptcy Court to confirm the plan. However, a plan must be accepted by the holders of at least one impaired class of claims (unless there are no impaired classes) without considering the votes of "insiders" within the meaning of the Bankruptcy Code.

The summary of the Plan contained herein addresses only certain provisions of the Plan. As a summary, it is qualified in its entirety by reference to the Plan itself. Upon Confirmation and the Effective Date, the Plan shall bind the Debtors, all of the Debtors' Creditors, the Holders of Equity Interests, and other parties in interest except as expressly set forth in the Plan. TO THE EXTENT THAT THE TERMS OF THIS DISCLOSURE STATEMENT VARY OR CONFLICT WITH THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL.

## General Overview of the Plan

The Plan provides for the implementation of the Mediated Settlement Agreement between the Debtors, their principals and Affiliates, and the Official Committee of Resident Creditors, and the Insider Release Parties, by the transfer of all operations of the Health Center to the New Health Center Operators and the appointment of the Liquidating Trustee to oversee the operations of the Facilities, market and sell the Facilities, and otherwise manage the orderly liquidation of the remaining assets of the Debtors' Estates and WNT for the benefit of creditors. The Liquidating Trustee will use the Cash Sale Proceeds to fund Distributions to Holders of Allowed Claims under the Plan. On the Effective Date, and pending the Closing of the sale of the Purchased Assets, all of the Debtors' assets shall be vested in the Liquidating Trustee, who shall enter into such contracts with a Buyer and other third-parties as are necessary to permit the continuing operation of the Facilities while honoring the Current Residents' and parties to Third Party Leases continued use and occupancy of the Facilities in accordance with their existing residency agreements. At the Closing, a Buyer will acquire the real estate and other assets subject to the existing residency agreements of the Current Residents as provided in the Plan. On or after the Closing, to the extent applicable, any Buyer will comply with Chapter 651 of the Florida Statutes.

## TREATMENT OF ADMINISTRATIVE
## EXPENSES AND PRIORITY TAX CLAIMS

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims have not been classified in the Plan. The treatment accorded to Administrative Expenses and Priority Tax Claims is set forth in Article 3 of the Plan.

## Administrative Expenses.

Except as otherwise provided in Articles 3.03 through 3.07 of the Plan, each Holder of an Allowed Administrative Expense shall be paid (a) on the Closing Date an amount, in Cash, equal to the Allowed Amount of its Administrative Expense less any portion of such Allowed Administrative Expense that has already been satisfied pursuant to the Exit Financing, or (b) under

such other terms as may be agreed to by the Holder of such Allowed Administrative Expense.

**DIP Loan Claims**.

All amounts owed to the DIP Lender for the DIP Loan Claims shall receive on the Closing Date an amount, in Cash, equal to the DIP Loan Claims less any portion of such DIP Loan Claims that has already been satisfied pursuant to the Exit Financing.

**Fees and Charges**.

All fees and charges assessed against the Estates under Chapter 123 of Title 28, United States Code, 28 U.S.C. §§ 1911-1930, through the Confirmation Date, as determined by the Bankruptcy Court in the Confirmation Order, will be paid no later than thirty (30) days after the Effective Date.

**Ordinary Course Liabilities**.

All Allowed Administrative Expenses with respect to Liabilities incurred by the Debtors in the ordinary course of business during the Bankruptcy Cases shall be paid by the Liquidating Trustee in the ordinary course of business in accordance with contract terms or as may be otherwise agreed upon by both the Holder of such Allowed Administrative Expense and the Liquidating Trustee.

**Assumed Liabilities**.

All Allowed Administrative Expenses representing Assumed Liabilities shall not be the responsibility of the Debtors or the Liquidating Estate or the Liquidating Trustee or be paid under Article 3 of the Plan, but shall be paid by the Buyer in accordance with the terms and conditions of an Asset Purchase Agreement.

**Applications for Allowance of Administrative Expenses**.

Except as provided in Articles 3.04 through 3.06 above, all Holders of Administrative Expenses (including Holders of any Claims for non-ad valorem Postpetition federal, state, or local taxes) that do not file an application or other Bankruptcy Court-approved pleading by the Administrative Expense Claim Bar Date will be forever barred from asserting such Administrative Expense against the Debtors, the Liquidating Estate, the Liquidating Trustee, or any of their respective assets or properties.

**Priority Tax Claims**.

Each Holder of an Allowed Priority Tax Claim shall be paid (a) on the Closing Date, an amount, in Cash, equal to the Allowed Amount of its Priority Tax Claim by the Liquidating Trustee out of the Cash Sale Proceeds, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtors or the Liquidating Trustee.

**DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS**

13

Set forth below is a designation of Classes of Claims and Equity Interests, along with the Plan Proponents' designation of whether a particular Class is Impaired and entitled to vote on the Plan.  A Claim is classified (a) in a particular Class of Claims only to the extent the Claim qualifies within the description of that Class and (b) in a different Class to the extent the Claim qualifies within the description of that different Class. Unless otherwise expressly stated, the Classes of Claims set forth below include all Claims against each of the Debtors that qualify within the description of that Class.

| Class | Claims and Equity Interests | Impairment Status | Voting Rights? |
|---|---|---|---|
| 1 | Allowed Priority Claims | Unimpaired | No |
| 2 | Allowed Secured Claims of CPIF | Impaired | Yes |
| 3 | Allowed Secured Claims of USAmeriBank | Impaired | Yes |
| 4 | Allowed Secured Tax Claims of Governmental Units | Impaired | Yes |
| 5 | Allowed Secured Claims of Drywizard Drywall Services, Inc. | Impaired | Yes |
| 6 | Allowed Secured Claims of Geiger | Impaired | Yes |
| 7 | Allowed Secured Claims of Flood Pros of SWFL Corp. | Impaired | Yes |
| 8 | Allowed Secured Claims of Prospect Construction & Development Group | Impaired | Yes |
| 9 | Allowed Secured Claims of Team Construction Services, LLC | Impaired | Yes |
| 10 | Allowed Secured Claims of John Deere | Unimpaired | No |
| 11 | Allowed Secured Claims of Marlin | Unimpaired | No |
| 12 | Allowed Secured Claims not otherwise specifically classified in the Plan | Unimpaired | No |
| 13 | Allowed Unsecured Claims of the Resident Parties | Impaired | Yes |
| 14 | Allowed Unsecured Claims not otherwise specifically classified in the Plan | Impaired | Yes |
| 15 | Allowed Subordinated Unsecured Claims of the Current Operators | Impaired | Yes |
| 16 | Allowed Equity Interests | Unimpaired | No |

## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**Unclassified Claims.**

Each Holder of an Allowed Administrative Expense or an Allowed Priority Tax Claim will receive the treatment set forth in Article 3 of the Plan.

**Class 1: Allowed Priority Claims.**

Class 1 consists of all Allowed Priority Claims.  Each Holder of an Allowed Priority Claim shall be paid (a) on the Closing Date, an amount, in Cash, equal to the Allowed Amount of its Priority Claim by the Liquidating Trustee out of the Cash Sale Proceeds, in accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by the Holder of such Allowed Priority Claim and the Debtors or the Liquidating Trustee. Class 1 is Unimpaired and, therefore, is not entitled to vote to accept or reject the Plan.  Class 1 is presumed to have accepted the Plan.

**Class 2: Allowed Secured Claims of CPIF.**

Class 2 consists of the Allowed Secured Claims of CPIF.  The Secured Claims asserted by CPIF are disputed by the Official Committee of Resident Creditors and, unless such dispute can be resolved by consensual agreement with CPIF, the Official Committee of Resident Creditors intends to file and prosecute an objection to the Secured Claims asserted by CPIF and counterclaims against CPIF.  Unless otherwise paid from the Exit Financing on the Effective Date, the Allowed Secured Claims of CPIF shall be paid as follows:

(a)    If the Closing on an Asset Purchase Agreement occurs on or before June 30, 2018, then on the Closing Date either:

(1)    CPIF shall be paid in Cash by the Liquidating Trustee out of the Cash Sale Proceeds in an amount equal to the agreed amount of the Allowed Secured Claims of CPIF determined by the Liquidating Trustee and CPIF as of the Closing Date, which payment shall be in full and final satisfaction of CPIF's Liens on the Debtors' Purchased Assets; or

(2)    To the extent that the amount of the Secured Claims of CPIF remain Disputed as of the Closing Date, then CPIF's Liens shall attach to the Cash Sale Proceeds and CPIF shall be paid the amount determined by the Bankruptcy Court upon entry of a Final Order determining the amount of the Allowed Secured Claims of CPIF; or

(b)    If the Closing on an Asset Purchase Agreement does not occur on or before June 30, 2018, then upon the later of July 1, 2018 or entry of a Final Order determining the amount of the Allowed Secured Claims of CPIF, the Liquidating Trustee shall pay CPIF deferred cash payments as follows: equal monthly payments of interest only for the first twelve months, followed by equal monthly payments of principal and interest based upon a 25-year amortization for the next one hundred and seven months, with a balloon payment of the outstanding principal amount of the Allowed Secured Claims of CPIF and accrued interest on the one hundred and twentieth month. The interest rate for purposes of calculating the payments on the Allowed Secured Claims of CPIF under this Article 5.04(b) of the Plan shall be either 3.5% per annum or such other interest rate determined by the Court in accordance with *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).

15

Until paid in full or otherwise disallowed, CPIF shall retain its Liens. Class 2 is Impaired and entitled to vote to accept or reject the Plan.

**Class 3: [Intentionally omitted]**

**Class 4: Allowed Secured Tax Claims of Governmental Units.**

Class 4 consists of all Allowed Secured Tax Claims of Governmental Units. The Holders of Allowed Secured Tax Claims shall be paid an amount, in Cash, equal to their Allowed Class 4 Secured Tax Claims by the Liquidating Trustee out of the Cash Sale Proceeds on the Closing Date, unless otherwise agreed with the Plan Proponents or the Liquidating Trustee. Class 4 is Impaired and is entitled to vote to accept or reject the Plan.

**Class 5: Allowed Secured Claims of Drywizard Drywall Services, Inc.**

Class 5 consists of all Allowed Secured Claims of Drywizard Drywall Services, Inc., if any, represented by, related to, or arising under or in connection with its Claim of Lien recorded against the Debtors' Purchased Real Property. Drywizard Drywall Services, Inc. shall be paid an amount, in Cash, equal to its Allowed Class 5 Secured Claim by the Liquidating Trustee out of the Cash Sale Proceeds on the Closing Date, unless otherwise agreed with the Plan Proponents or the Liquidating Trustee. To the extent any amounts claimed by Drywizard Drywall Services, Inc. are determined to be Allowed Unsecured Claims, such Allowed Unsecured Claims shall be paid under the Plan pursuant to the treatment for Allowed Class 14 Unsecured Claims. Class 5 is Impaired and is entitled to vote to accept or reject the Plan.

**Class 6: Allowed Secured Claims of Geiger.**

Class 6 consists of all Allowed Secured Claims of Geiger, if any, represented by, related to, or arising under or in connection with its final judgment recorded against the Debtors' Purchased Real Property. Geiger shall be paid an amount, in Cash, equal to its Allowed Class 6 Secured Claim by the Liquidating Trustee out of the Cash Sale Proceeds on the Closing Date, unless otherwise agreed with the Plan Proponents or the Liquidating Trustee. To the extent any amounts claimed by Geiger are determined to be Allowed Unsecured Claims, such Allowed Unsecured Claims shall be paid under the Plan pursuant to the treatment for Allowed Class 14 Unsecured Claims. Class 6 is Impaired and is entitled to vote to accept or reject the Plan.

**Class 7: Allowed Secured Claims of Flood Pros of SWFL Corp.**

Class 7 consists of all Allowed Secured Claims of Flood Pros of SWFL Corp., if any, represented by, related to, or arising under or in connection with its Claim of Lien recorded against the Debtors' Purchased Real Property. Flood Pros of SWFL Corp. shall be paid an amount, in Cash, equal to its Allowed Class 7 Secured Claim by the Liquidating Trustee out of the Cash Sale Proceeds on the Closing Date, unless otherwise agreed with the Plan Proponents or the Liquidating Trustee. To the extent any amounts claimed by Flood Pros of SWFL Corp. are determined to be Allowed Unsecured Claims, such Allowed Unsecured Claims shall be paid under the Plan pursuant to the treatment for Allowed Class 14 Unsecured Claims. Class 7 is Impaired and is entitled to vote to accept or reject the Plan.

**Class 8: Allowed Secured Claims of Prospect Construction & Development Group.**

Class 8 consists of all Allowed Secured Claims of Prospect Construction & Development Group, if any, represented by, related to, or arising under or in connection with its Claim of Lien recorded against the Debtors' Purchased Real Property. Prospect Construction & Development Group shall be paid an amount, in Cash, equal to its Allowed Class 8 Secured Claim by the Liquidating Trustee out of the Cash Sale Proceeds on the Closing Date, unless otherwise agreed with the Plan Proponents or the Liquidating Trustee. To the extent any amounts claimed by Prospect Construction & Development Group are determined to be Allowed Unsecured Claims, such Allowed Unsecured Claims shall be paid under the Plan pursuant to the treatment for Allowed Class 14 Unsecured Claims. Class 8 is Impaired and is entitled to vote to accept or reject the Plan.

**Class 9: Allowed Secured Claims of Team Construction Services, LLC.**

Class 9 consists of all Allowed Secured Claims of Team Construction Services, LLC, if any, represented by, related to, or arising under or in connection with its Claim of Lien recorded against the Debtors' Purchased Real Property. Team Construction Services, LLC shall be paid an amount, in Cash, equal to its Allowed Class 9 Secured Claim by the Liquidating Trustee out of the Cash Sale Proceeds on the Closing Date, unless otherwise agreed with the Plan Proponents or the Liquidating Trustee. To the extent any amounts claimed by Team Construction Services, LLC are determined to be Allowed Unsecured Claims, such Allowed Unsecured Claims shall be paid under the Plan pursuant to the treatment for Allowed Class 14 Unsecured Claims. Class 9 is Impaired and is entitled to vote to accept or reject the Plan.

**Class 10: Allowed Secured Claims of John Deere.**

Class 10 consists of all Allowed Secured Claims of John Deere, if any. The Allowed Class 10 Secured Claims of John Deere shall be treated as follows:

      (a)     If a Buyer wishes to purchase the collateral securing the Allowed Class 10 Secured Claims of John Deere, then the Buyer shall pay the Allowed Class 10 Secured Claims of John Deere at the Closing; or

      (b)     If a Buyer does not wish to purchase the collateral securing the Allowed Class 10 Secured Claims of John Deere, then such collateral shall be abandoned to John Deere in full satisfaction of John Deere's Allowed Class 10 Secured Claims.

Class 10 is Unimpaired and, therefore, is not entitled to vote to accept or reject the Plan. Class 10 is presumed to have accepted the Plan.

**Class 11: Allowed Secured Claims of Marlin.**

Class 11 consists of all Allowed Secured Claims of Marlin, if any. The Allowed Class 11 Secured Claims of Marlin shall be treated as follows:

(a)      If a Buyer wishes to purchase the collateral securing the Allowed Class 11 Secured Claims of Marlin, then the Buyer shall pay the Allowed Class 11 Secured Claims of Marlin at the Closing; or

(b)      If a Buyer does not wish to purchase the collateral securing the Allowed Class 11 Secured Claims of Marlin, then such collateral shall be abandoned to Marlin in full satisfaction of Allowed Class 11 Secured Claims of Marlin.

Class 11 is Unimpaired and, therefore, is not entitled to vote to accept or reject the Plan. Class 11 is presumed to have accepted the Plan.

## Class 12: Other Allowed Secured Claims.

Class 12 consists of all Allowed Secured Claims not otherwise specifically classified in the Plan.  In the event there is more than one Secured Claim in this Class, such Secured Claims shall be separated into subclasses in Class 12.  Within ten (10) days following the Effective Date, the Holder of a Class 12 Secured Claim shall be satisfied by the Debtors returning to the Secured Creditor any Assets (to the extent such Assets are not part of the Debtors' Purchased Assets) determined by the Bankruptcy Court to secure its Secured Claim in full and final satisfaction of such Secured Claim.  Any deficiency owing to a Secured Creditor with respect to a Class 12 Claim shall be classified and treated as a Class 14 Unsecured Claim to the extent Allowed by a Final Order of the Bankruptcy Court.  Notwithstanding the foregoing, all Class 12 Secured Claims representing Assumed Liabilities or secured by any of the Debtors' Purchased Assets shall not be the responsibility of the Plan Proponents or the Liquidating Estates or the Liquidating Trustee or be paid under this Article 5.14, but shall be paid by the Buyer in accordance with the terms and conditions of the Asset Purchase Agreement.  Class 12 is Unimpaired and, therefore, is not entitled to vote to accept or reject the Plan.  Class 12 is presumed to have accepted the Plan.

## Class 13: Allowed Unsecured Claims of the Resident Parties.

Class 13 consists of (a) all Allowed Unsecured Claims of the Former Residents under the Former Resident Contracts and (b) all Allowed Current Resident PIP Rejection Claims (collectively, the "**Resident Unsecured Claims**").   Each Holder of an Allowed Resident Unsecured Claim shall receive, in full and final satisfaction of such Holder's Allowed Resident Unsecured Claim, equal quarterly cash payments beginning on the last Business Day of the first full calendar quarter following the second anniversary of the Effective Date and continuing on the last Business Day of each subsequent calendar quarter until the twelfth anniversary of the Effective Date, together with interest at 3% per annum beginning on the second anniversary of the Effective Date. Class 13 is Impaired and is entitled to vote to accept or reject the Plan.

## Class 14: Other Allowed Unsecured Claims.

Class 14 consists of all Allowed Unsecured Claims not otherwise specifically classified in the Plan. Each Holder of an Allowed Class 14 Unsecured Claim shall receive, in full and final satisfaction of such Holder's Allowed Class 14 Unsecured Claim, either:

(a)    In the event there is not a Closing under the Asset Purchase Agreement, such Holder's Pro Rata Share of the lesser of (i) one hundred percent (100%) of all Allowed Class 14 Unsecured Claims or (ii) Seven Hundred and Fifty Thousand and 00/100 Dollars ($750,000.00), in equal quarterly cash payments beginning on the last Business Day of the first full calendar quarter following the second anniversary of the Effective Date and continuing on the last Business Day of each subsequent calendar quarter until the twelfth anniversary of the Effective Date, together with interest at 3% per annum beginning on the second anniversary of the Effective Date; or

(b)    In the event there is a Closing under an Asset Purchase Agreement, such Holder's Pro Rata Share of the General Unsecured Creditor Distribution Amount, such amount to be paid to such Holder by the Liquidating Trustee from the Cash Sale Proceeds within ten (10) Business Days following the Closing.

Class 14 is Impaired and entitled to vote to accept or reject the Plan.

**Class 15:  Allowed Subordinated Unsecured Claims of Current Operators.**

Class 15 consists of all Allowed Unsecured Claims of the Current Operators for the Collection Difference in accordance with the Mediated Settlement Agreement.  Each Holder of an Allowed Class 15 Subordinated Unsecured Claim shall receive, in full and final satisfaction of such Holder's Allowed Class 15 Subordinated Unsecured Claim, such Holder's Pro Rata Share of the Collection Difference from any cash remaining in the Estates after satisfaction in full of all allowed claims in Classes 1 through 14.  Class 15 is Impaired and is entitled to vote to accept or reject the Plan.

**Class 16: Allowed Equity Interests.**

Class 16 consists of all Allowed Equity Interests. On the Effective Date, except as otherwise expressly provided in the Plan, all Holders of Allowed Equity Interests shall be entitled to retain all legal, equitable, and contractual rights in such Allowed Equity Interests; provided, however, that such Holders of Allowed Equity Interests shall not be entitled to any distributions from the Estates until (a) the satisfaction in full of all allowed claims in Classes 1 through 15, and (b) the satisfaction of all allowed expenses of the Liquidating Trustee, any professionals employed by the Liquidating Trustee, or any member of the Trust Advisory Board in accordance with the Plan, including but not limited to Sections 8.14 and 8.22 of the Plan.  Class 16 is Unimpaired and, therefore, is not entitled to vote to accept or reject the Plan.  Class 16 is presumed to have accepted the Plan.

## ACCEPTANCE OR REJECTION OF THE PLAN

**Each Impaired Class Entitled to Vote Separately.**

The Holders of Claims in each Impaired Class of Claims will be entitled to vote separately to accept or reject the Plan.

**Acceptance by Impaired Classes.**

Classes 2, 4, 5, 6, 7, 8, 9, 13, 14, and 15 are Impaired under the Plan, and Holders of Claims in such Classes are entitled to vote to accept or reject the Plan. Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims will have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Pursuant to Section 1126(d) of the Bankruptcy Code, an Impaired Class of Equity Interests will have accepted the Plan if the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

**Presumed Acceptance of Plan by Unimpaired Classes.**

Classes 1, 10, 11, 12, and 16 are Unimpaired. Pursuant to Section 1126(f) of the Bankruptcy Code, each such Class and the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have accepted the Plan and, thus, are not entitled to vote on the Plan. Except as otherwise expressly provided in the Plan, nothing contained in the Plan or otherwise will affect the Plan Proponents' or the Liquidating Trustee's rights and legal and equitable claims or defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**Impairment Controversies.**

If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Class of Equity Interests, is Impaired under the Plan, such Claim, Equity Interest or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest, or a particular Class of Claims or Class of Equity Interests, under the Plan.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Assumption and Assignment of Assigned Contracts.**

Exhibit A attached to the Plan identifies the Assumed Contracts, which consist of all Prepetition executory contracts and unexpired leases, other than Assumed Resident Contracts, to which either Debtor is a party. On the Effective Date, the Debtors will conditionally assume the Assumed Contracts, with the final assumption of the Assumed Contracts and assignment of the Assumed Contracts to a Buyer to occur at the Closing, subject to the discretion of a Buyer. Until the Closing, the Debtors shall comply with the terms of the Assumed Contracts. Until such assumption becomes final upon the Closing, the subsequent termination of any conditionally assumed Assumed Contract between the Effective Date and the Closing shall not result in any claims arising from such termination becoming an administrative expense of the Debtors' Estates.

**Assumption and Assignment of Current Resident Contracts and Third Party Leases.**

On the Effective Date, the Debtors will conditionally assume any Current Resident Contracts and Third Party Leases (the "**Assumed Resident Contracts**"), with the final assumption of the Assumed Resident Contracts and assignment of the Assumed Resident Contracts to a Buyer to occur at the Closing, subject to the discretion of a Buyer. Until the Closing, the Debtors shall comply with the terms of the Assumed Resident Contracts. Until such assumption becomes final upon the Closing, the subsequent termination of any conditionally assumed Assumed Resident Contract between the Effective Date and the Closing shall not result in any claims arising from such termination becoming an Administrative Expense of the Debtors' Estates. Notwithstanding the foregoing, any claims arising from the termination of any conditionally assumed Assumed Resident Contract by either the voluntary termination or death of the respective Current Resident on or before the later of (a) a Closing or (b) the second anniversary of the Effective Date, shall be treated in accordance with the Allowed Resident Unsecured Claims in Class 13 of the Plan.

**Adequate Assurance of Future Performance of Assumed Resident Contracts.**

The amount of minimum liquid reserve required and approved by OIR as of the Closing, as calculated in accordance with Rule 69O-19.050 of the Florida Administrative Code (the "**Continuing Care Reserve**"), shall serve as adequate assurance of the Buyer's future performance under the Assumed Resident Contracts, as contemplated under Section 365(b)(1)(C) of the Bankruptcy Code. To the extent that the Debtors' existing Cash set aside for regulatory reserves is insufficient to fund the Continuing Care Reserve at the Closing, then the Buyer must fund the difference in Cash at the Closing.

**Rejection of Other Executory Contracts and Unexpired Leases.**

All other executory contracts and unexpired leases that exist between either of the Debtors and another Person or Entity and that (a) are not Assumed Contracts or Assumed Resident Contracts, or (b) have not been expressly rejected or assumed by the Debtors with Bankruptcy Court approval on or before the Effective Date, shall be deemed rejected by the Debtors as of the Effective Date (the "**Non-Resident Rejected Contracts**").

**Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases and Adequate Assurance of Future Performance of Assumed Contracts.**

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Closing, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the conditional assumption of the executory contracts and unexpired leases assumed pursuant to Articles 7.01 and 7.02 hereof, (ii) the approval, pursuant to Section 365(b)(1)(C) of the Bankruptcy Code, of the Continuing Care Reserve Amount and other consideration provided under the Plan as the Buyer's adequate assurance of future performance of any Assumed Contracts or Assumed Resident Contracts; (iii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Articles 7.04 hereof, and (iv) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtors may finally assume, assign, or reject any

unexpired lease of nonresidential real property through the date of entry of an order approving the final assumption, assignment, or rejection of such unexpired lease. The final assumption and assignment by the Debtors of any conditionally assumed Assumed Contract or Assumed Resident Contract shall be binding upon any and all parties to such Assumed Contract or Assumed Resident Contract as a matter of law, and each such Assumed Contract or Assumed Resident Contract shall be fully enforceable by the Buyer in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

## Cure Claims Under Assumed Contracts.

Any lessor, lessee, or other party to an Assumed Contract asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract under Articles 7.01 and 7.02 hereof, as contemplated by Section 365(b) of the Bankruptcy Code, must have filed such Cure Claim with the Bankruptcy Court on or before the Cure Claim Deadline (unless a late Cure Claim is specifically allowed by the consent of the Debtors or order of the Bankruptcy Court) asserting all alleged amounts accrued or alleged defaults through the Effective Date. Any lessor, lessee or other party to an Assumed Contract or Assumed Resident Contract who fails to file a Cure Claim by the Cure Claim Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtors, the Liquidating Trustee, or the Buyer. The Liquidating Trustee or a Buyer, as applicable, shall have sixty (60) days from the entry of the Confirmation Order to file an objection to any Cure Claim filed in connection with any Assumed Contract or Assumed Resident Contract. Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Unless otherwise agreed to by the parties, any allowed Cure Claim shall be paid by the Liquidating Trustee in equal quarterly cash payments beginning on the last Business Day of the first full calendar quarter following the Effective Date and continuing on the last Business Day of each subsequent calendar quarter until the fifth anniversary of the Effective Date; provided, however, that, at the sole discretion of a Buyer, such Buyer may elect to either (a) continue such quarterly payments after the assignment of the respective Assumed Contract or Assumed Resident Contract to the Buyer at the Closing or (b) pay 90% of the remaining allowed Cure Claim in cash at the Closing. With respect to any disputed Cure Claim, no payments shall be made by the Liquidating Trustee or a Buyer on any such disputed Cure Claims until a Final Order has been entered by the Bankruptcy Court allowing all or a portion of such disputed Cure Claim.

## Claims Under Non-Resident Rejected Contracts.

Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any Non-Resident Rejected Contract must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such Non-Resident Rejected Contract or such Claim shall be forever barred and unenforceable against the Debtors, the Liquidating Estates, the Liquidating Trustee, or the Buyer. With respect to any Non-Resident Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be the Voting Deadline. The Plan and any other order of the Bankruptcy Court providing for the rejection of a Non-Resident Rejected Contract shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of a Non-Resident Rejected Contract of the Bar Date for filing a Claim in connection therewith. All Claims for damages from the rejection of a Non-Resident Rejected Contract, once fixed and

liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Class 14 Unsecured Claims.  Any such Claims that become Disputed Class 14 Claims shall be Disputed Claims for purposes of administration of Distributions under the Plan to Holders of Allowed Class 14 Unsecured Claims.

**Inclusiveness.**

Unless otherwise specified in the Plan or an Asset Purchase Agreement, each executory contract and unexpired lease that is rejected or assumed shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is specifically referenced in this Plan or in a notice of assumption provided under this Plan.

## MEANS OF IMPLEMENTATION OF THE PLAN

**Maintenance of Existing Lien Rights Under Mediated Settlement Order.**

The Plan incorporates the terms of the Mediated Settlement Agreement and the Mediation Settlement Order.  The Confirmation Order shall provide that, upon the Effective Date, all existing lenders to the Debtors, WNT and the Current Operators, including CPIF, USAmeriBank, and CNH, and all holders of Secured Claims shall maintain their existing lien rights to the same extent, validity, and priority as provided in the Mediation Settlement Order.

**Effective Date Transactions.**

Subject to the approval of the Bankruptcy Court and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date contained in Article 10.02 of the Plan, on or as of the Effective Date: (a) the appointment of the Liquidating Trustee shall become effective and the Liquidating Estate shall be automatically substituted for the Debtors as a party to all contested matters, adversary proceedings, and lawsuits, both within and outside of the Bankruptcy Court, involving the assets of the Liquidating Estate; and (b) the Liquidating Trustee shall have carried out the other Effective Date responsibilities under the Plan, including the execution and delivery of all documentation contemplated by the Plan and any Asset Purchase Agreement.

**Sale of Assets of the Debtors and WNT.**

On the Effective Date, the Liquidating Trustee is authorized without further order of the Bankruptcy Court to market and sell the Independent Living Facility and the Health Center to a Buyer pursuant to an Asset Purchase Agreement.  After the Effective Date, the Closing of the purchase and sale of the Purchased Assets pursuant to an Asset Purchase Agreement shall occur on the Closing Date, with the disbursement of the Cash Sale Proceeds to be made in accordance with the Plan. At the Closing, the New Health Center Operators shall, to the extent necessary, terminate or transfer (a) the full financial and operational control of the Health Center, (b) the New Health Center Lease, and (c) any and all licenses, permits, provider agreements, and other

additional documents to turn over full financial and operational control of the Health Center from the New Health Center Operators to any Buyer under the Plan.

**Vesting of Certain Assets of the Estates in the Liquidating Estate.**

On the Effective Date, except as otherwise expressly provided in the Plan, all Assets of the Estates (including the Excluded Assets and the Causes of Action) shall vest in, and become assets of, the Liquidating Estate, free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature, and the Confirmation Order shall so provide.

**Continued Limited Partnership Existence.**

The Debtors will continue to exist after the Effective Date as Delaware limited partnerships, with all of the powers of for profit limited partnerships under applicable law in the State of Delaware and pursuant to their respective limited partnership agreements, articles of organization or other organizational documents in effect prior to the Effective Date, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date.

**Management of the Debtors Following the Effective Date.**

On and after the Effective Date, the Debtors will be operated and managed solely by and through the Liquidating Trustee, through HMS of Tampa, Inc. or such other qualified managers appointed in the Liquidating Trustee's business judgment, and the operations of the Health Center shall be managed consistent with the terms of the Mediated Settlement Agreement, subject to the oversight of the Liquidating Trustee as provided in the Mediated Settlement Agreement and any lease or management agreement contemplated therein, all in accordance with the irrevocable delegations of authority contemplated in Articles 8.03(a) and (b) of the Plan and, notwithstanding anything in the partnership agreements of the Debtors, no Holders of Equity Interests in the Debtors shall have any power to direct or remove the Liquidating Trustee or otherwise manage the affairs of the Debtors after the Effective Date.

**Limited Partnership Actions.**

All matters provided for under the Plan involving the limited partnership structure of the Debtors, or any limited partnership action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the partners of the Debtors. From and after the Confirmation Date and until the Effective Date, the Liquidating Trustee shall have all powers accorded by law of the State of Delaware to put into effect and carry out the Plan and the Confirmation Order.

**Section 1146 Exemption.**

Any Asset Purchase Agreement shall provide for and require the simultaneous sale to a Buyer of the Debtors' Purchased Assets and the WNT Purchased Assets. The sale of the WNT

Purchased Assets is necessary for the consummation of the Plan. Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any security or the making, delivery or recording of any instrument of transfer pursuant to, in implementation of or as contemplated by the Plan or the Asset Purchase Agreement, or the vesting, re-vesting, transfer or sale of any Assets of, by or in the Debtors or their Estates or any assets of, by or in WNT pursuant to, in implementation of or as contemplated by the Plan or the Asset Purchase Agreement, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents or Governmental Units shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Effectuating Documents; Further Transactions.**

The Liquidating Trustee shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, mortgages, and other agreements or documents, and take such actions as may be necessary or appropriate on behalf of the Debtors, to effectuate and further evidence the terms and conditions of the Plan or an Asset Purchase Agreement or to otherwise comply with applicable law.

**Selection of the Liquidating Trustee.**

Jeffrey W. Warren shall be appointed as the initial Liquidating Trustee by the Bankruptcy Court at the Confirmation Hearing. The Liquidating Trustee shall serve from and after the Effective Date until his or her successor is duly appointed and qualified or until his or her earlier death, resignation or removal. In the event of the death, resignation or removal of the Liquidating Trustee, any successor thereto shall be selected following notice to the Notice Parties and a hearing before the Bankruptcy Court.

**Indemnification and Limitation of Liability of Liquidating Trustee.**

The Liquidating Trustee shall be indemnified by and be entitled to receive reimbursement from the Debtors' Estates, upon approval by the Bankruptcy Court, against and from any and all loss, cost, expense, liability or damage which the Liquidating Trustee may actually incur or sustain in the exercise and performance of any of the powers and duties under this Plan, excepting those acts of the Liquidating Trustee arising from its own gross negligence, fraud or willful misconduct. The Liquidating Trustee shall not have any personal obligation to satisfy any liability of the Debtors or their Estates. No recourse shall ever be had, directly or indirectly, against the Liquidating Trustee, individually, or his or her representatives, agents, or professionals, by legal or equitable proceedings or by virtue of any statute or otherwise, or any acts taken by the Liquidating Trustee under the Joint Plan.

**Powers and Limitations of Liquidating Trustee.**

(a)     The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and in the Confirmation Order.  The responsibilities of the Liquidating Trustee shall include (i) the receipt, management, supervision, and protection of the assets of the Liquidating Estate on behalf of and for the benefit of the Creditors, including authority to establish such accounts as the Liquidating Trustee deems appropriate and to make all Distributions required under the Plan; (ii) the investigation, analysis, prosecution and, if necessary and appropriate, compromise of the claims and Causes of Action included among the assets of the Liquidating Estate; (iii) the marketing, selling, leasing, or otherwise disposing of any of the assets of the Liquidating Estate; (iv) filing all required tax returns and paying taxes and all other obligations of the Liquidating Estate; and (v) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Plan, by orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan.

(b)     The Liquidating Trustee shall be deemed to be for all purposes the "representative" of the Liquidating Estate as set forth in Section 1123(b) of the Bankruptcy Court to retain, enforce, settle and prosecute all Causes of Action.  The Liquidating Trustee shall use its best efforts to promptly liquidate the assets of the Liquidating Estate as soon as practicable at minimal cost and to distribute the proceeds thereof (including any Causes of Action Recoveries and Excluded Assets Recoveries) as soon as practicable pursuant to this Plan.  The powers of the Liquidating Trustee shall include the power to (i) invest funds; (ii) make Distributions; (iii) pay taxes and other obligations owed by the Liquidating Estate; (iv) engage and compensate, from the assets of the Liquidating Estate, consultants, agents, employees and professional persons to assist the Liquidating Trustee with respect to the Liquidating Trustee's responsibilities; (v) retain and compensate, from the assets of the Liquidating Estate, the services of experienced auctioneers, brokers, and/or marketing agents to assist and/or advise in the sale or other disposition of the assets of the Liquidating Estate; (vi) liquidate and dispose of the assets of the Liquidating Estate; (vii) prosecute, compromise and settle Causes of Actions, with approval of the Bankruptcy Court being required only as stated in the Plan or in the Confirmation Order; (viii) act on behalf of the Liquidating Estate in all adversary proceedings and contested matters pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere, including any appeals; (ix) commence and/or pursue any and all Causes of Action involving assets of the Liquidating Estate that could arise or be asserted at any time, unless otherwise waived or relinquished in this Plan or in a Final Order of the Bankruptcy Court; (x) sue and be sued, including the filing and defending of any contested matters and adversary proceedings in the Bankruptcy Court and actions or other proceedings in any other court, and pursue or defend any appeal from any judgment or order therefrom; (xi) utilize assets of the Liquidating Estate to purchase appropriate insurance to insure the acts and omissions of the Liquidating Trustee; and (xii) act and implement this Plan and orders of the Bankruptcy Court.  The Liquidating Trustee shall exercise such powers in accordance with the provisions of this Plan and the Confirmation Order.  The Liquidating Trustee shall be entitled to retain any of the Professionals, in its sole discretion, that have been employed by the Debtors or other parties in interest in the Bankruptcy Cases.  The Liquidating Trustee shall obtain the approval of the Bankruptcy Court prior to retention and engagement of any professional who has not previously been approved by the Bankruptcy Court as a professional for the Debtors in the Bankruptcy Cases.  The provision of services by a Professional to the Debtors in the Bankruptcy Cases shall not disqualify such Professional from employment by the Liquidating Trustee.

(c)    The Liquidating Trustee shall not do any act or undertake any activity unless it determines, in good faith, that such act or activity is desirable, necessary or appropriate for the management, conservation, and protection of the Debtors' Estates.

(d)    The Liquidating Trustee shall not be deemed to make any representations or warranties as to the value or condition of the Assets of the Debtors' Estates, or as to the validity, execution, enforceability, legality, or sufficiency of this Plan, and the Liquidating Trustee shall incur no liability or responsibility in respect of such matters. Persons dealing with the Liquidating Trustee shall look only to the Assets of the Debtors' Estates to satisfy any liability incurred by the Liquidating Trustee to such Person in carrying out the terms of this Plan, and the Liquidating Trustee shall have no personal or individual obligation to satisfy any such liability, unless it is proven that the Liquidating Trustee was grossly negligent or acted with willful misconduct in ascertaining the pertinent facts or in performing any of the rights, powers or duties hereunder.

## Compensation of Liquidating Trustee.

(a)    The initial compensation of the Liquidating Trustee shall be on an hourly rate basis as established by the Bankruptcy Court, plus reimbursement for actual, reasonable and necessary expenses incurred by the Liquidating Trustee, and such amounts shall be paid by the Liquidating Estate.  The Liquidating Trustee shall not be entitled to increase such hourly rate absent an order of the Bankruptcy Court. From and after the Effective Date, any professionals engaged or retained by the Liquidating Trustee shall be entitled to reasonable compensation to perform services for the Liquidating Trustee.  The fees and expenses of the Liquidating Trustee and any professionals employed by the Liquidating Trustee shall be subject to review and approval by the Bankruptcy Court.  Unless otherwise provided in an order of the Bankruptcy Court, the Liquidating Trustee and any professionals engaged or retained by the Liquidating Trustee shall be required to file interim applications for approval of fees and expenses with the Bankruptcy Court every sixty (60) days following the Effective Date.

(b)    Subject to Bankruptcy Court approval, all costs and expenses and obligations incurred by the Liquidating Trustee in administrating the Plan or any manner connected, incidental, or related thereto shall be a claim against the Assets of the Debtors' Estates, including payments to the Liquidating Trustee for its services as Liquidating Trustee.

## Resignation of Liquidating Trustee.

The Liquidating Trustee shall, after written notice filed with the Bankruptcy Court, be entitled to resign as Liquidating Trustee for any reason.  The Liquidating Trustee shall be obligated to perform its duties under this Plan, and shall be entitled to compensation (under terms previously approved by the Bankruptcy Court) through and including the date a replacement is approved by the Bankruptcy Court.  In the event of such resignation, the Liquidating Trustee shall file a notice of replacement Liquidating Trustee with the Bankruptcy Court, whose appointment shall be subject to Bankruptcy Court approval.

**No Bond Required of Liquidating Trustee.**

The Liquidating Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. If otherwise so ordered, all costs and expenses of procuring any such bond shall be paid by the Liquidating Estate.

**Pursuit of Causes of Action.**

(a)     On the Effective Date, the Causes of Action shall vest in, and become assets of, the Liquidating Estate as provided in Article 8.04 of the Plan, except to the extent a Creditor or other third party has been specifically released from any Cause of Action by the terms of the Plan or by a Final Order of the Bankruptcy Court, including the Mediation Settlement Order. The Causes of Action shall be pursued by the Liquidating Trustee. Except as otherwise provided in the Plan, the Liquidating Trustee will have the rights, powers and privileges, in its sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court. The Plan Proponents are not currently in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. For purposes of providing notice, the Plan Proponents state that any party in interest that engaged in business or other transactions with the Debtors Prepetition or that received payments from the Debtors Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation. In this regard, notice is hereby given that the Causes of Action shall include any avoidance actions relating to preferential transfers and possible fraudulent transfers under various provisions of the Bankruptcy Code against various trade Creditors and other Prepetition Creditors, as more particularly listed in the Statement of Financial Affairs, Part 2, Item 3 [Doc. No. 91]. The Liquidating Trustee Reserve Amount will fund the expenses of the Liquidating Trustee to pursue the Causes of Action, including fees of counsel for the Liquidating Trustee.

(b)     No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Cause of Action. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. ADDITIONALLY, EXCEPT AS OTHERWISE PROVIDED IN ARTICLE 11, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE LIQUIDATING TRUSTEE AND THE LIQUIDATING ESTATE. Creditors are advised that legal rights, claims and rights of action the Debtors may have against them, if they exist, are retained under the Plan for prosecution unless a specific order of the Bankruptcy Court authorizes the Debtors to release such claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Plan Proponents or the Liquidating Trustee do not possess or do not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan. Except as otherwise provided in Article 11, it is the expressed intention of the Plan to preserve rights, claims, and rights of action of the Debtors, whether now known or unknown, for the benefit of the Liquidating Estate and the Debtors' Creditors. A Cause of Action shall not, under any

circumstances, be waived as a result of the failure of the Plan Proponents to describe such Cause of Action with specificity in the Plan or the Disclosure Statement; nor shall the Liquidating Trustee, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action.  Nothing in the Plan operates as a release of any of the Causes of Action, except as expressly provided otherwise.

(c)    The Plan Proponents do not presently know the full extent of the Causes of Action, and, for purposes of voting on the Plan, all Creditors are advised that the Liquidating Trustee will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action.  Accordingly, except as otherwise provided in Article 11, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any *res judicata* or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

(d)    The Liquidating Estate shall remain open, even if the Bankruptcy Cases shall have been closed, as to any and all Causes of Action until such time as the Causes of Action have been fully administered and the assets of the Liquidating Estate have been distributed as provided in this Plan.

### Prosecution and Settlement of Causes of Action.

The Liquidating Trustee (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtors had or had power to assert immediately prior to the Confirmation Date, and (b) may settle or adjust such Cause of Action.  From and after the Effective Date, the Liquidating Trustee shall be authorized pursuant to Bankruptcy Rule 9019(b) and Section 105(a) of the Bankruptcy Code to compromise and settle any Cause of Action in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Cause of Action originally asserted in an amount equal to or less than $25,000.00, then the Liquidating Trustee may settle the Cause of Action upon notice to the Notice Parties and execute necessary documents, including a stipulation of settlement or release, in its sole discretion and without notice to any other party; and (ii) if the resulting settlement involves a Cause of Action initially asserted in an amount exceeding $25,000.00, then the Liquidating Trustee shall, upon written notice to the Notice Parties, be authorized and empowered to settle such Cause of Action only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019.

### Establishment of Liquidating Trustee Reserve Amount.

As soon as reasonably practicable (as determined by the Liquidating Trustee) after the Effective Date, the Liquidating Trustee shall deposit the Cash assets of the Liquidating Estate into the Liquidating Trustee Reserve Account.  The Liquidating Trustee shall be entitled to always

maintain a balance in the Liquidating Trustee Reserve Account equal to the Liquidating Trustee Reserve Amount (the "**Minimum Reserve Balance**").

**Deposits and Disbursements as to Liquidating Trustee Reserve Account.**

Upon the receipt by the Liquidating Estate of any Cash assets, including any Causes of Action Recoveries and any Excluded Assets Recoveries, the Liquidating Trustee shall promptly deposit such Cash assets into the Liquidating Trustee Reserve Account. If, at the end of any calendar month following the Closing Date, the balance in the Liquidating Trustee Reserve Account exceeds the Minimum Reserve Balance by $25,000.00, the Liquidating Trustee may transfer such excess balance to such distribution accounts as the Liquidating Trustee deems appropriate. All funds transferred to the Liquidating Trustee pursuant to this Article 8.20 shall be made available for Distributions in accordance with the provisions of Article 9.02 of this Plan.

**Dissolution of the Committees.**

Upon the Effective Date, the Committees shall be dissolved.

**Trust Advisory Board.**

On the Effective Date, an advisory board (the "**Trust Advisory Board**") shall be established and, until the Bankruptcy Cases are closed, the Liquidating Trustee shall consult regularly with the Trust Advisory Board when carrying out the purpose and intent of this Plan. The Trust Advisory Board shall be initially comprised of five (5) members, each of whom shall be Holders of Allowed Claims against the Debtors. Subject to the approval of the Bankruptcy Court, three (3) of the initial members of the Trust Advisory Board shall be jointly nominated by the Committees, and two (2) of the initial members of the Trust Advisory Board shall be jointly nominated by the Holders of Allowed Claims in Classes 2 and 3. Until the Bankruptcy Cases are closed, the Liquidating Trustee shall consult regularly with the Trust Advisory Board when carrying out the purpose and intent of this Plan; provided, however, that the Liquidating Trustee is not required to abide by any advice or recommendations of the Trust Advisory Board. The members of the Trust Advisory Board shall be entitled to compensation and reimbursement of the reasonable and necessary expenses incurred by them in carrying out the purposes of the Trust Advisory Board, subject to the approval of the Bankruptcy Court and payable as an expense of the Liquidating Estates in the same manner as the expenses of the Liquidating Trustee accordance with the provisions of Article 8.14 of this Plan. In the case of an inability or unwillingness of any member of the Trust Advisory Board to serve, such member shall be replaced by designation of the remaining members of the Trust Advisory Board. Upon certification by the Liquidating Trustee that all assets of the Estates have been liquidated, distributed, abandoned, or otherwise disposed of, the members of the Trust Advisory Board shall resign their positions, whereupon they shall be discharged from any further duties and responsibilities.

## PROVISIONS GOVERNING DISTRIBUTIONS

**Closing Distributions.**

At the Closing, the Liquidating Trustee shall pay, from the Cash Sale Proceeds, (a) Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals), Allowed Priority Tax Claims, and Allowed Priority Claims, and (b) the Allowed Claims in Classes 2, 4, 5, 6, 7, 8, and 9. Thereafter, the Liquidating Trustee shall make additional Distributions to Holders of Allowed Claims and Holders of Allowed Equity Interests as and when required by the terms of the Plan.

**Distributions as to Allowed Claims in Class 13 and Class 14.**

(a)    Notwithstanding any provision herein to the contrary, no Distribution shall be made to the Holder of a Disputed Claim in Class 13 unless and until such Disputed Claim becomes an Allowed Claim. If, on any applicable Distribution Date, any Disputed Claims in Class 13 remain, then the Liquidating Trustee shall withhold from any Distribution to the Holders of Allowed Class 13 Claims the amount of funds that would be necessary to make the same proportionate distribution to the Holders of all Class 13 Claims which are Disputed Claims as if each such Disputed Claim were an Allowed Class 13 Claim. At such time that such Disputed Claim becomes an Allowed Class 13 Claim, the Holder of such Allowed Class 13 Claim shall receive the Distribution to which such Holder is then entitled under the Plan.

(b)    Notwithstanding any provision herein to the contrary, no Distribution shall be made to the Holder of a Disputed Claim in Class 14 unless and until such Disputed Claim becomes an Allowed Claim. If, on any applicable Distribution Date, any Disputed Claims in Class 14 remain, then the Liquidating Trustee shall withhold from any Distribution to the Holders of Allowed Class 14 Claims the amount of funds that would be necessary to make the same proportionate distribution to the Holders of all Class 14 Claims which are Disputed Claims as if each such Disputed Claim were an Allowed Class 14 Claim. At such time that such Disputed Claim becomes an Allowed Class 14 Claim, the Holder of such Allowed Class 14 Claim shall receive the Distribution to which such Holder is then entitled under the Plan.

(c)    Notwithstanding any provision herein to the contrary, if, on any applicable Distribution Date, the Holder of a Class 13 Claim or a Class 14 Claim is subject to an Action against it by the Liquidating Trustee, the Liquidating Trustee (in its sole discretion) may withhold a Distribution to such Holder until the final resolution of such Action.

(d)    Distributions to a Holder of an Allowed Class 13 Claim or an Allowed Class 14 Claim shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Debtors or the Liquidating Trustee at the time of the Distribution, unless the Liquidating Trustee has been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003(e) by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules. The Liquidating Trustee shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided herein.

**Determination of Claims.**

(a)      Unless otherwise provided in an order of the Bankruptcy Court, the Plan Proponents or the Liquidating Trustee, as applicable, shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims.  Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than the Claims Objection Deadline, and the Confirmation Order shall contain appropriate language to that effect. Holders of Class 14 Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve notice on the Notice Parties of any request to the Bankruptcy Court for allowance to file late Unsecured Claims.  If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as a Class 14 Unsecured Claim. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (i) sixty (60) days following the Effective Date or (ii) the date 60 days after the Debtors receive actual notice of the filing of such Claim.

(b)      Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Plan Proponents or the Liquidating Trustee as applicable effect service in any of the following manners: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (ii) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (iii) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Cases on behalf of the Holder of a Claim.

(c)      Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise.  If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Cases, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and distribution.  The Plan Proponents or the Liquidating Trustee as applicable may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Plan Proponents or the Liquidating Trustee as applicable previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Plan Proponents or the Liquidating Trustee as applicable may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim.  The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and distribution.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

**Unclaimed Distributions.**

(a)     If the Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued, then the Liquidating Trustee shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

(b)     If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to the Liquidating Trustee due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to the Liquidating Trustee as to such check within thirty (30) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

(c)     Any unclaimed Distribution as described above shall be property of the Liquidating Trustee available for further Distributions as required by Article 9.02 of the Plan.

**Transfer of Claim.**

In the event that the Holder of any Claim shall transfer such Claim on and after the Effective Date, such Holder shall immediately advise the Liquidating Trustee in writing of such transfer and provide sufficient written evidence of such transfer. The Liquidating Trustee shall be entitled to assume that no transfer of any Claim has been made by any Holder unless and until the Liquidating Trustee shall have received written notice to the contrary. Each transferee of any Claim shall take such Claim subject to the provisions of the Plan and to any request made, waiver or consent given or other action taken hereunder and, except as otherwise expressly provided in such notice, the Liquidating Trustee shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plan.

**One Distribution per Holder.**

If the Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of Distributions hereunder, and only one Distribution shall be made with respect to the single aggregated Claim.

**Effect of Pre-Confirmation Distributions.**

Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan. All such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying

the obligations of the Debtors or the Liquidating Trustee as applicable to such Holder under the Plan.

## No Interest on Claims.

Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition interest or the payment of Postpetition interest, penalties, or late charges on account of such Allowed Claim for any purpose.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

## Compliance with Tax Requirements.

In connection with the Plan, the Liquidating Trustee shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim or an Allowed Equity Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

## CONDITIONS PRECEDENT TO CONFIRMATION
## OF THE PLAN AND THE EFFECTIVE DATE

## Condition Precedent to Confirmation of the Plan.

The following are conditions precedent to Confirmation of the Plan: (i) the Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan; and (ii) the Plan Proponents shall have timely filed the Plan Supplement containing, among other things, the Plan Documents. For the avoidance of doubt, the approval of the releases and injunctions in Articles 11.05, 11.06, and 11.08 of the Plan shall not be conditions precedent to Confirmation of the Plan.

## Conditions Precedent to the Effective Date.

The Plan shall not be consummated and the Effective Date shall not occur unless (a) the Confirmation Order shall be a Final Order and (b) the Additional Lender Documents have been executed by all parties thereto.

## Waiver.

The Plan Proponents retain the right to waive any condition precedent to the Confirmation of the Plan or the Effective Date by filing a notice in the Bankruptcy Cases.  Any such waiver shall be effective immediately.

**Notice of the Effective Date.**

Promptly following the satisfaction, or the waiver by the Plan Proponents, of all of the conditions set forth in Article 10.02, the Plan Proponents or the Liquidating Trustee shall file a notice (the "**Effective Date Notice**") with the Bankruptcy Court designating the Effective Date.  The Liquidating Trustee shall serve the Effective Date Notice on all of the Notice Parties.

## EXCULPATION FROM
## LIABILITY, GENERAL INJUNCTION, AND RELEASES

**Exculpation from Liability.**

**The Debtors and their officers, directors, partners, employees, and Professionals (acting in such capacity), the Committees and their members and Professionals (acting in such capacity), the Buyer and its officers, directors, members, managers, employees, and professionals (acting in such capacity), and the Examiner and his Professionals (acting in such capacity) (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or Confirmation of the Plan, the Disclosure Statement, the Asset Purchase Agreement, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Cases, for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party or breach of any contract or any fiduciary duty.  With respect to Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Cases.  Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy.  The rights granted under this Article 11.01 are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law.  In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan.  This exculpation from liability provision is an integral part of the Plan and is essential to its implementation.  This exculpation from liability provision is not intended to, and does not, release any Prepetition Causes of Action.**

**General Injunction.**

**Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, Liability or Equity Interest shall be permanently enjoined and forever barred**

35

**to the fullest extent permitted by law from taking any of the following actions on account of any such Claims, Debts, Liabilities or Equity Interests, other than actions brought to enforce any rights or obligations under the Plan: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, their Assets or their Estates, or the Buyer or the Purchased Assets, or the Liquidating Trustee or the Liquidating Estate; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, their Assets or their Estates, or the Buyer or the Purchased Assets, or the Liquidating Trustee or the Liquidating Estate; (c) creating, perfecting or enforcing any Lien against the Debtors, their Assets or their Estates, or the Buyer or the Purchased Assets, or the Liquidating Trustee or the Liquidating Estate; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or their Estates or the Liquidating Estate; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtors or their Estates, the Liquidating Trustee or the Liquidating Estate under the Plan and the documents executed in connection therewith. The Plan Proponents, or the Buyer, the Liquidating Trustee or the Liquidating Estate, shall have the right to independently seek enforcement of this general injunction provision. This general injunction provision is an integral part of the Plan and is essential to its implementation.**

**Term of Certain Injunctions and Automatic Stay.**

All injunctions or automatic stays provided for in the Bankruptcy Cases pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date or the Effective Date, shall remain in full force and effect following the Confirmation Date or the Effective Date, as applicable, and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

With respect to all lawsuits or Actions pending in courts in any jurisdiction (other than the Bankruptcy Court) in which the Debtors were listed as a defendant and that seek to establish the Debtors' liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits or Actions shall be deemed dismissed as of the Effective Date, unless the Debtors or the Liquidating Trustee as applicable affirmatively elect to have the Debtors' liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits or Actions in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Plan Proponents or the Liquidating Trustee as applicable affirmatively elect to have the automatic stay lifted and to have the Debtors' liability established by such other courts; and the Prepetition Claims at issue in such lawsuits or Actions shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Plan Proponents or the Liquidating Trustee as applicable as provided herein. To be clear, any lawsuits or Actions pending in courts in any jurisdiction in which the Plan Proponents or the Liquidating Trustee as applicable are a plaintiff or seek to establish a claim against another party are not subject to this Article 11.03 and shall not be deemed dismissed.

**No Liability for Tax Claims.**

Unless a taxing Governmental Unit has asserted a Claim against the Debtors before the Governmental Unit Bar Date or Administrative Expense Claim Bar Date established therefor, no Claim of such Governmental Unit shall be Allowed against the Debtors, the Liquidating Trustee or the Liquidating Estates, the Buyer or the Purchased Assets, or any of the Plan Proponents', the Liquidating Trustee's or the Buyer's officers, directors, partners, members, or agents, for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Plan Proponents, any of their Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period or (ii) an audit of any return for a period before the Petition Date.

**Release of Plan Release Parties.**

**Upon the occurrence of the Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, except as expressly provided in this Plan, the Insider Release Parties shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged the Plan Release Parties from any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies and demands, of any and every kind, character or nature whatsoever, whether liquidated or unliquidated, asserted or unasserted, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, at equity or otherwise, which the Insider Release Parties, or anyone claiming through them, on their behalf or for their benefit, may have or claim to have as of the Effective Date, against the Plan Release Parties that are based upon, relate to, or arise out of, in connection with or pertain to (a)(i) the Bankruptcy Cases, (ii) the Debtors, (iii) WNT, (iv) University Village, (v) the Independent Living Facility, (vi) the Health Center, (vii) this Plan (as may be amended), or (b) any act, fact, transaction, event, occurrence, statement or omission in connection with (i) the Bankruptcy Cases, (ii) the Debtors, (iii) WNT, (iv) University Village, (v) the Independent Living Facility, (vi) the Health Center, (vii) this Plan (as may be amended), or (c) anything alleged in any complaint asserted by a Plan Release Party against an Insider Release Parties, including but not limited to, anything alleged in a draft complaint made part of the record in the Bankruptcy Cases, or that could have been alleged in any complaint or other similar proceedings; provided, however, the release of the Plan Release Parties shall not effect a release of any claims the Insider Release Parties may hold against Timothy Parker, Kathleen Burkholder, Lawrence Landry, Agewell Senior Living LLC, John McCoy, David Mills, Mark Lichtenwalner, Westport Senior Living Investment Fund and their individual members and/or limited partners (collectively, the "Excluded Parties"). Notwithstanding anything contained in this Section 11.05 or elsewhere in this Plan to the contrary, the foregoing is not intended to release, nor shall it have the effect of (w) releasing any Plan Release Party or the Liquidating Trustee from the performance of their respective obligations in accordance with this Plan or the Mediated Settlement Agreement, (x) releasing any Plan Release Party or the Liquidating Trustee from making any Distribution to any Insider Release Party that is authorized and provided for in this Plan, (y) releasing or otherwise prohibiting any Insider Release Party from asserting any released claim defensively or in response to any claim brought against the Insider Release**

**Party by any Entity, or (z) releasing any Plan Release Party from any claim arising after the Effective Date.**

**Release of Insider Release Parties.**

**Upon the occurrence of the Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, except as expressly provided in this Plan, the Plan Release Parties shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged the Insider Release Parties from any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, claims, debts, encumbrances, liens, remedies and demands, of any and every kind, character or nature whatsoever (including Unknown Claims), whether liquidated or unliquidated, asserted or unasserted, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law, at equity or otherwise, which the Plan Release Parties, or any of them, or anyone claiming through them, on their behalf or for their benefit may have or claim to have as of the Effective Date, against any Insider Release Party that are based upon, relate to, or arise out of, in connection with or pertain to (a)(i) the Bankruptcy Cases, (ii) the Debtors, (iii) WNT, (iv) University Village, (v) the Independent Living Facility, (vi) the Health Center, (vii) this Plan (as may be amended), or (b) any act, fact, transaction, event, occurrence, statement or omission in connection with (i) the Bankruptcy Cases, (ii) the Debtors, (iii) WNT, (iv) University Village, (v) the Independent Living Facility, (vi) the Health Center, (vii) this Plan (as may be amended), or (c) the Insider Recovery Claims or the Insider Causes of Action, or (d) anything alleged in any complaint asserted by a Plan Release Party against an Insider Release Party, including but not limited to, anything alleged in a draft complaint made part of the record in the Bankruptcy Cases, or that could have been alleged in any complaint or other similar proceedings, including Unknown Claims (collectively, the "Released Claims"); provided, however, the release of the Insider Release Parties described herein shall not apply to (x) any claims that may be asserted by any Excluded Party against an Insider Release Party or (y) any claims that may be asserted by any party in defense or in response to a claim asserted by an Insider Release Party or (z) any claims arising after the Effective Date. Notwithstanding anything contained in this Section 11.06 or elsewhere in this Plan to the contrary, the foregoing is not intended to release, nor shall it have the effect of releasing the Insider Release Party from the performance of their obligations in accordance with the Mediated Settlement Agreement.**

**Unknown Claims.**

An "Unknown Claim" is any Released Claim that any Plan Release Party does not know or suspect to exist in its favor at the time of giving the release required by Article 11.06 of this Plan that if known by it might have affected its agreement to the settlement and release provided in the Mediated Settlement Agreement or in this Plan. With respect to any and all Released Claims, each Plan Release Party shall expressly waive or be deemed to have waived, and by operation of the Confirmation Order shall have waived the provisions, rights and benefits of California Civil Code § 1542 (to the extent it applies herein), which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

Each Plan Release Party expressly waives, and shall be deemed to have waived, and by operation of the Confirmation Order shall have waived, any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, that is similar, comparable or equivalent in effect to California Civil Code § 1542. The Plan Release Parties may hereafter discover facts in addition to or different from those that any of them now knows or believes to be true with respect to the subject matter of the Released Claims, but each Plan Release Party shall expressly have and shall be deemed to have, and by operation of the Confirmation Order shall have fully, finally and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or noncontingent, whether or not concealed or hidden, that now exist or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including conduct that is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery of existence of such different or additional facts. Each Plan Release Party acknowledges and shall be deemed to have acknowledged, and by operation of the Confirmation Order shall have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Plan of which this release is a part.

**Insider Release Party Injunction and Bar Order.**

**Upon the occurrence of the Effective Date, the Confirmation Order shall act as an injunction against each and every Entity, and shall permanently enjoin, bar, and restrain each and every Entity from instituting, prosecuting, continuing, pursuing or litigating in any manner any Released Claim or any action, suit or proceeding against any Insider Release Party, or from (in each case, whether pre-judgment or post-judgment) enforcing, levying, employing legal process, attaching, garnishing, sequestering, bringing proceedings supplementary to execution, collecting or otherwise recovering by any means or in any manner from any Insider Release Party based upon any liability or responsibility, or asserted or potential liability or responsibility, directly or indirectly, of any Insider Release Party to or for the benefit of any Entity arising from, in any way related to, based upon, arising in connection with (a)(i) the Bankruptcy Cases, (ii) the Debtors, (iii) WNT, (iv) University Village, (v) the Independent Living Facility, (vi) the Health Center, (vii) this Plan (as may be amended), or (b) the Released Claims, or (c) the Insider Recovery Claims, or (d) any other claims, acts, facts, transactions, events, occurrences, statements or omissions that are or could have been alleged in any complaint asserted by a Plan Release Party against an Insider Release Party, including but not limited to, anything alleged in a draft complaint made part of the record in the Bankruptcy Cases, or in any other complaint, action, suit or proceeding brought or that might be brought by, through, on behalf of, or for the benefit of any Entity (whether arising under federal, state or foreign law and regardless of where asserted), that is in any way related to (i) the Bankruptcy Cases, (ii) the Debtors, (iii) WNT, (iv) University Village, (v) the Independent Living Facility, (vi) the Health Center, (vii) this Plan (as may be amended); provided, however, the relief provided in this Section 11.08 shall not apply to (x)**

**any claims that may be asserted by any Excluded Party against an Insider Release Party or (y) any claims that may be asserted by any party in defense or in response to a claim asserted by an Insider Release Party; or (z) any claims arising after the Effective Date.**

## RETENTION OF JURISDICTION

**General Retention.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, until the Bankruptcy Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of the Bankruptcy Cases that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

**Specific Purposes.**

In addition to the general retention of jurisdiction set forth in Article 12.01 of the Plan, after Confirmation of the Plan and until the Bankruptcy Cases are closed, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases for the specific purposes listed in Article 12.02 of the Plan.

**Closing of the Bankruptcy Cases.**

In addition to the retention of jurisdiction set forth in Articles 12.01 and 12.02, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases to enter an order reopening the Bankruptcy Cases after they have been closed.

## MODIFICATION OF PLAN AND CONFIRMATION OVER OBJECTIONS

**Modification of Plan.**

The Plan Proponents retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date, provided that the Plan, as modified, and the Disclosure Statement meet applicable Bankruptcy Code and Bankruptcy Rules requirements.

After the entry of the Confirmation Order, the Liquidating Trustee may modify the Plan to remedy any defect or omission herein, or to reconcile any inconsistencies between the Plan and the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that (i) the Liquidating Trustee obtain Bankruptcy Court approval for such modification, after notice to the Notice Parties and a hearing; and (ii) such modification does not materially adversely affect the interests, rights, or treatment of any Class of Claims under the Plan.

After the entry of the Confirmation Order and before substantial consummation of the Plan, the Liquidating Trustee may modify the Plan in a way that materially adversely affects the interests, rights, or treatment of a Class of Claims, provided that (i) the Plan, as modified, meets applicable Bankruptcy Code requirements; (ii) the Liquidating Trustee obtains Bankruptcy Court approval for such modification, after notice to the Notice Parties and a hearing; (iii) such modification is

accepted by at least two-thirds in dollar amount, and more than one-half in number, of Allowed Claims actually voting in each Class adversely affected by such modification; and (iv) the Liquidating Trustee complies with Section 1125 of the Bankruptcy Code with respect to the Plan, as modified.

Notwithstanding anything to the contrary contained in this Article 13.01 or elsewhere in the Plan, the Plan may not be altered, amended or modified without the written consent of the Plan Proponents or the Liquidating Trustee as applicable.

## Confirmation Over Objections.

If any Impaired Class of Claims votes against the Plan, the Plan Proponents request, and shall be allowed, to modify the terms of the Plan to effect a "cramdown" on such dissenting Class by (a) restructuring the treatment of any Class on terms consistent with Section 1129(b)(2)(B) of the Bankruptcy Code, or (b) deleting Distributions to all Classes at or below the level of the objecting Class, or reallocating such Distributions, until such Impaired senior Classes are paid in accordance with the absolute priority rule of Section 1129(b) of the Bankruptcy Code. The Plan Proponents may make such modifications or amendments to the Plan and such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice prior to the Confirmation Hearing. No such modifications shall require any resolicitation of acceptances as to the Plan by any Class of Claims unless the Bankruptcy Court shall require otherwise. Notwithstanding any provision of the Plan to the contrary, the Plan Proponents reserve any and all rights they may have to challenge the validity, perfection, priority, scope and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

## General

The tax consequences of the Plan to Holders of Claims and Holders of Equity Interests (collectively, "**Holders**") are discussed below. This discussion of the federal income tax consequences of the Plan to Holders under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended, is provided for informational purposes only. While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties. Moreover, the consequences to a Holder may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of persons, such as persons holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holder's particular tax situation. In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**THE PLAN PROPONENTS' RESPECTIVE COUNSEL HAVE NO TAX EXPERTISE AND HAVE NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.**

**SOME OF THE ISSUES DISCUSSED BELOW ARE COMPLEX, AND THERE CAN BE NO ASSURANCE OF THE ACCURACY OF THIS INFORMATION.**

<u>**General Federal Income Tax Consequences to Holders**</u>

*In General*. The following discussion addresses certain of the material consequences of the Plan to Holders. Under the Plan, the tax consequences of the Plan to a Holder will depend, in part, on the type of consideration received in exchange for the Claim or Equity Interest and the tax status of the Holder, such as whether the Holder is an individual, corporation or other entity, whether the Holder is a resident of the United States, the accounting method of the Holder, and the tax classification of the Holder's particular Claim or Equity Interest. **HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIM OR EQUITY INTEREST.**

*Tax Consequences to Holders*. Holders are urged to consult with their tax advisors as to the consequences of the Plan to them. Among the issues Holders and their advisors may wish to consider are:

(1)    The extent to which a Holder may be entitled to a bad debt deduction or a worthless securities loss.

(2)    The extent to which a Holder may recognize gain or loss on the exchange of its Claim or Equity Interest for property, debt, and stock of the Debtors and the character of that gain or loss.

(3)    The basis and the holding period for any property, debt, and stock received by a Holder.

(4)    Whether the original issue discount rules, market discount rule, and amortizable bond premium rules apply to any debt received by a Holder.

(5)    The treatment of property, stock, or debt, if any, received by a Holder in satisfaction of accrued interest.

(6)    The effect of a Holder receiving deferred distributions or distributions that are contingent in amount.

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS.  THE PLAN

PROPONENTS MAKE THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THEY MAY WISH TO CONSIDER. THE PLAN PROPONENTS CANNOT AND DO NOT REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW EMBODIES MANY COMPLICATED RULES THAT MAKE IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.

## VOTING ON AND CONFIRMATION OF THE PLAN

### Confirmation and Acceptance by All Impaired Classes

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all of the requirements of Bankruptcy Code Section 1129 are met. Among the requirements for confirmation of a plan are that the plan be accepted by all impaired classes of claims and equity interests, and satisfaction of the matters described below.

*Feasibility.* A plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial liquidation of a debtor. The Plan Proponents believe that the Debtors will be able to perform their obligations under the Plan without further financial liquidation.

*Best Interests Standard.* The Bankruptcy Code requires that the Plan meet the "best interest" test, which requires that members of a Class must receive or retain under the Plan property having a value not less than the amount which the Class members would have received or retained if the Debtor was liquidated under Chapter 7 on the same date. The Plan Proponents believe that Distributions to all Impaired Classes of Claims in accordance with the terms of the Plan would exceed the net distribution that would otherwise take place in Chapter 7. See "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN—Liquidation under Chapter 7 or Chapter 11." For more detail, please see the Liquidation Analysis attached to this Disclosure Statement as Exhibit B.

### Confirmation Without Acceptance by All Impaired Classes

If one or more of the Impaired Classes of Claims or Equity Interests does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

*Discriminate Unfairly.* The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Plan Proponents believe that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no Class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank.

*Fair and Equitable Standard*.  The "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claims or interests before any junior class receives any distribution.  The Plan Proponents believe the Plan is fair and equitable to all Classes pursuant to this standard.

With respect to any Impaired Class of Unsecured Claims, Bankruptcy Code Section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each holder of a claim of such a class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the Holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.  The Plan Proponents believe that the Plan meets these standards.

Accordingly, if necessary, the Plan Proponents believe that the Plan meets the requirements for Confirmation by the Bankruptcy Court, notwithstanding the non-acceptance by an Impaired Class of Claims.

The Plan Proponents intend to evaluate the results of the balloting and determine whether to seek Confirmation of the Plan in the event that less than all the Impaired Classes of Claims do not vote to accept the Plan.  The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

## Absolute Priority Rule

The Bankruptcy Code and other applicable law establish the priority for distribution of funds in bankruptcy cases.  These priority provisions are sometimes referred to as the "absolute priority" rule.  Normally, and subject to exceptions not relevant here, valid secured claims are first paid to the extent of the amount of the claim or the value of the claimant's collateral (if less than the claim).  Any property in the bankruptcy estate, net of the valid secured claims described above, is first distributed to holders of priority claims, including (a) the costs of administering the Bankruptcy Cases, including the cost of operating the Debtors' businesses during the Bankruptcy Cases; (b) certain wage and benefit claims; and (c) certain tax claims.  After payment of priority claims or simultaneously therewith, Unsecured Creditors receive distributions either at the Closing or over time based on the amount of their Allowed Claim.  Equity holders (i.e., the partners of the Debtors) are paid only after all creditors have been paid.

## Non-Confirmation of the Plan

If the Plan is not confirmed by the Bankruptcy Court, the Bankruptcy Court may permit the filing of an amended plan, dismiss the Bankruptcy Cases, or convert the Bankruptcy Cases to Chapter 7.  In a Chapter 7 case, the Debtors' assets would be distributed to the Debtors' unsecured creditors only after the payment of all Secured Claims, costs of administration and the payment of priority claims.

The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances, will be borne by the Debtors.

## CERTAIN RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), including the "Risk Factors" and other matters discussed in the Financial Statements attached hereto, before deciding whether to vote to accept or to reject the Plan.

### Failure to Confirm the Plan

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 cases will continue rather than be converted to Chapter 7 liquidation cases. In fact, the Debtors believe that, absent confirmation of the Plan, the likely result may be liquidation through Chapter 7.  In the event of a Chapter 7 liquidation, holders of Allowed Secured Claims likely would receive fractions of the face amounts of their Allowed Claims, and all other creditors and stockholders likely would receive nothing.

### Potential Adverse Effects of Chapter 11

While the Debtors will seek to have the stay in chapter 11 as brief as practicable so as to minimize any potential disruption to its operations, it is possible that, despite the belief and intent of the Debtors, the commencement of the Bankruptcy Cases could materially adversely affect relationships between the Debtors and their customers and applicable regulatory agencies and bodies.

### Real Estate

The Debtors own the real estate on which the Retirement Center is located and operated. Such real estate may deteriorate in value during the life of the Plan, which may affect the amount that a buyer may be willing to pay for such real estate. Acts of nature, including hurricanes, tornados, earthquakes, fires, and floods, each of which may be exacerbated by global climate change and may cause uninsured damage and other loss of value to the real estate.

### Litigation Risk

The Debtors and WNT may be involved from time to time in a variety of litigation, investigations or similar matters arising out of their business. Insurance may not cover all claims that may be asserted against the Debtors or WNT, and any claims asserted against the Debtors or WNT, regardless of merit or eventual outcome, may harm their reputation.  Should the ultimate judgments or settlements in any litigation or investigation significantly exceed insurance coverage, it could have a material adverse effect on the Debtors' or WNT's business, financial condition, and results of operation.

### Regulatory Risks

The effectiveness of the Plan is conditioned on, among other things, the receipt of certain required regulatory approvals to consummate the transactions contemplated by the Plan, the

Disclosure Statement, and any related ancillary documents. The Debtors are heavily regulated by federal and state agencies under various programs and regimes. If the Debtors cannot obtain the required approvals, the Plan may fail and the Debtors may be forced to pursue liquidation or other alternatives, in which case the recoveries to stakeholders will almost certainly be less than the recoveries available under the Plan. Moreover, even if the Plan is successful, the inability of the Debtors to comply with regulatory obligations on a going-forward basis with, and potential future changes or modifications to, applicable statutes, regulations, and regulatory policies, could adversely affect the Debtors' operations, including, among other things, limiting the types of services that may be offered and/or increasing operating costs. In addition, any failure to comply with applicable laws, regulations, and policies, could subject the Debtors to sanctions, reputational damage, and other harm.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11, (b) dismissal of the Bankruptcy Cases, or (c) conversion of the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code.

### Alternative Plans of Liquidation

If the Plan is not confirmed, the Debtors or, subject to further determination by the Bankruptcy Court as to extensions of exclusivity under the Bankruptcy Code, any other party in interest in the Bankruptcy Cases, could attempt to formulate and propose a different plan or plans, including a plan proposed by the Debtors to reorganize their debts. The Plan Proponents believe that the Plan will enable Creditors to be paid the maximum amount possible for their Allowed Claims.

### Liquidation under Chapter 7 or Chapter 11

If a plan is not confirmed, the Bankruptcy Cases may be converted to Chapter 7 cases. In a Chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtors. The proceeds of the liquidation would be distributed to the Creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code.

In general, the Plan Proponents believe that liquidation under Chapter 7 would result in diminution of the value of the interests of the Creditors because of (a) additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee; (b) additional expenses and claims, some of which might be entitled to priority, which would arise by reason of the liquidation; (c) the inability to utilize the work product and knowledge of the Debtors and their Professionals; and (d) the substantial delay that would elapse before Creditors would receive any distribution in respect of their Claims.

The Plan provides for the sale of the Debtors' assets as going concerns in connection with the sale of the entire University Village campus. In the event of a liquidation under Chapter 7, distributions to Unsecured Creditors would be significantly reduced because the Debtors would not be able to realize the full value of their assets, which are encumbered by Liens. A Chapter 7

would result in the rejection of all Current Resident Contracts and PIP Contracts of Current Residents, which would increase the amount of Unsecured Claims.  The Plan Proponents therefore believe that the Plan is superior to liquidation under Chapter 7 and therefore meets the best interests of creditors test.

## SUMMARY, RECOMMENDATION AND CONCLUSION

The Plan Proponents believe that the Plan is in the best interests of all Creditors.  In the event of a liquidation of the Debtors' Assets under Chapter 7 of the Bankruptcy Code, the Plan Proponents believe the distribution to Unsecured Creditors would be vastly reduced.   For these reasons, the Plan Proponents believe that the Plan is in the best interests of all Creditors and urge that the Plan be accepted.

Tampa, Florida
Dated as of December 31, 2017

**WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP**

By:    **IMH Healthcare, LLC, General Partner**

By:    _____
Name: Eli Freiden
Title:  Manager

**WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP**

By:    **IMH Healthcare, LLC, General Partner**

By:    _____
Name: Eli Freiden
Title:  Manager

/s/ Charles A. Postler
Charles A. Postler (FBN 455318)
Scott A. Stichter (FBN 0710670)
Matthew B. Hale (FBN 0110600)
Stichter, Riedel, Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
Email: cpostler@srbp.com;
sstichter@srbp.com; mhale@srbp.com
Attorneys for the Debtors

[Signature Page to Disclosure Statement to First Amended and Restated Joint Plan of Liquidation]

Tampa, Florida
Dated as of December 31, 2017

**THE OFFICIAL COMMITTEE OF RESIDENT
CREDITORS OF WESTPORT HOLDINGS
TAMPA, LIMITED PARTNERSHIP AND
WESTPORT HOLDINGS TAMPA II,
LIMITED PARTNERSHIP**

By: _____
Name: Stephen K. Miller
Title: Chairperson


/s/ David S. Jennis
David S. Jennis (FBN 775940)
Eric D. Jacobs (FBN 0058512)
Jennis Law Firm
606 East Madison Street
Tampa, FL 33602
Telephone: (813) 229-2800
Fax: (813) 229-1707
djennis@jennislaw.com; ejacobs@jennislaw.com
Attorneys for the Official Committee of Resident
Creditors


[Signature Page to Disclosure Statement to First Amended and Restated Joint Plan of
Liquidation]

65Z3005.DOC

# EXHIBIT A

**University Village - Continuing Care Retirement Community**
*10 YEAR FINANCIAL PROJECTION*

| In Thousands of Dollars                          YEAR NUMBER----> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| YEAR -----> | 2018 *Total* | 2019 *Total* | 2020 *Total* | 2021 *Total* | 2022 *Total* | 2023 *Total* | 2024 *Total* | 2025 *Total* | 2026 *Total* | 2027 *Total* |
| **Revenue** | | | | | | | | | | |
| ILF  Earned Entrance Fees | 2,390 | 2,390 | 2,390 | 2,390 | 2,390 | 2,390 | 2,390 | 2,390 | 2,390 | 2,390 |
| ILF  Life Care, Existing Residents , Net | 5,584 | 5,403 | 5,208 | 4,998 | 4,775 | 4,562 | 4,358 | 4,164 | 3,978 | 3,800 |
| ILF  Second Person, Existing Residents, Net | 579 | 457 | 334 | 210 | 87 | 36 | 15 | 6 | 3 | 1 |
| ILF  Life Care, New Residents, Net | 22 | 980 | 2,953 | 5,077 | 7,048 | 7,400 | 7,770 | 8,159 | 8,567 | 8,995 |
| ILF  Rental Revenue, Existing Residents, Net | 765 | 607 | 379 | 99 | - | - | - | - | - | - |
| ILF  Rental Revenue, New Residents, Net | 259 | 266 | - | | | | | | | - |
| ILF  New Life Care Buy In Fees (Non-Refundable) | 102 | 1,908 | 4,272 | 5,582 | 6,329 | 6,645 | 6,977 | 7,326 | 7,693 | 8,077 |
| ILF  Rental Program Community Fees (Non-Refundable) | 120 | | | | | | | | | |
| ILF  Other Revenue | 163 | 172 | 197 | 229 | 261 | 264 | 267 | 269 | 272 | 275 |
| ALF  Monthly Services Fees Existing Residents | 2,292 | 1,646 | 835 | 75 | | | | | | |
| ALF  Monthly Services Fees New Residents | 334 | 1,682 | 3,024 | 4,245 | 4,702 | 4,749 | 4,796 | 4,844 | 4,893 | 4,942 |
| SNF  Medicare A Payer | 3,044 | 3,389 | 3,854 | 4,290 | 4,461 | 4,506 | 4,551 | 4,596 | 4,642 | 4,689 |
| SNF  Managed Care | 1,223 | 1,362 | 1,549 | 1,725 | 1,793 | 1,811 | 1,829 | 1,848 | 1,866 | 1,885 |
| SNF  Medicaid Payer | 2,715 | 3,024 | 3,439 | 3,828 | 3,980 | 4,020 | 4,060 | 4,100 | 4,141 | 4,183 |
| SNF  Private Pay | 1,478 | 1,646 | 1,871 | 2,083 | 2,166 | 2,188 | 2,210 | 2,232 | 2,254 | 2,277 |
| SNF  Other - Hospice Medicaid | 423 | 471 | 536 | 597 | 620 | 627 | 633 | 639 | 646 | 652 |
| **Total Revenue** | **$21,495** | **$25,402** | **$30,840** | **$35,429** | **$38,613** | **$39,198** | **$39,857** | **$40,574** | **$41,344** | **$42,165** |
| | | | | | | | | | | |
| **Operating Expense** | | | | | | | | | | |
| Payroll & Taxes | 10,032 | 10,382 | 10,585 | 10,687 | 10,788 | 11,004 | 11,224 | 11,449 | 11,678 | 11,911 |
| Employee Benefits | 946 | 1,006 | 1,054 | 1,104 | 1,156 | 1,179 | 1,203 | 1,227 | 1,251 | 1,276 |
| Food Services - Food & Supplies | 1,240 | 1,371 | 1,581 | 1,829 | 2,052 | 2,093 | 2,135 | 2,177 | 2,221 | 2,265 |
| Housekeeping & Laundry | 224 | 255 | 294 | 336 | 367 | 375 | 382 | 390 | 398 | 405 |
| Transportation | 112 | 123 | 136 | 148 | 156 | 159 | 162 | 165 | 168 | 172 |
| Plant Operations | 962 | 988 | 1,016 | 1,044 | 1,066 | 1,087 | 1,109 | 1,131 | 1,154 | 1,177 |
| Marketing | 242 | 586 | 398 | 359 | 360 | 367 | 374 | 382 | 389 | 397 |
| Medical Care | 769 | 847 | 972 | 1,119 | 1,239 | 1,264 | 1,289 | 1,315 | 1,341 | 1,368 |
| Other Expense / Contracted Services | 180 | 182 | 184 | 185 | 187 | 191 | 195 | 199 | 203 | 207 |
| Security | 410 | 413 | 415 | 417 | 419 | 427 | 436 | 444 | 453 | 462 |
| Management Fees | 1,256 | 1,289 | 1,323 | 1,357 | 1,393 | 1,421 | 1,449 | 1,478 | 1,508 | 1,538 |
| Utilities | 1,496 | 1,668 | 1,913 | 2,187 | 2,429 | 2,477 | 2,527 | 2,577 | 2,629 | 2,681 |
| Insurance on Facility and Other | 897 | 914 | 934 | 955 | 977 | 996 | 1,016 | 1,036 | 1,057 | 1,078 |
| **Total Operating Expenses** | **$18,766** | **$20,024** | **$20,802** | **$21,728** | **$22,588** | **$23,040** | **$23,500** | **$23,970** | **$24,450** | **$24,939** |
| | | | | | | | | | | |
| **Total Operating Profit/(Loss)** | **$2,729** | **$5,378** | **$10,038** | **$13,701** | **$16,025** | **$16,158** | **$16,356** | **$16,604** | **$16,894** | **$17,226** |
| *% of Revenue* | *13%* | *21%* | *33%* | *39%* | *42%* | *41%* | *41%* | *41%* | *41%* | *41%* |
| | | | | | | | | | | |
| Interest Expense | 1,482 | 2,389 | 2,368 | 2,345 | 2,321 | 2,294 | 2,265 | 2,234 | 2,200 | 2,163 |
| Taxes (Property Tax) | 798 | 817 | 837 | 858 | 879 | 905 | 932 | 960 | 989 | 1,019 |
| Taxes (Other) | 55 | 57 | 58 | 60 | 61 | 63 | 65 | 67 | 69 | 71 |
| Depreciation | 1,987 | 2,335 | 2,694 | 2,948 | 3,107 | 3,170 | 3,233 | 3,298 | 3,364 | 3,431 |
| Amortization | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 |
| **Total Other Expenses** | **$8,522** | **$9,799** | **$10,157** | **$10,411** | **$10,568** | **$10,632** | **$10,696** | **$10,759** | **$10,822** | **$10,884** |
| | | | | | | | | | | |
| **Net Income/(Loss)** | **($5,793)** | **($4,420)** | **($119)** | **$3,289** | **$5,457** | **$5,526** | **$5,661** | **$5,845** | **$6,072** | **$6,342** |
| *% of Revenue* | *-27%* | *-17%* | *0%* | *9%* | *14%* | *14%* | *14%* | *14%* | *15%* | *15%* |
| | | | | | | | | | | |
| **EBITDA / Free Cash Flow** | **$339** | **$2,988** | **$7,648** | **$11,310** | **$13,635** | **$13,768** | **$13,966** | **$14,213** | **$14,504** | **$14,836** |
| *% of Revenue* | *2%* | *12%* | *25%* | *32%* | *35%* | *35%* | *35%* | *35%* | *35%* | *35%* |

**University Village - Continuing Care Retirement Community**
*10 YEAR FINANCIAL PROJECTION*

| In Thousands of Dollars | YEAR NUMBER----> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | YEAR -----> | 2018 Total | 2019 Total | 2020 Total | 2021 Total | 2022 Total | 2023 Total | 2024 Total | 2025 Total | 2026 Total | 2027 Total |
| **EBITDA / Free Cash Flow** | | *$339* | *$2,988* | *$7,648* | *$11,310* | *$13,635* | *$13,768* | *$13,966* | *$14,213* | *$14,504* | *$14,836* |
| **Uses of Free Cash Flow** | Proj Opening Balance | | | | | | | | | | |
| (1) Capital Expenditures - ILF | N/A | 3,390 | 3,572 | 3,594 | 1,657 | 1,533 | 647 | 748 | 687 | 707 | 733 |
| (2) Capital Expenditures - ALF/SNF | N/A | 1,463 | 1,144 | 1,046 | 942 | 366 | 99 | 283 | 207 | 81 | 283 |
| (3) Allowed PIP Loan Claims | 6,300 | - | - | 639 | 639 | 639 | 639 | 639 | 639 | 639 | 639 |
| (4) Allowed Former Resident Claims | 9,800 | - | - | 994 | 994 | 994 | 994 | 994 | 994 | 994 | 994 |
| (5) Allowed General Unsecured Claims | 750 | - | - | 76 | 76 | 76 | 76 | 76 | 76 | 76 | 76 |
| (6) Deposit Refunds - Current Residents | 18,800 | - | - | 1,906 | 1,906 | 1,906 | 1,906 | 1,906 | 1,906 | 1,906 | 1,906 |
| (7) Deposit Refunds - New Residents | N/A | - | - | 315 | 630 | 840 | 840 | 840 | 840 | 840 | 840 |
| (8) CPIF Secured Loan - Debt Service | 11,400 | 663 | 1,326 | 1,326 | 1,326 | 1,326 | 1,326 | 1,326 | 1,326 | 1,326 | 1,326 |
| (9) US Ameribank Secured Loan - Debt Service | 12,000 | 408 | 817 | 817 | 817 | 817 | 817 | 817 | 817 | 817 | 817 |
| (10) Bankruptcy Exit Financing - Debt Service | 7,000 | 560 | 560 | 560 | 560 | 560 | 560 | 560 | 560 | 560 | 560 |
| (11) SCM Secured Loan - Debt Service | - | - | - | - | - | - | - | - | - | - | - |
| **Total Other Uses of Cash** | | *$6,484* | *$7,418* | *$11,272* | *$9,546* | *$9,056* | *$7,903* | *$8,188* | *$8,051* | *$7,945* | *$8,173* |
| **Surplus/(Shortfall)** | | ($6,145) | ($4,431) | ($3,624) | $1,764 | $4,579 | $5,865 | $5,778 | $6,163 | $6,559 | $6,663 |
| **Cumulative Surplus/(Shortfall)** | | ($6,145) | ($10,576) | ($14,200) | ($12,436) | ($7,857) | ($1,992) | $3,785 | $9,948 | $16,506 | $23,170 |

*General Notes*
Projections above include the Independent Living Facility (ILF), Assisted Living Facility (ALF), and Skilled Nursing Facility (SNF).
Projections above assume bankruptcy exit has already occurred.

*Notes on Uses of Free Cash Flow*
(1)  Sources: Terracon Immediate Repairs Cost Table and Replacement Reserve Cost Table dated March 17, 2017
(2)  Source: Capital Plan dated 2012 / 2013 created by ALF /SNF management
(3)  Receive 100% of total claim beginning in Year 3 amortized over 10 years with 3% interest
(4)  Receive 100% of total claim beginning in Year 3 amortized over 10 years with 3% interest
(5)  Receive 100% of total claim beginning in Year 3 amortized over 10 years with 3% interest
(6)  Receive 100% of total claim beginning in Year 3 amortized over 10 years with 3% interest
(7)  Average refund of $105K starting in Year 3
(8)  Principal 25 Year amortization starts in July of Year 1 @ 11% non-default interest rate
(9)  Principal 25 Year amortization starts in July of Year 1 @ 4.95% non-default interest rate
(10) Potential bankruptcy exit secured line of credit assumes $7mm in principal at 8.0% interest only
(11) Assumes SCM secured loan is retired on bankruptcy exit date.

# EXHIBIT B

## DEBTORS' LIQUIDATION ANALYSIS

**In Connection with the Mediated Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code**

## ASSETS

|  | Liquidation Value (Chapter 7) |
|---|---|
| Cash[1] | $170,427.43 |
| Real Property[2] | $23,781,613.00 |
| Furniture, Fixtures, and Equipment[3] | $300,000.00 |
| Inventory[4] | $2,500.00 |
| Accounts Receivable[5] | $0.00 |
| Deposits[6] | $0.00 |
| Causes of Action[7] | Unknown |
| Westport Nursing Tampa, LLC (Equity Interests)[8] | $2,474,000.00 |
| **Total Assets** | **$26,728,540.43** |

[Remainder of Page Intentionally Left Blank]

1

**DISTRIBUTIONS**

| | Ch. 11 Distributions[9] | Ch. 7 Distributions |
|---|---|---|
| **Secured Claims** | | |
| CPIF Lending[10] | Unknown | $13,500,000.00 |
| USAmeriBank[11] | $0.00 | $0.00 |
| Secured Tax Claims of Governmental Units[12] | $681,000.00 | $681,000.00 |
| Drywizard Drywall Services, Inc. | $71,814.42 | $71,814.42 |
| Geiger | $9,070.14 | $9,070.14 |
| SWFL Corp. | $34,391.35 | $34,391.35 |
| Prospect Construction & Development Group | $40,630.00 | $40,630.00 |
| Team Construction Services, LLC | $48,630.00 | $48,630.00 |
| John Deere[13] | N/A | $5,105.02 |
| Marlin[14] | N/A | $13,333.32 |
| Other Secured Claims[15] | N/A | $64,829.78 |
| **Priority Claims** | | |
| Priority Tax Claims | $265,000.00 | $265,000.00 |
| **Administrative** | | |
| Post-petition Ordinary Course Liabilities[16] | $148,411.94 | $148,411.94 |
| DIP Loan[17] | $250,000.00 | $250,000.00 |
| United States Trustee Fees[18] | $9,750.00 | $9,750.00 |
| Chapter 7 Trustee Fees[19] | N/A | $600,000.00 |
| Chapter 7 Professional Fees[20] | N/A | $250,000.00 |
| Chapter 11 Professional Fees[21] | $4,000,000.00 | $4,000,000.00 |
| **Unsecured** | | |
| Class 13 (Resident Parties)[22] | $16,100,000.00[23] [100% distribution] | $2,437,277.50 [15.14% distribution] |
| Class 14 (Other Unsecured Claims) | $750,000.00 [27.78% distribution[24]] | $408,735.98 [15.14% distribution[25]] |
| Class 15 (Subordinated Unsecured Claims of Current Operators)[26] | Unknown | $0.00 |
| Current Resident Obligations[27] | N/A | $3,890,560.98 [15.14% distribution] |
| **Total** | Unknown[28] | **$26,728,540.43** |

## ASSUMPTIONS IN THE PREPARATION
## OF THE LIQUIDATION ANALYSIS

A.   Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to such terms in the Mediated Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code dated as of December 31, 2017 (the "**Plan**").

B.   This Liquidation Analysis (the "**Liquidation Analysis**") was prepared in accordance with the requirements of Section 1129 of the Bankruptcy Code to establish that the Plan is in the best interests of each Holder of a Claim or Equity Interest.

C.   This Liquidation Analysis is based upon certain estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant economic factors, market conditions, uncertainties, and contingencies beyond the control of the Debtors.  This Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change.  Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were in fact to undergo such liquidation and actual results could vary materially and adversely from those contained herein.  The liquidation and reorganization values represent the Debtors' best estimate of those values based on available information.  Where appropriate, the Debtors rounded values to the nearest $1,000.

D.   This Liquidation Analysis assumes the conversion of the current Chapter 11 cases to Chapter 7 cases and the liquidation of the Debtors' Assets by a Chapter 7 Trustee within a significantly abbreviated timeframe.  A Chapter 7 Trustee would be initially appointed by the Bankruptcy Court to administer the Estates.  The Chapter 7 Trustee would be independent and would be entitled to make all of his or her own decisions regarding the liquidation of the Estates' assets, the hiring of professionals, the pursuit of claims or litigation, and the payment of or objection to claims.  The distribution of any ultimate dividend would be made in accordance with the priorities established by the Bankruptcy Code.  The Chapter 7 Trustee would be compensated in accordance with the Bankruptcy Code.

E.   This Liquidation Analysis uses the Debtors' unaudited financial information, and other figures estimated by the Debtors' management and professionals.

F.   This Liquidation Analysis was prepared by the Debtors and their professionals.  The Official Committee of Resident Creditors or its professionals have not independently verified the information or estimates used in this Liquidation Analysis.

G.   There can be no assurance made that all of the Debtors' Assets will be completely liquidated during the shortened liquidation period in a Chapter 7.

H.   This Liquidation Analysis is the Debtors' best estimate of the net value of assets

3

available for distribution to its Creditors after deducting the value of Secured Claims and Administrative Claims.   To the extent the Debtors' Estates are comprised of assets that had no value as set forth in the Debtors' bankruptcy schedules, those assets were excluded from this analysis.

I.      This Liquidation Analysis is without prejudice to the Debtors' ability to object to the characterization, amount, secured status or classification of any Claim or Asset. No stated claim amount or value shall be deemed an admission by any party of the amount of such creditor's claim, and nothing herein shall act to in any way prevent any party-in-interest from objecting to any creditor's claim.

J.      The Debtors reserve the right to amend, modify, or supplement this Liquidation Analysis prior to the Confirmation Hearing.

## NOTES TO LIQUIDATION ANALYSIS

---

[1] Reflects the ending cash balance of the Debtors' operating account per the Debtors' bank statement as of October 31, 2017 based on the October 2017 monthly operating report.  The cash in the Debtors' accounts will be used to fund operations and pay accounts payable. The bank balance will continue to fluctuate until the Confirmation Hearing.

[2] The Debtors own an independent living facility consisting of 446 independent living apartments, 46 independent living villas and common areas.  The Liquidation Value is based on the combined tax-assessed value of the real property owned by Westport Holdings Tampa, LP ($17,026,624) and Westport Holdings Tampa II, LP ($6,754,989).

[3] Liquidation Value is an estimated value based on an adjusted value from the most recent appraisal available to the Debtors, which has been discounted at twenty percent based on a hypothetical forced liquidation.

[4] The book value of inventory is $42,293.29 as of October 31, 2017 based on the October 2017 monthly operating report.  Liquidation Value is near zero because the Debtors' inventory is comprised of perishable food products, which would not realize value in a Chapter 7 scenario, and minimal maintenance supplies.

[5] Accounts Receivable are $741,594.57 as of October 31, 2017 based on the October 2017 monthly operating report.  The accounts receivable balance includes November 2017 billings.  The accounts receivable will continue to fluctuate until the Confirmation Hearing. The Debtors have assumed that in a Chapter 7 scenario, when the Current Resident Contracts and the PIP Contracts of Current Residents are terminated, the Current Residents' claims against the Estates for refunds of entrance fees will setoff amounts owed by the Current Residents to the Debtors.

[6] Debtors have certain deposits with utilities companies, but in the event that the Debtors ceased to operate, the deposit would be applied against outstanding invoices.

[7] Causes of Action are preserved by the Plan for the Liquidating Trustee, except as released under the Plan or by separate order of the Court.  The Debtors do not have any estimate regarding the value of the Causes of Action. However, any Causes of Action held by the Estates against the Insider Release Parties have been released under the Settlement and Release Agreement (the "**Settlement Agreement**") (*See* Doc. No. 802 Ex. A).

[8] Pursuant to the Settlement Agreement, the equity interests of Westport Nursing Tampa, L.L.C. ("**WNT**"), are being transferred to the Debtors' bankruptcy estates. The liquidation value of the WNT equity interests assumes a forced-sale scenario in a truncated time frame and is based on an estimated value of $18 million for WNT's assets, less the following assumed amounts for WNT's liabilities: approximately $14 million owed to USAmeriBank, secured by substantially all of WNT's assets; approximately $1,000,000 owed to CNH Finance Fund I, L.P.; approximately $146,000 in secured tax claims; and the $380,000 Arvon Funding escrow amount per Bankruptcy Court order (Adv. No. 8:16-ap-00802-MGW, Doc. No. 15).

[9] Estimated distributions under the Plan.

[10] Secured by substantially all of the Debtors' Assets.  Under the Plan, the allowed amount of CPIF's Secured Claim is unknown, as the Plan contemplates determination of CPIF's Allowed Secured Claim amount through either (a) the filing of an objection to claim and counterclaims against CPIF by the Official Committee of Resident Creditors or the Liquidating Trustee, or (b) mutual agreement. Under a Chapter 7 scenario, the figure shown is an estimate which includes post-petition interest at the default rate of interest through December 31, 2017 and the Debtors' estimate of attorney fees to be claimed by CPIF.

[11] USAmeriBank does not hold a secured claim against the Debtors apart from its secured claim on account of the DIP Loan.  Amounts owed by WNT to USAmeriBank will be satisfied by non-Debtor sources.

[12] Estimated amount.

[13] Under the Plan, amounts owed to the creditor will be assumed by a Buyer pursuant to an APA, so a distribution amount is not applicable.  Chapter 7 scenario assumes forced sale and/or repossession of collateral, with a 60% discount factor applied to the creditor's proof of claim amount of $12,762.56.

[14] Under the Plan, amounts owed to the creditor will be assumed by a Buyer pursuant to an APA, so a distribution amount is not applicable.  Chapter 7 scenario assumes forced sale and/or repossession of collateral, with a 60% discount factor applied to the creditor's proof of claim amount of $33,333.30.

[15] Includes claims of Keybank National Assoc. and Wells Fargo Financial Leasing, Inc. based on financing agreements assumed by a Buyer under an APA.  Under the Plan, amounts owed to the creditor will be assumed by the Buyer pursuant to the APA, so a distribution amount is not applicable.  Chapter 7 scenario assumes forced sale and/or repossession of collateral, with a 60% discount factor applied to the creditors' proofs of claim amounts of $162,074.45.

[16] Reflects the Debtors' post-petition accounts payable as of October 31, 2017 based on the October 2017 monthly operating report. This balance will continue to fluctuate until the Confirmation Hearing.

[17] Reflects the Debtors' estimated balance on the DIP Loan with USAmeriBank as of the Confirmation Hearing. Under the Plan, the amounts outstanding under the DIP Loan will be paid as an administrative/superpriority claim. In a Chapter 7 liquidation, the Debtors have assumed that USAmeriBank would first recover under its first-priority security interest on the Debtors' unencumbered Assets (which include Causes of Action), its junior security interest on the Debtors' Assets, and/or its super-priority administrative expense claim.

[18] Estimated at one quarter of U.S. Trustee fees owed at conversion.

[19] Estimated Chapter 7 trustee fees calculated pursuant to the formula in 11 U.S.C. § 326.

[20] Reflects the Debtors' best estimate based on their minimum estimate of the work required to consummate a sale to an alternative buyer under a forced-sale scenario.

[21] Reflects the Debtors' estimate of amounts owed to professionals employed by the Debtors, amounts owed to the Examiner, amounts owed to the Examiner's professionals, and amounts owed the committee professionals through the Confirmation Hearing. Such parties have not yet filed final fee applications with the Bankruptcy Court. All such amounts owed are subject to Bankruptcy Court approval.

[22] Under the Plan, Holders of Allowed Class 13 Claims will be paid in full over time, with interest. In a Chapter 7 liquidation, the Holders of Allowed Class 13 Claims would share from the liquidation proceeds remaining after payment of senior claims (the "**Liquidation Unsecured Pot**") *pro rata* with the Holders of Allowed Class 14 Claims and the Holders of rejection claims arising from Current Resident Contracts. The Liquidation Unsecured Pot is estimated at $6,736,574.46 based on the waterfall under this Liquidation Analysis.

[23] The amount of Allowed Class 13 Claims of Resident Parties, estimated for purposes of this Liquidation Analysis, may have fluctuated since such parties submitted their claims. Such adjustments will be determined through the claims resolution process.

[24] Estimated percentage distribution is based on $2,700,000.00 of Allowed Class 14 Unsecured Claims. This figure represents the Debtors' best estimate of Allowed Class 14 Unsecured Claims at a Closing. The Debtors intend to object to a number of filed claims, which will be determined by the Bankruptcy Court pursuant to 11 U.S.C. § 502. As such, the actual total amount of Allowed Class 14 Claims, and the percentage of distribution based on those claims, will fluctuate up to a Closing.

[25] *See supra* Note 23. In a Chapter 7 liquidation, the Holders of Allowed Class 14 Claims would share *pro rata* from the Liquidation Unsecured Pot.

[26] See Section 5.17 of the Plan. Allowed Class 15 Claims only receive distribution in the event all superior classes receive payment in full under the Plan.

[27] Under the Plan, the Resident Obligations are being assumed by a Buyer, or modified and/or compromised as between a Buyer and the Current Residents.  This Liquidation Analysis assumes that, in a Chapter 7 liquidation, the Resident Obligations would become Unsecured Claims for contract rejection damages and would receive a *pro rata* distribution of the Liquidation Unsecured Pot.  *See supra* Note 23.

[28] The total distribution amount under the Plan would depend upon the purchase price received in a post-confirmation sale by the Liquidating Trustee.