UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| Westport Holdings Tampa, Limited Partnership, | Case No.: 8:16-bk-08167 MGW |
| Westport Holdings Tampa II, Limited Partnership, | Case No.: 8:16-bk-08168-MGW |
| Debtors. | *Jointly Administered Under* Case No. 8:16-bk-08167-MGW |

_____________________________________/

**RESPONSE AND OBJECTION TO LIQUIDATING TRUSTEE'S MOTION TO SELL AND REQUEST FOR EVIDENTIARY HEARING**

Valley National Bank as successor to US AmeriBank, ("Valley National") hereby responds and objects to the Liquidating Trustee's Motion for Entry of An Order Authorizing (I) the Sale of the Assets of Debtors and WNT Free and Clear of all Liens, Claims, and Encumbrances, and (II) Authorizing the Assumption and Assignment of Contracts (the "Motion to Sell") (Doc. No. 1277). In support of the Objection, Valley National states as follows:

## INTRODUCTION

This proposed sale runs afoul of the Confirmed Plan and violates the Consent Order with the Florida Office of Insurance Regulation. This Court, following a three-day trial, approved the "grand bargain" in its Confirmation Order.[1] Among other things, the grand bargain provided that University Village—a continuing care retirement community—that consists of an independent living facility, an assisted living facility, and a skilled nursing facility be sold as a unified campus. To accomplish this goal, the Liquidating Trustee was ordered to engage a real estate

---

[1] Doc. No. 1016.

broker to market and sell University Village.[2] Yet no broker was ever retained. Instead, the Liquidating Trustee proposes to sell the assets of Debtors and Westport Nursing to Quality Senior Housing Foundation, an affiliate of Big Rock Partners, LLC—the antagonist to this case from the beginning. To be sure, on its face, the Motion to Sell appears to comport with the "game plan" that the property be sold as a unified campus.[3] Not so. The Asset Purchase Agreement provides that the buyer, Quality Senior Housing, in its sole discretion, has the ability to elect to exclude the Westport Nursing assets.[4] There is no closing date[5] and the buyer has not made any deposit.[6] A "no shop" provision in the Asset Purchase Agreement prevents the Liquidating Trustee from speaking to other potential buyers. Worse still, there is no actual purchase price to allow the Court to consider whether the price is fair, reasonable, and in the best interests of the creditors. Even if there were, there is no evidence of what, if any, exposure University Village had to the market without the skill and expertise of a real estate broker who specializes in entrance-fee senior housing sales. Prior to determining whether this sale under 11 § U.S.C. 363(b)(1) serves a sound business purpose, this Court should conduct an evidentiary hearing.

## BACKGROUND

1. On September 22, 2016, Westport Holdings Tampa, Limited Partnership ("Westport I") and Westport Holdings Tampa II, Limited Partnership ("Westport II")

---

[2] Doc. No. 1197.
[3] Doc. No. 1277.
[4] Doc. No. 1322, ¶ 4.1.
[5] The Florida Office of Insurance Regulation ("OIR") must approve the sale prior to Closing. The Liquidating Trustee has entered into a consent order with OIR which requires that the Liquidating Trustee sale a "unified" campus by March 31.
[6] The Liquidating Trustee has provided no information to demonstrate the buyer's financial ability to close.

(collectively the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On that same date, the Court entered an order jointly administering the cases.

2. Debtors own an Independent Living Facility, which is comprised of 446 independent living apartments and 46 independent living villas.

3. Westport Nursing ("WNT") owns a 110-bed Assisted Living Facility and 120-bed Skilled Nursing Facility. Collectively the Assisted Living Facility and the Skilled Nursing Facility are referred to as the Health Center.

4. WNT, executed and delivered a Promissory Note, in the original principal amount of $15,000,000.00 to USAmeriBank, and a Mortgage to USAmeriBank, which are now held by Valley National as a successor in interest. WNT also executed an Assignment of Leases and Rents and a Loan Agreement.

5. Valley National Bank holds a first priority security interest in the Health Center.

6. The Independent Living Facility, Skilled Nursing Facility, and Assisted Living Facility are both on the campus of what is known as University Village. University Village is a Continuing Care Retirement Community ("CCRC") authorized by a Certificate of Authority held by Westport I. Florida's Office of Insurance Regulation ("OIR") authorized the Certificate of Authority.

7. On May 10, 2018, this Court entered the Confirmation Order[7] confirming the First Amended and Restated Mediated Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code ("Confirmed Plan").[8]

8. The Confirmation Order approved the "grand bargain." The grand bargain includes: (1) the current residents' agreement to be paid over time and to modify certain resident

[7] Doc. No. 1016.
[8] Doc. No. 1012.

obligations accruing after two years after the effective date of the plan; (2) the agreement of the owners of WNT to transfer all of their membership interests in WNT to Westport I to provide for unification of the University Village campus; (3) the appointment of the Liquidating Trustee to market and sell the unified University Village campus following the effective date; and (4) the deferment of payment of the administrative expenses to professionals.[9]

9. This grand bargain allowed for the parties to effectuate the "game plan" of selling the property as a unified University Village.[10] The Court found that the game plan—the proposed sale of the *unified* University Village is achievable.[11] And the Court found that a sale of University Village is more likely to occur once the membership interests in Westport Nursing have been transferred to Westport I and that the Liquidating Trustee must be allowed to immediately market and sell the unified University Village.[12]

10. After confirmation of the Plan, the Liquidating Trustee filed his Emergency Motion for Authority to Obtain Post-Confirmation Financing.[13] The Court entered an Order Granting the Trustee's Motion to Obtain Financing ("Order Granting Motion to Obtain Financing").[14] In that Order, the Court required that the Liquidating Trustee **by no later than December 1, 2018** "shall engage a real estate broker to market and sell University Village unless a signed term sheet for the acquisition of the entire University Village campus with a bona fide and qualified entity has been executed and presented to this Court for approval."[15] The Order further provided that the broker shall be agreed to by the Liquidating Trustee and Valley

[9] Doc. No. 1016, p. 3.
[10] Doc. No. 1016, p. 5.
[11] Doc. No. 1016, p. 5.
[12] Doc. No. 1016, p. 5.
[13] Doc. No. 1171.
[14] Doc. No. 1197.
[15] Doc. No. 1197, p. 9.

National, among others, provided that Valley National enter into a forbearance agreement.[16] In the event no forbearance agreement was entered into, the Liquidating Trustee shall select a broker, subject to the Court's approval, and Valley National and any party in interest shall have standing to object to such engagement.[17] The Order also provided that Valley National would be provided with "full access to the broker during the sale process," "provided with regular updates," and that Valley National would "receive regular monthly updates on the performance of University Village."[18]

11. The Liquidating Trustee entered into a Consent Order with OIR that, among other things, authorized the Liquidating Trustee to operate and manage the Debtors under the Confirmation Order pending a sale of the re-unified University Village. The Consent Order had an effective date of May 30, 2018. The Consent Order further provided that in the event, OIR had not approved the acquisition of Debtors or their assets and issued a new Certificate of Authority by December 31, 2018, then Westport I would consent to the dismissal of the bankruptcy case and consent to a receivership by the OIR. The Liquidating Trustee and OIR entered into an Amended Consent Order that extended the deadline to March 31, 2019.[19]

12. The Liquidating Trustee's Motion to Sell[20] seeks entry of an order authorizing the sale of substantially all of the Debtors' assets in connection with the sale of the re-unified University Village including the following assets owned by WNT: the Assisted Living Facility,

---

[16] Doc. No. 1197, p. 9.
[17] Doc. No. 1197, p. 9.
[18] Doc. No. 1197, p. 10.
[19] Doc. No. 1274.
[20] Doc. No. 1277.

the Skilled Nursing Facility, otherwise referred to as the Health Center. These are defined as the "WNT Purchased Assets." [21]

13. The Purchased Assets will be sold free and clear of all liens, claims, and encumbrances pursuant to Section 363(f) of the Bankruptcy Code (the "Sale"), with any liens, claims, or encumbrances to attach to the proceeds of the Sale to the same extent, validity, and priority as existed prior to the Closing.

14. The Letter of Intent/ Proposed Asset Acquisition of University Village ("Letter of Intent") between the Liquidating Trustee and Quality Senior Housing provides for a "purchase price" for the WNT Purchased Assets of an undefined amount of cash consideration sufficient to pay the liabilities or obligations of WNT at closing.[22]

15. The Asset Purchase Agreement[23] provides for the sale of the "WNT Purchased Assets" and states the "purchase price" of WNT as follows:

> (b)At the Closing, provided that the WNT Closing occurs, the Buyer shall pay to WNT total consideration (the "<u>WNT Total Consideration</u>") consisting of the assumption of WNT's Assumed Liabilities and the payment of an amount of cash (the "<u>WNT Cash Purchase Price</u>") sufficient to pay the following liabilities or obligations of WNT (collectively, the "<u>WNT</u> <u>Secured Claims</u>") at the Closing:
>
> (i) the amount necessary to satisfy in full and/or remove the mortgage lien and any other Lien held or asserted by Valley National Bank, as successor in interest to USAmeriBank against the WNT Purchased Assets pursuant to the Valley National Secured Claim;

---

[21] While the Liquidating Trustee may have the authority, as the holder of the ownership interests in WNT, to sell the WNT Purchased Assets, such a sale cannot be conducted under 11 U.S.C. § 363. Westport Nursing Tampa ("WNT") is not a debtor.

[22] Doc. No. 1277-1, p. 5.

[23] Doc. No. 1322.

> (ii) the amount necessary to satisfy in full all real property and tangible personal property taxes that constitute Liens against the WNT Purchased Assets;[24]

16. The Asset Purchase Agreement further provides that the closing on the WNT Purchased Assets does not even need to occur at all. It states as follows:

> Notwithstanding the above, the Buyer, in its sole discretion, may **elect to exclude** the WNT Purchased Assets and all Liabilities arising from or related to the Transferred WNT Contracts from the Transactions if an agreement to remove all Liens related to the WNT Purchased Assets is not reached to the satisfaction of the Buyer. In such event, the Closing shall occur without the occurrence of the WNT Closing, and the Purchase Price shall be reduced to exclude the WNT Total Consideration, and all provisions herein related to the WNT Closing shall be modified accordingly.[25]

17. Thus, contrary to the Confirmed Plan, any provision in the Asset Purchase Agreement that Buyers acquire WNT assets, is at best, illusory.

## STANDING

18. Valley National has been involved in this case since its inception. As a first-position secured creditor of WNT, Valley National is a party in interest to the proposed sale.[26] Bankruptcy Code § 1109(b) provides for a non-exhaustive list of parties who may appear and have the right to be heard. Should the Court approve the Liquidating Trustee's Motion to Sell, Valley National would be a "person aggrieved" as a party that has a "direct and substantial interest" that would be affected peculiarly because of the order.[27] Courts have widely agreed that

---

[24] Doc. No. 1322, p. 24.
[25] Doc. No. 1322, p. 25, ¶ 4.1.
[26] 11 U.S.C. 1109(b).
[27] *In re Westwood Cmty. Two Ass'n, Inc.*, 293 F.3d 1332, 1337–38 (11th Cir. 2002) ("[W]e hold that a person may appeal a bankruptcy court's order as a person aggrieved when that order directly, adversely, and pecuniarily affects the person.") (internal citation omitted).

the person aggrieved doctrine permits standing to appeal a bankruptcy court order to those individuals who have a financial stake in the order being appealed.[28]

19. Valley National has a direct financial stake in the sale of WNT, or in this case the failure to sell WNT, as the Asset Purchase Agreement appears to do. Valley National is no stranger to these bankruptcy cases. As the Court has previously recognized, specifically with respect to the Debtors' efforts to enjoin Valley National's state court foreclosure action against WNT (as well as other court proceedings), the Independent Living and the Health Center and inextricably intertwined bound by an economic nexus.[29]

## OBJECTION

### A. The Motion to Sell is barred by the doctrine of *res judicata* and an improper modification of confirmed plan.

20. The Liquidating Trustee must follow the terms of the Confirmed Plan and sell University Village as a unified campus (i.e., the property of both Debtors and WNT). Under Bankruptcy Code § 363(f), a trustee may sell property free and clear of any lien, claim or interest in such property, if, among other things: (1) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which the property is sold is greater than all liens on such property; (4) such interest is in a bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such interest.

21. Section 363(b)(1) of the Bankruptcy Code states that "[t]he trustee, after notice and a hearing, may use, sell, lease, other than in the ordinary course of business, property of the estate."

---

[28] *In re Westwood Cmty. Two Ass'n, Inc.*, 293 F.3d at 1335.

[29] Adv. Case No. 8:16-ap-802-MGW.

22. Under § 363(b)(1) of the Bankruptcy Code, for a trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for the sale. [30] In other words, the Court in considering whether to approve a sale should apply the business judgement test.[31]

23. Courts have considered whether: (1) there is any improper or bad faith motive, (2) price is fair and the negotiations or bidding occurred at arm's length, (3) there has been an adequate procedure, including proper exposure to the market and accurate and reasonable notice to all parties in interest.[32] A § 363 sale should be closely scrutinized by the bankruptcy court.[33]

24. Here, the Quality Nursing has no obligation to close on the WNT Assets. The Confirmation Order provided that the "game plan" was to sell the University Village as a unified campus. Despite this requirement in the Confirmation Order, the Liquidating Trustee is pursuing an Asset Purchase Agreement that allows for Qualified Nursing, in its sole discretion, to choose to *exclude* the WNT Assets.

25. This is evident from the conditional language discussing the closing of the WNT Purchased Assets, such as "in the event the WNT closing occurs"[34] or "provided that the WNT Closing occurs."[35] Read together, there does not appear to be a good faith sale of a unified campus. While it is true that under the Asset Purchase Agreement, the Buyer *may* purchase the WNT Purchased Assets, there is no real obligation under the Agreement to do so. The

[30] *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).
[31] *In re BDK Health Management*, 1998 WL 34188241, *5 (Bankr. M.D. Fla. 1998).
[32] *In re Gulf States Steel Inc. of Alabama*, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002).
[33] *See, e.g., Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 14 C.B.C.2d 1298 (6th Cir. 1986); *In re Abbotts Dairies*, 788 F.2d 143, 150, 14 C.B.C.2d 811, 819 (3d Cir. 1986) (section 363(b)(1) "mirrors the requirement of section 1129 that the bankruptcy court independently scrutinize the debtor's reorganization plan").
[34] Doc. No. 1322, p. 27.
[35] Doc. No. 1322, p. 23.

Confirmation Order requires the sale of a unified campus. To the extent the Liquidating Trustee is attempting to circumvent the Confirmed Plan and not sell University Village as a unified campus, this action is barred by the express provisions of the Confirmation Order, the Confirmed Plan, and the doctrine of *res judicata*.

26. Under Bankruptcy Code § 1141(a), the provisions of a confirmed plan are binding. "[O]nce a Chapter 11 plan is confirmed, 'it is not only binding upon the Debtor but all claimants dealt with under the plan.'"[36] A confirmed plan is a final order that is binding on all parties, and *res judicata* precludes collateral attacks on confirmation orders.[37]

27. This Confirmation Order was already determined to be final order with *res judicata* effect on appeal.[38] An appeal was taken of this Court's order granting the Liquidating Trustee's Motion to Compel two of the three holders of the WNT Membership Interests to execute a transfer and assignment of the WNT Membership Interests. [39] District Judge Moody found that because the Confirmation Order provided that following the Effective Date the members of WNT were directed to transfer all membership interests to Westport I, and the members of WNT failed to seek modification of the Confirmation Order the Confirmation Order "is a final order with res judicata effect."[40] Because the Liquidating Trustee has not filed a motion to modify the Confirmation Order, the Confirmation Order is final and binding upon the Liquidating Trustee.

---

[36] *In re Taylor*, 379 B.R. 388, 396 (Bankr. M.D. Fla. 2007) (quoting *In re Turner*, 221 B.R. 920, 924 (Bankr. M.D. Fla. 1998)).
[37] *In re Harloff*, 247 B.R. 523, 527 (Bankr. M.D. Fla. 2000) (citing *Israel Discount Bank Ltd. v. Entin*, 951 F.2d 311, 314 (11th Cir. 1992)), *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1550 (11th Cir. 1990).
[38] Case No. 8:18-cv-01439-JSM, Doc. No. 40, p. 10.
[39] Doc. No. 1035.
[40] Case No. 8:18-cv-01439-JSM, Doc. No. 40, p. 10.

28. Moreover, to the extent the Liquidating Trustee seeks to modify the Confirmed Plan, the time has passed for him to do so. Under § 1127, a plan may be modified at "any time after confirmation of such plan and before substantial consummation of such plan." A plan is substantially consummated when a debtor, or in this case the Liquidating Trustee, "has transferred all or substantially all of the property to be transferred under the plan; assumed the business or management of all or substantially all of the property dealt with under the plan; and started making distributions under the plan."[41] The Effective Date of the Confirmed Plan was May 10, 2018.[42] The plan became substantially consummated when the members of WNT transferred their interests to the Liquidating Trustee and the Liquidating Trustee assumed the management of University Village.

29. In fact, on appeal to the United States District Court for the Middle District of Florida, the Liquidating Trustee argued himself that the Confirmed Plan has been substantially consummated.[43] "Because the transfer of the WNT Membership Interests has been substantially consummated in accordance with the Modified Plan, the Confirmation Order, and the Transfer Order. . ." Therefore, the Liquidating Trustee is judicially estopped from taking an inconsistent position in this Court.[44]

---

[41] *In re Scrub Island Dev. Grp. Ltd.*, 523 B.R. 862, 878 (Bankr. M.D. Fla. 2015) (citing *Ala. Dep't of Economic & Community Affairs v. Ball Healthcare–Dallas, LLC (In re Lett)*, 632 F.3d 1216, 1225 (11th Cir.2011)).
[42] Doc. No. 1017.
[43] Case No. 8:18-cv-01439-JSM, Doc. No. 11, p. 17.
[44] *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (finding that the equitable doctrine of judicial estoppel is intended to "prevent the perversion of the judicial process" and protect the judicial process by prohibiting parties from taking inconsistent positions).

**B. The Liquidating Trustee was required to retain a broker to properly market the CCRC but failed to do so.**

30. The Liquidating Trustee seeks authority to sell the Debtors to Quality Senior Housing without hiring a broker, as required by this Court, and without establishing that the proposed sale is the highest and best offer for the Debtors.

31. The Order Granting Motion to Obtain Financing specifically directed the Liquidating Trustee to retain a broker no later than December 1, 2018 unless a signed term sheet for the acquisition of the entire University Village campus with a bona fide and qualified entity has been executed and presented to this Court for approval.[45] Even so, the Liquidating Trustee did not retain a broker. Nor did he request permission from this Court to extend the time provided in the Order. The Letter of Intent from Quality Senior Housing is dated after the December 1, 2018 deadline. Valley National is deprived of the rights afforded to it in the Order by virtue of the Liquidating Trustee's failure to retain a broker such as standing to object to the engagement, full access to the broker during the sale's process, and regular updates.

32. In his deposition, the Liquidating Trustee testified that he did not hire a broker to sell University Village.[46]

33. Furthermore, the Liquidating Trustee was required to deliver to Valley National a proposed forbearance agreement no later than November 9, 2018. No such forbearance agreement was ever delivered to Valley National for consideration.

**C. The proposed sale fails to meet the Business Purpose Test.**

34. The Court cannot approve the sale and make a determination that the price is fair without a defined Purchase Price. On its face, the Asset Purchase Agreement appears to commit

---

[45] Doc. No. 1197, p. 9.
[46] Dep. p. 9, ¶ 6-8.

Quality Senior Housing to pay an amount to fund all distributions under the Plan.[47] However, the Liquidating Trustee, in his deposition[48] and in his Declaration in support of the sale,[49] has admitted that the purchase price will be less than that amount. Quality Senior Housing expects parties to compromise their claims. Paragraph 25 of the Declaration states in relevant part: "in light of the competing parties seeking to make recoveries from the closing of a sale, I deemed it reasonable to expect that all of the interested parties would share a common interest in resolving their differences by compromising amounts of claims rather than continuing to receive nothing."[50]

35. The Motion to Sell lacks sufficient disclosures to enable Valley National to make a determination as to the fairness and reasonableness of the proposed Purchase Price. The Motion to Sell does not provide an allocation of the Purchase Price among the various assets being purchased, making it impossible for Valley National to make a determination as to whether the Purchase Price is fair and reasonable as it applies to the individual real property assets, and in particular the Skilled Nursing Facility and the Independent Living Facility. Thus, Valley National requests that the Liquidating Trustee provide further disclosures setting forth the allocations of the Purchase Price to the individual assets being sold, and in particular, Skilled Nursing Facility and the Independent Living Facility.

36. More importantly, without market-testing the properties and without specific Purchase Price in place, it is impossible to assess the proposed sale to Quality Senior Housing or secure the highest and best offer for the assets being sold. Because the Liquidating Trustee has not shown that the purchase price proposed by Quality Senior Housing is adequate and made in

---

[47] Doc. No. 1322, ¶ 3.1.
[48] Dep. p. 82, ¶ 7–14.
[49] Doc. No. 1326, ¶ 25.
[50] Doc. No. 1326, ¶ 25.

good faith, the proposed sale fails to meet the business purpose test and should not be approved.[51] At the very least, consideration of the Motion to Sell should follow an evidentiary hearing to determine what efforts, if any, the Liquidating Trustee made to market the property. Moreover, the Liquidating Trustee must convince the Court that the quality of information given to prospective buyers was adequate, particularly in light of the troubled nature of this particular property.

37. The Court in making its determination of University Village's adequate exposure to the market, should consider the following: no broker or investment has ever been retained to attempt to sell the properties; no offering memorandum promoting the sale of the properties has ever been prepared or disseminated to potential buyers; and the "data room" which has been made available to potential purchasers, contains stale and inadequate information contains no information or materials prepared or gathered by a broker or investment banker in an effort to meet the due diligence needs of inquiring parties.

38. It is important to note that the Liquidating Trustee and Quality Senior Housing's agreement has a confidentiality provision otherwise referred to as a "no shop" provision.[52] So in the event a prospective buyer wants to inquire about purchasing University Village, the Liquidating Trustee could only refer them to the restructuring consultant, CR3, with the consent of Quality Housing.[53] The Liquidating Trustee estimates that the closing will realistically be

[51] *See In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220-21 (Bankr. N.D. Ohio 1994) (finding that proposed sale should not be authorized because there was no effort by the debtor to solicit other offers and thus the adequate price and good faith elements of the sound business purpose test were not met); *see also In re Embrace Systems Corp.*, 178 B.R. 112, 123 (Bankr. W. D. Mich. 1995) (section 363 sale could not be approved when there was no showing that the marketing of the assets has been diligent or sufficient and thus the debtor has failed to demonstrate that the purchase price is the highest and best offer).

[52] Dep. p. 55, ¶ 11-13.

[53] Dep. p. 55, ¶ 14-18.

somewhere around June 1.[54] This means that if this Court approves the sale agreement to Quality Senior Housing, it will have "exclusivity"[55] to purchase the property until at least May 1, 2019, which is the outside closing date.[56]

39. In addition, OIR approval is a condition of closing.[57] The Consent Order and the Amended Consent Order entered into by the Liquidating Trustee and OIR requires the sale of a unified campus.[58] Further, the Liquidating Trustee has no indication from OIR that it changed its position on requiring the sale of a unified campus.[59]

40. To the extent the Liquidating Trustee would argue that the still-pending license revocation proceeding before the Florida Second District Court of Appeal mandates either excuse or departure from the Confirmed Plan or the Consent Order, § 429.04(2)(h), Florida Statutes, provides that the Assisted Living Facility does not require an independent license. That section reads, in pertinent part:

> (2) The following are exempt from licensure under this part:
> . . .
> (h) Any residential unit for independent living which is located within a facility certified under chapter 651, or any residential unit which is colocated with a nursing home licensed under part II of chapter 400 or colocated with a facility licensed under this part in which services are provided through an outpatient clinic or a nursing home on an outpatient basis.[60]

41. Because the Assisted Living Facility is "co-located" within the unified CCRC campus, it is therefore exempt from any independent license requirement. Arguably, if the Liquidating Trustee severs the CCRC through the proposed sale it is that act that would result in license revocation rather than the pending Second District Court of Appeal proceeding.

---

[54] Dep. p. 22, ¶ 13-20.
[55] Dep. p. 83, ¶ 14-21.
[56] Doc. No. 1322, p. 55, ¶ 10.1(b).
[57] Dep. p. 23, ¶ 2-5.
[58] Dep. p. 42, ¶ 10-12.
[59] Dep. p. 42 ¶ 18-19.
[60] Fla. Stat. § 429.04.

**D. An evidentiary hearing on the Motion to Sell is required to resolve disputed or unknown facts surrounding the sale of the CCRC.**

42. Without more, the Court cannot determine what exposure University Village had to the market without the skill and expertise of a real estate broker who is specializes in entrance-fee senior housing sales. A broker in the arena of senior housing sales, with a specific emphasis on the sale of CCRC's, should be permitted to access the data room and opine as the proposed sale and the marketing techniques employed to advertise University Village.

43. The residents of University Village are not collectively represented by counsel. As such, the primary means of receiving communications regarding the proposed sale of University Village is through the Liquidating Trustee. It is unclear what information the residents have received in connection with the proposed sale of University Village. In particular, it is unclear whether the residents have collectively and expressly been advised that the Liquidating Trustee is not requiring the buyer to purchase the Independent Living Facility, the Skilled Nursing Facility, and the Assisted Living Facility. At an evidentiary hearing, the residents will be able to make informed objections to the sale.

44. An evidentiary hearing (and further discovery) is necessary: (a) to determine the financial ability of the purchase to close; and (b) to further develop issues relating to the licensing approvals for the skilled nursing facility and the assisted living facility.

WHEREFORE, Valley National Bank, as successor to UsAmeriBank, respectfully requests that the Court enter an order (a) denying the sale of the Purchased Assets free and clear of all liens, claims, and encumbrances, or in the alternative, (b) set this matter for an evidentiary hearing to resolve the issues raised herein, and (c) for such other and further relief as the Court deems just and proper.

*/s/ Edmund Whitson, III*
Edmund Whitson, III, Esq.
Florida Bar No. 0897272
Dana L. Robbins, Esq.
Florida Bar No. 106626
**BURR & FORMAN, LLP**
201 North Franklin Street, Suite 3200
Tampa, Florida 33602
Phone: (813) 221-2626
Facsimile: (813) 221-7335
Primary E-mail Address: ewhitson@burr.com
Secondary E-mail Address: drobbins@burr.com
*Attorneys for Valley National Bank*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of Court by using the Court's CM/ECF electronic mail system, which will send an Electronic Mail notification to counsel of record on this 5th day of February, 2019.

*s/ Dana L. Robbins*

Attorney