ORDERED.

Dated:  May 20, 2020

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

Westport Holdings Tampa,
Limited Partnership

Westport Holdings Tampa II,
Limited Partnership,

Debtors.

_____/

Chapter 11

Case No. 8:16-bk-08167-MGW
(Lead Case)

Case No. 8:16-bk-08168-MGW

*Jointly Administered under
Case No. 8:16-bk-08167-MGW*

## MEMORANDUM OPINION ON
## <u>CALCULATION OF RESERVE</u>

American cartoonist Rube Goldberg was famous for "depicting complicated

gadgets performing simple tasks in indirect, convoluted ways."[1] In this case, the

Court is asked to assume that the drafters of a confirmed plan took a Goldbergian

---

[1] "Reuben Garrett Lucius Goldberg, known best as Rube Goldberg, was an American cartoonist, sculptor, author, engineer, and inventor . . . . best known for his popular cartoons depicting complicated gadgets performing simple tasks in indirect, convoluted ways." https://en.wikipedia.org/wiki/Rube_Goldberg.

approach to drafting a plan provision that instructs a liquidating trustee how to fund a reserve account.[2]

Under the confirmed plan in this case, the Liquidating Trustee was required to market and sell the Debtors' independent living facility and then use the sales proceeds to first fund a reserve for the benefit of CPIF Lending, which has a lien on the independent living facility. Section 5.04(a)(2) of the plan provides that the amount of the reserve is $12.9 million "*less any outstanding real estate and personal property tax claims secured by the Independent Living Facility as of the Effective Date*" of confirmation, which was May 10, 2018.

The Liquidating Trustee contends § 5.04(a)(2) was intended to authorize him to deduct from the sales proceeds *all* the property taxes for 2018. CPIF Lending, however, contends that § 5.04(a)(2) was intended to prohibit the Liquidating Trustee from deducting *any* property taxes. The Court rejects both parties' interpretations of § 5.04(a)(2).

Had the drafters of the plan intended for the Liquidating Trustee to deduct either all the property taxes or none of them, they would not have used such unnatural and convoluted language to achieve such a simple outcome. And this Court will not apply such a strained and unnatural construction to a plan provision, particularly when doing so would render language in the plan provision meaningless.

---

[2] Derived from Rube Goldberg, the term "Goldbergian" means "grotesquely complex: contrived with inept and excessive intricacy." Goldbergian, *available at* https://www.merriam-webster.com/dictionary/Goldbergian.

The only natural reading of § 5.04(a)(2)—one that gives meaning to all the provision's terms—is that the Liquidating Trustee is authorized to deduct from the $12.9 million reserve the property taxes that had accrued on a per diem basis as of the plan's effective date.

## I. BACKGROUND

The Debtors operate a continuing care retirement community known as University Village, which consists of an independent living facility and a health center.[3] Under the confirmed plan in this case, a Liquidating Trustee was appointed to market and sell University Village.[4] The Liquidating Trustee has found a buyer, though only for the independent living facility, which is secured by a first mortgage in favor of CPIF Lending.[5]

CPIF Lending previously filed a secured claim in the amount of $9.8 million, plus postpetition interest and attorney's fees.[6] At confirmation, the Court determined that the independent living facility was worth $12.9 million. So the maximum value of CPIF Lending's secured claim is $12.9 million. CPIF Lending's claim, however, is disputed.[7]

---

[3] Doc. No. 839 at 5 – 6.

[4] Doc. No. 1012 at § 8.01.

[5] Doc. No. 1625.

[6] Claim No. 22-1.

[7] The Liquidating Trustee is currently prosecuting various claims against CPIF Lending for money damages, as well as an objection to CPIF Lending's Claim No. 22-1. *Jeffrey W. Warren, as Liquidating Trustee v. CPIF Lending, LLC*, Adv. No. 8:18-ap-00102-MGW, Adv. Doc. No. 93.

Therefore, before the Liquidating Trustee can use the proceeds from the sale of the independent living facility to pay creditors other than CPIF Lending, the confirmed plan requires him to first fund a reserve equal to $12.9 less certain property taxes:

> [B]efore the Liquidating Trustee can use the Cash Sale Proceeds to pay any Allowed Claims junior to [CPIF Lending's secured claim], *the Liquidating Trustee shall first establish a reserve of the Cash Sale Proceeds in favor of CPIF equal to the amount of $12,900,000.00 less any outstanding real estate and personal property tax claims secured by the Independent Living Facility as of the Effective Date.*[8]

With the closing of the sale looming on the horizon, the Liquidating Trustee and CPIF Lending cannot agree on how to calculate the reserve.[9] According to the Liquidating Trustee, he is required to deduct all property taxes for 2018 from the $12.9 million reserve.[10] The Liquidating Trustee points out that under Florida law, all property taxes are secured by a first lien that goes into effect on January 1 of the year the taxes are assessed.[11] Because the effective date of confirmation was not until May 10, 2018, five months after the property tax lien went into effect, the Liquidating Trustee reasons that the property taxes were secured by a lien on the independent

---

[8] Doc. No. 1012 at § 5.04(a)(2) (emphasis added).

[9] Doc. Nos. 1684 & 1685.

[10] Doc. No. 1684 at ¶ 2.

[11] *Id.* at ¶¶ 3 – 4.

living facility as of the effective date of confirmation and therefore should be deducted from the reserve.[12]

CPIF Lending doesn't dispute that a lien goes into effect on January 1. But it basically takes the position that the date the lien goes into effect is irrelevant because, under the plain language of the confirmation order, the lien must secure "outstanding" property taxes.[13] And, as CPIF Lending points out, property taxes are not due and payable until November 1.[14] Thus, although there may have been a lien that existed as of May 10, 2018, there were no property taxes for the lien to secure until November 1, 2018—the date the taxes first became due and payable.[15]

## II. CONCLUSIONS OF LAW

This case comes down to a matter of plan interpretation: The Court must determine what the drafters of the plan meant when they said, in § 5.04(a)(2) of the confirmed plan, that the Liquidating Trustee could exclude from the $12.9 million reserve "any outstanding real estate and personal property tax claims secured by the Independent Living Facility as of the Effective Date."

---

[12] *Id.* at ¶ 4.

[13] Doc. No. 1685 at 1 – 2.

[14] *Id.* (citing § 197.333, Fla. Stat.).

[15] *Id.*

Although a confirmed plan is a judgment rendered by a federal court,[16] the chapter 11 plan itself is essentially a contract between a debtor and the creditors of the bankruptcy estate.[17] For that reason, the Eleventh Circuit follows principles of contract interpretation when interpreting a confirmed plan of reorganization.[18]

Interpretation of a contract under Florida law is governed by the parties' intent.[19] The best evidence of the parties' intent is the contract itself.[20] Thus, absent some ambiguity, the intent of the parties must be ascertained from the words used in the contract.[21]

---

[16] *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004).

[17] *In re Sunnyland Farms, Inc.*, 2016 WL 1212723, at *3 (Bankr. D.N.M. Mar. 28, 2016) (explaining that a "Chapter 11 bankruptcy plan is essentially a contract between the debtor and his creditors"); *In re W. Integrated Networks, LLC*, 322 B.R. 156, 160-61 (Bankr. D. Colo. 2005) ("A chapter 11 plan is a contract between a debtor and the creditors of the bankruptcy estate.).

[18] *In re FFS Data, Inc.*, 776 F.3d 1299 (11th Cir. 2015) ("The Court follows principles of contract interpretation to interpret a confirmed plan of reorganization."); *see also In re Stratford of Texas, Inc.*, 635 F.2d 365, 368 (5th Cir. 1981) (explaining that although a confirmed Chapter XI plan under the Bankruptcy Act of 1898 was "tantamount to a judgment of a bankruptcy court," the "arrangement represents a kind of consent decree which has many attributes of a contract and should be construed basically as a contract").

[19] *L&H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. 5th DCA 2011) ("It is well-established that the parties' intent governs contract construction and interpretation.").

[20] *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996) (explaining that courts should interpret a contract according to its plain meaning "because the terms of a contract provide the best evidence of the parties' intent").

[21] *WSC-L Lakeside Investors V, LLC v. Pulte Homes Corp.*, 2010 WL 1688008, at *3 (M.D. Fla. Apr. 22, 2010) ("Absent some ambiguity, the intent of the parties to a written contract must be ascertained from the words used in the contract, without resort to extrinsic evidence.") (citing *Wheeler v. Wheeler, Erwin & Fountain, P.A.*, 964 So. 2d 745, 749 (Fla. 1st DCA 2007)).

But, when a contract is ambiguous, courts may look to well-established rules of contract interpretation to give meaning to the contract.[22] Under Florida law, a contract is ambiguous "if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Here, § 5.04(a)(2) is susceptible of more than one meaning.

On the one hand, § 5.04(a)(2) could reasonably be read to authorize the Liquidating Trustee to deduct from the $12.9 million reserve all the taxes for 2018 because a lien securing the payment of those taxes arose on January 1—five months before the effective date of confirmation. On the other hand, because the taxes ordinarily are not due until November 1, the taxes secured by the lien arguably were not "outstanding" as of the effective date, in which case the Liquidating Trustee would not be authorized to deduct any property taxes for 2018.[23]

Because § 5.04(a)(2) is susceptible to more than one meaning, it is ambiguous, which means the Court must look to well-established rules of contractual

---

[22] 11 Fla. Jur. 2d *Contracts* § 139 (2020) ("Thus, if the language of a contract is clear and unambiguous, it does not call for judicial interpretation, but where the agreement is badly drafted or contains language that is ambiguous, uncertain, and susceptible of more than one construction, a court may, under the well-established rules of construction, interfere to reach a proper construction and make certain that which in itself is uncertain.")

[23] This interpretation requires outstanding to mean "due and payable." Courts are required to give the words in a contract their natural, ordinary meaning. *United States ex rel. v. FEDCON Joint Venture*, 2019 WL 5295329, at *12 (M.D. Fla. Oct. 18, 2019). To determine a word's natural, ordinary meaning, courts general look to the dictionary. *Id.* According to Merriam-Webster dictionary, outstanding means "unpaid." https://www.merriam-webster.com/dictionary/outstanding. Although Merriam-Webster doesn't define "outstanding" as meaning due and payable, "owed" and "payable" are listed as synonyms. So, while the Court is not convinced the taxes are not "outstanding" until November 1, CPIF Lending's interpretation is still a reasonable one.

7

interpretation to determine the parties' intent. One of those well-established rules is that courts are discouraged from applying a "strained and unnatural construction" to a contract.[24]

Although it may not be obvious at first glance, both the Liquidating Trustee and CPIF Lending are asking the Court to apply a strained and unnatural construction to the contract. To see how, let's start with the result of the construction that each party advocates for.

The Liquidating Trustee contends that § 5.04(a)(2) authorizes him to deduct *all* the 2018 property taxes from the $12.9 million reserve, while CPIF Lending says the Liquidating Trustee is not authorized to deduct *any* property taxes.[25] In fact, even though § 5.04(a)(2) appears to peg the amount of property taxes to be deducted to the plan's effective date, the outcome under the parties' competing interpretations is binary: Either all the taxes are deducted or none of them are.

It's hard to envision a more roundabout—and unnatural—way to say that the Liquidating Trustee should either deduct all or none of the 2018 property taxes than by using the phrase "*less any outstanding real estate and personal property tax claims*

---

[24] *Tampa Elec. Co. v. Travelers Indem. Co. of Am.*, 2017 WL 3911562, at *4 (M.D. Fla. 2017) ("The Court simply notes that 'damages resulting from . . . for statutory violation' arguably is an unnatural reading of the provision, and, as a general rule, courts are discouraged from applying a 'strained and unnatural construction' to a contract.") (quoting *Health Options, Inc. v. Kabeller*, 932 So. 2d 416, 420 (Fla. 2d DCA 2006)).

[25] To be fair, CPIF Lending acknowledges that the result of the construction it advocates for would be excessive and unfair. Doc. No. 1685 at 3 n.2. So, as a compromise, CPIF Lending asks the Court to direct the Liquidating Trustee to deduct only those taxes that had accrued on a per diem basis as of the May 10, 2018 effective date. As explained below, the Court is convinced this is the outcome the plan drafters intended all along.

*secured by the Independent Living Facility as of the Effective Date.*" It is unlikely that the highly skilled lawyers who drafted the plan in this case took a Goldbergian approach to contract drafting and crafted such complicated language to achieve such a simple result.

If the parties had intended the Liquidating Trustee to deduct all the 2018 taxes, wouldn't it have been more natural for the parties' lawyers to say that the Liquidating Trustee shall establish a reserve equal to $12.9 million *less the 2018 property taxes*? Or, if the parties intended for the Liquidating Trustee to deduct none of the taxes, wouldn't it have been more natural to omit any reference to deducting property taxes: "The Trustee shall establish a $12.9 million reserve."

Surely the plan drafters intended the reference to the confirmed plan's effective date to have some meaning. Indeed, it is a cardinal rule of contractual interpretation that courts must interpret a contract in a way that gives meaning to all a contract's terms.[26] Yet, under the parties' competing interpretations here, the reference to the confirmed plan's effective date is essentially rendered meaningless.

There is, however, a natural reading of § 5.04(a)(2) that gives meaning to the provision's reference to the plan's effective date: The parties intended that the

---

[26] *SRQ Taxi Mgmt., LLC v. Sarasota Manatee Airport Auth.,* ___ B.R. ___, 2020 WL 1158469 (Bankr. M.D. Fla. Mar. 10, 2020) ("When interpreting a contract, the Court must do so in a way that gives meaning to *all* the contract's provisions.") (citing *BVS Acquisition Co. v. Brown,* 649 F. App'x 651, 652 (11th Cir. 2016)).

Liquidating Trustee should deduct from the $12.9 million reserve the amount of 2018 property taxes that had accrued on a per diem basis through the effective date.

Under this interpretation, the reference to the effective date determines the amount of property taxes the Liquidating Trustee can deduct. This interpretation also gives meaning to the other terms in § 5.04(a)(2): Taxes that have accrued as of the plan's effective date are outstanding (i.e., unpaid) and secured by the independent living facility should be deducted.

To be sure, property taxes technically don't accrue on a per diem basis under Florida law. But the Court is not convinced that the plan drafters had in mind the intricacies of Florida property tax law when drafting § 5.04(a)(2). There certainly is no reason to think the drafters used knowledge of the intricacies of Florida property tax law to devise a legal version of a Rube Goldberg machine.

## III. CONCLUSION

Ultimately, this Court is charged with determining what the drafters of the plan intended when they said that the Liquidating Trustee could exclude from the $12.9 million reserve "any outstanding real estate and personal property tax claims secured by the Independent Living Facility as of the Effective Date." The answer lies in the reference to the plan's effective date.

Only one reading—indeed the most natural one—gives meaning to the reference to the plan's effective date: The parties intended that the Liquidating Trustee should deduct from the $12.9 million reserve the amount of 2018 property taxes that had accrued on a per diem basis through the effective date. Accordingly,

the Court will enter a separate order directing the Liquidating Trustee to use the

proceeds from the sale of the independent living facility to fund a reserve in the

amount of $12.9 million less any property taxes that accrued on a per diem basis

from January 1, 2018 through May 10, 2018.

---

Attorney Mark A. Salzberg is directed to serve a copy of this Memorandum Opinion on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry of this Memorandum Opinion.

---

**Mark A. Salzberg, Esq.**
**Squire Patton Boggs (US) LLP**
 *Counsel for CPIF Lending, LLC*

**Adam Lawton Alpert, Esq.**
**Bush Ross, P.A.**
 *Counsel for Jeffrey W. Warren, as Liquidating Trustee for Westport Holdings Tampa,*
 *Limited Partnership and Westport Holdings Tampa II, Limited Partnership*